Filed 2/6/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S055652 |
| v. | ) | |
| | ) | |
| FREDDIE FUIAVA, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA115681 |
| _____ | ) | |

After a jury trial, defendant Freddie Fuiava was convicted of the first degree murder of Los Angeles County Deputy Sheriff Stephen Blair (Pen. Code, § 187, subd. (a)),[1] and the premeditated attempted murder of Blair's partner, Deputy Robert Lyons (§§ 664, subds. (a) & (e), 187, subd. (a)). The jury found true the two special circumstance allegations that the murder of Deputy Blair was committed for the purpose of avoiding and preventing a lawful arrest (§ 190.2, subd. (a)(5)), and that Blair was a peace officer engaged in the performance of his duties when defendant knowingly and intentionally killed him (§ 190.2, subd. (a)(7)). Additionally, the jury found true the allegations that defendant personally used a firearm in the murder and attempted murder (§ 12022.5, subd. (a)), previously had been convicted of a serious felony (§ 667, subd. (a)(1)), and had served two prior prison terms (§ 667.5, subd. (b)). The jury

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

returned a verdict of death for the murder of Deputy Blair. The trial court denied defendant's motion for new trial and the automatic application to modify the verdict (§ 190.4, subd. (e)), and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt Phase

There was no dispute at trial that defendant shot and killed Deputy Blair. The evidence concerning the circumstances of the shooting, however, was conflicting. The prosecution's theory of the case was that defendant, a convicted felon who was carrying two handguns in violation of the law (see § 12021, subd. (a)(1)) and the conditions of his parole, opened fire on the deputies in order to avoid being arrested and returned to prison. The defense version of the events was that Deputy Blair instigated the gunfight by shooting at an unarmed friend of defendant's, and then turned his weapon on defendant when defendant tried to intervene — and that defendant fired only at Blair (not at Deputy Lyons) in order to protect his friend and himself from Deputy Blair's attack.

#### 1. Prosecution Evidence

Deputy Lyons testified that in 1995, he and Deputy Blair served in a gang enforcement detail within the sheriff's department. For the evening of Friday, May 12, 1995, the gang detail was assigned to conduct a saturation patrol in the area surrounding the sheriff's department's Century Station, which included the City of Lynwood. A saturation patrol meant that, in addition to the normal patrol deputies in the area, the 50 deputies in the gang detail, wearing standard sheriff's department uniforms and patrolling in 25 marked patrol vehicles, also would be in the area, investigating and responding to gang-related incidents. Before beginning their patrol duties, the gang detail received a briefing concerning recent gang activity in the area, including information regarding a gang known as "Young Crowd." The deputies were shown photographs of an inoperable

2

pickup truck that recently had been recovered from the yard of a Young Crowd gang member. The passenger side door of the truck had been painted to resemble a sheriff's department patrol vehicle — the area around the white door had been painted black, and the word "SHERIFF" and a six-pointed star had been painted on the door. Also written on the door were the phrases "THE CROWD bE [*sic*] ALL YOU CAN BE," "FUCK THE" with arrows pointing to the word "SHERIFF," "DON'T HIDE BEHIND THE BAGE [*sic*] FOOLS," "FUCK THE SHERRIFFS [*sic*]," and "THE CROWD'S GONNA GET YOU!" The door and the area around it had a number of holes in the metal that resembled bullet holes. The deputies were told that a number of firearms, including an AK-47 assault rifle and a shotgun, were found inside the house in front of which the truck had been parked.

Lyons testified that shortly before 8:00 p.m. on May 12, 1995, when it was approaching dusk, Blair and he were patrolling in Lynwood. Blair was driving because he was more familiar with the area, having worked out of the former Lynwood Station.[2] As the deputies approached an intersection, Lyons recognized they were in the area described during the briefing as Young Crowd territory. Blair turned onto Walnut Avenue, a residential street that dead-ended in a park. Lyons saw two young men, who he believed might be gang members based on the clothes they were wearing, standing together on the sidewalk approximately 50 feet in front of the patrol car. Lyons noticed the two men glance over their shoulders at the patrol car for an instant, and then start walking toward the park, in the same direction that the deputies were traveling. Lyons testified that seconds later, the shorter of the two men reached into his jacket pocket, removed a large object, and threw the object over his shoulder — in a motion similar to a

---

[2] By 1995, the area previously patrolled by deputies at the Lynwood Station had been incorporated into the responsibilities of those assigned to the Century Station.

"hook shot" in basketball — into a yard.  Lyons said to Blair, "We have a toss," meaning that he suspected the man had thrown either a weapon or drugs.  After throwing the item, the shorter man stopped walking, while the taller man continued walking toward the park at an increased pace.

Lyons testified that Blair said, "You get the shorter guy, I'll get the taller guy," and pulled the patrol car over approximately five feet in front of the shorter man, who had thrown the item.  Lyons started to get out of the car before it completely stopped because he was expecting the shorter man to run away.  After taking a couple of steps toward the front of the patrol car, Lyons heard a series of five rapid gunshots and what he believed to be bullets traveling by him to his left.  Lyons testified he was not able to tell from which direction the shots came, but he initially thought the gunfire had come from behind him.  Lyons looked toward the other side of the police car and saw that Blair, who was right-handed, had his right hand on top of the door and was pulling himself out of the car.  Lyons then saw Blair start to reach for his sidearm and crouch down in a defensive position.  Lyons also crouched down and drew his weapon, observing that the taller man was sprinting toward the park, while the shorter man remained in front of the patrol car.  Lyons began moving toward the rear of the patrol car, and heard a second, slower series of approximately eight gunshots.  He thought that these gunshots, which sounded different from the first set, were coming from in front of him, and could have been Blair shooting at a truck parked to the side of the patrol car.  These shots sounded as if they had been fired by a gun different from the first, and more like shots fired from the standard-issue nine-millimeter pistols the deputies carried.  Lyons called to Blair, but received no response.  After circling around the rear of the patrol car, Lyons saw the unresponsive Blair facedown on the pavement, bleeding from the mouth.  Blair's service weapon, which had been fired, was in his right hand.  He was transported to a hospital, but died from two gunshot wounds.

4

Deputy Blair had been shot once in the neck and once in the shoulder by the same .44-caliber handgun. One of the bullets severed his aorta, which would have caused the immediate cessation of blood flow to his organs. A person suffering such an injury, however, could engage in "purposeful activity," including firing a weapon, for possibly as long as six seconds after the wound was inflicted. The trajectories of the bullets passing through Blair's body were consistent with his leaning forward and turning when he was hit.

Five nine-millimeter shell casings ejected from Blair's sidearm were found on the ground near the driver's side of the patrol car. The locations of the casings were consistent with their having been ejected from the gun as it was fired in the direction of a tree located between the patrol car and the park, toward which the taller of the two men had been walking when Blair stopped the car. Lyons testified that Blair was rated a "distinguished expert" in marksmanship with his service weapon, meaning he had scored in the 280 range out of 300 possible points in the sheriff's department's firearms qualification examination, which involved target shooting at a distance of 25 feet.

A loaded .45-caliber pistol was found in the yard adjacent to where the patrol car had stopped. Sheriff's investigators found two possible bullet impact marks on a house behind the patrol car, which, if the bullets had been fired from a location near the tree where the taller person was, would have passed close to the left side of Lyons's head when he got out of the car.

An off-duty police officer from the Long Beach Police Department testified he was in the park located at the end of Walnut Avenue on May 12, 1995. He heard approximately four gunshots fired in rapid succession, and then approximately five to 10 seconds later, a second round of gunshots that was louder than the first set. He could hear the bullets from the second group of shots passing over his head.

Renele Brooks testified she was standing in a yard on Walnut Avenue when she heard several gunshots. She saw a police car and a person on the sidewalk running away

5

from the car toward her location and the park at the end of the street. After Brooks heard more gunshots and felt bullets passing by her head, she ran into a house.[3]

Sergeant Bruce Harris, a firearms expert in the sheriff's department, testified that in circumstances such as the shooting of Deputy Blair, it would be very difficult for a person to identify what caliber of weapon was fired at any given point during the incident, because of the many variables involved, including different gunpowder loads between rounds for the same caliber gun, the effects of the surrounding buildings on the sounds, and the direction in which the weapon was aimed when it was fired. It would not necessarily be the case that a larger caliber handgun, such as a .44, would sound louder to a person than a smaller one, such as a nine-millimeter pistol. In Sergeant Harris's experience, it also was not uncommon for deputies participating in simulated gunfight exercises to misperceive the direction from which shots had been fired.

Renele Brooks and Sara Frausto knew defendant, and testified he was a member of the Young Crowd gang. Defendant's nickname within the gang was "Smokey." When defendant was staying at Brooks's house in the City of Fontana in the days following the shooting of Deputy Blair, Brooks and Frausto participated in or overheard several conversations regarding the incident. Brooks testified that, contrary to her initial statements to the police that she knew nothing concerning the shooting, she heard defendant say he and Ernesto Avila, another Young Crowd member, were walking down Walnut Avenue when the patrol car pulled up and an officer said, "Let me see those hands guys." Defendant had two guns with him and told Avila to be "cool," but Avila

---

[3] The prosecution presented several other witnesses who testified concerning their memory of the gunfight and other events that night. This testimony primarily tended to identify defendant as the person who shot Deputy Blair. We do not recount this testimony in detail because, as mentioned above, defendant ultimately did not contest identity — he admitted in his own testimony during the defense case that he shot at Blair with a .44-caliber revolver and saw him fall down immediately thereafter.

threw his gun into a yard. According to Brooks, defendant said all he could think of at that point was "going to jail for the rest of his life" because he "had two strikes," and his being armed with two guns would result in a third strike against him, and, Brooks relayed, he explained that he therefore shot at the deputies because he was not going to spend the rest of his life in jail for that "bullshit." Brooks recounted that defendant never mentioned that he shot the deputy in order to protect Avila or himself. Defendant told Brooks that if the police raided the house looking for him, she should tell them he was in the back of the house with a gun, seemingly implying he wanted the police to kill him because he did not want to go back to prison. Brooks testified she initially lied to the police regarding her lack of knowledge concerning the shooting because she was afraid of retaliation from Young Crowd members. She later decided to tell the police what she knew because she thought they had already learned that defendant was the one who shot the deputy. Brooks explained that she had moved before the trial and the sheriff's department had paid a portion of her relocation expenses.

Frausto also testified — contrary to her initial statements to the police that she did not know anything about the shooting — that she told defendant she knew he had shot the deputy and defendant replied he had done so because he "didn't want to go back to jail." According to Frausto, defendant told her that if the police came to Brooks's house looking for him, "he would go into the restroom, and he would kill himself before the cops got to him." As was the case with Brooks, Frausto testified she lied to the police at first due to fear of retaliation, but she eventually told them what she knew after she thought they had already identified defendant as the shooter. She also testified that she had relocated before the trial with the assistance of the sheriff's department.

Defendant was arrested in late May 1995, while he was driving a car away from a house in Fontana. Two deputies stopped defendant, while other deputies stopped traffic on the road. Defendant initially complied with the deputies' orders to exit the vehicle and lie on the ground. After one of the deputies placed a handcuff on one of defendant's

7

wrists, however, defendant stood up and began struggling. One of the deputies was armed with an M-16 assault rifle, and defendant grabbed the barrel of the weapon and tried to pull it away from the deputy. Eventually, the deputies who had been controlling traffic rushed to the scene and swarmed defendant, eventually subduing and restraining him. A deputy testified that as they were handcuffing him, defendant said, "Kill me, just fucking kill me."

While in jail after his arrest, defendant participated in a conversation with his mother and sister that was monitored and recorded pursuant to a court order. The conversation was in Samoan,[4] and an English translation was read to the jury during the trial. Defendant said he was displeased with his mother because he had told his attorney he had an alibi for the time of the shooting (that he was asleep at home the entire night), but his mother had contradicted the alibi when she talked to the police. Defendant discussed with his mother and his sister how they and other people could provide an alibi by telling the police defendant was at home at the time of the shooting. Defendant told his sister, "if I am caught in this case, I'm not spending my whole life here in jail. I'm going to the chair." Defendant blamed what happened on Avila's decision to throw his gun away; defendant thought that if Avila had not done so and instead had "kept on walking, the police wouldn't come to us. But he got scared man. He panicked. He threw his gun. That's why the police came to us. . . . [¶] . . . [¶] You know, I had two guns. If they found those, it's all over. I don't know what would have happened. They probably shoot me. You know, they just shot my friend, what three days before that . . . ." At no time during this ostensibly private conversation did defendant tell his mother or sister that the deputy had shot at Avila first or that defendant shot back to protect Avila and himself.

---

**4**      Defendant and his family are of Samoan descent.

8

The prosecution presented documentary evidence establishing that defendant had two prior convictions for assault with a firearm, one in 1989 and one in 1992, had served prison terms for those convictions, and was on parole when Deputy Blair was killed. Under the terms of defendant's parole, he was, among other restrictions, prohibited from possessing any firearm or having any contact with any Young Crowd members. Defendant's parole agent testified that he had stressed the firearms prohibition to defendant because defendant's prior convictions involved the use of firearms, and had explained to defendant that if he violated his parole he would be returned to prison.

2. *Defense Evidence*

Ernesto Avila testified that he and defendant were members of the Young Crowd gang. According to Avila, at approximately 8:00 p.m. on May 12, 1995, he was standing in front of his house on Walnut Avenue talking to his young daughter Melissa and her friend, Charlotte, when defendant passed by, walking in the direction of the park. Avila also was planning to go to the park in order to "hang out" with other Young Crowd members, and he told defendant he would see him there in a few minutes. Avila then told his daughter to go inside, and began walking toward the park when he heard the sound of squeaking car brakes coming from Duncan Avenue. Avila looked behind him and saw a police car coming toward him on Walnut Avenue. Avila was carrying a .45-caliber pistol, which was a violation of his parole, so he threw the gun into a nearby yard, hoping the police would not arrest him. The patrol car, however, pulled over to the curb, so Avila turned around, put his hands at his side, and asked, "What's up?" According to Avila, the driver's door quickly opened and Deputy Blair, whom Avila recognized from previous interactions, jumped out with his sidearm drawn. Avila perceived from the look on Blair's face that Blair intended to shoot him, so Avila ducked down and ran back toward his house, away from the park. As he did so, Avila heard someone yell, "Hey," and then heard an exchange of gunfire that sounded as if it was coming from two

9

different weapons. Avila ultimately testified during cross-examination that he did not see who shot first. Avila also acknowledged that he had previously told the investigating deputies and his parole agent that he was taking a shower in his house when the shooting occurred.

Douglas Bristol testified that on the evening of the shooting he was in the yard of a house on Walnut Avenue near the park when he saw the police car pull to the curb in front of Avila. According to Bristol, the driver jumped out of the car immediately after it stopped, with a gun in his hand, and then began shooting at Avila. Defendant, who was near a tree closer to the park, had his empty hands out and was yelling, "Hey, hey, hey," or "Whoa, whoa, whoa." The officer then turned toward defendant and fired several more shots. These shots passed over Bristol's head; he ducked and ran out of the yard. As he was running, Bristol heard an exchange of gunfire that sounded as if it came from two different guns.

Charlotte Bristol, who was six years old at the time of the trial, testified that she was playing on Walnut Avenue with Melissa when she witnessed a shooting. Her testimony concerning the circumstances of the shooting was unclear and conflicting. She said the officer was the first one to fire his gun, first shooting straight ahead at "one of the homeboy's friends" and then to the left toward where she was (that is, away from the park), before "one of the homeboys" shot him in the back. Charlotte at first testified, repeatedly, that Melissa's father Ernie (i.e., Avila) and Smokey (i.e., defendant) were not there when the shooting occurred. She subsequently testified, however, that she saw Ernie and Smokey running away from the park after they saw the police, before the shooting started. Charlotte said she knew the person who was running with Ernie was named Smokey, but she refused to identify defendant as Smokey, and said she knew only the person's name, although she also said she would know him if she saw him. She initially said the police officer was not shooting at Ernie, but then said the officer did shoot at Ernie, after shooting at "the homeboy." According to Charlotte, the officer's

10

back was toward her when he commenced shooting, and he was falling down when he shot at Ernie.

Defendant testified that at approximately 8:00 p.m. on May 12, 1995, he retrieved two handguns — a .44-caliber and a nine-millimeter — that had been hidden under Avila's house on Walnut Avenue. According to defendant, he was walking down Walnut toward another gang member's house near the park at the end of the street when he saw flashing lights and a police car "swoop up on" Avila. He took a few more steps toward the park, and then heard a gunshot. Defendant turned and saw a police officer pointing his sidearm at Avila, while Avila was ducking and running along the sidewalk. Defendant yelled, "Hey man, what the fuck?" at the officer, who then turned toward defendant and immediately began shooting in his direction. The first bullet passed close to defendant's head, which caused him to fall back into a fence. As the officer continued shooting at defendant, defendant took out the .44-caliber handgun and shot all five rounds in the gun at the officer, because he believed "that fool was trying to kill me." Defendant denied having shot at the other deputy.

Defendant testified that after he fired at the officer, the officer fell to the ground and defendant ran. He said he went to Martin Luther King Jr. Boulevard, where he was able to flag down someone he knew who was driving by, and obtained a ride to the City of Downey, where he spent the night at a friend's house. During cross-examination the following day, however, defendant admitted that he had lied in his testimony regarding where he went after the shooting, and that he, in fact, spent the night in a house near the park at the end of Walnut Avenue. Defendant testified he gave the .44-caliber gun to a friend so it could be disposed of, and he sold the nine-millimeter and transported some marijuana for drug dealers in order to make some money so he could travel to Mexico.

According to defendant's testimony, during his arrest he began to struggle with the deputies because he thought they were planning to kill him. Defendant testified he heard the deputies speaking of the bystanders who witnessed the arrest, and one of the deputies

11

said, "Damn, if there weren't so many witnesses." It was at that point that defendant yelled at the deputies, "go ahead motherfuckers, kill me."

Defendant denied he had told anyone at Renele Brooks's house that he shot at the deputies because he did not want to go back to prison. He testified that at the time of the shooting he was not "really paying attention to the [Three] Strike[s] law," and did not know whether his prior convictions for assault with a firearm would count as strikes. He did, however, know he would go back to jail if the deputies found the guns he was carrying. Defendant testified that *at the time of the trial*, he knew he, in fact, had only one strike.

Defendant testified he did not go to the police after the shooting because he did not think they would believe that Deputy Blair initiated the gun battle. He also did not think self-defense could constitute a legal defense to shooting a police officer, even if the officer was the aggressor. Defendant said he was afraid the police would kill him if he turned himself in. Defendant acknowledged at trial that he told his mother he was with Avila when Avila threw his gun away, but testified that he, in fact, was not with Avila and did not see him throw the gun. When he had the conversation in jail, defendant thought he could lie his way out of any trouble because the police could not place him at the scene, and he did not want to tell his mother what really happened. Defendant testified he had, however, told his sister that "a cop tried to smoke me and my homey that night, and that's why he ended up getting killed."

Defendant testified regarding the first of his two convictions for assault with a firearm that the victim had been "messing around with [defendant's] lady," and one night defendant decided to "pop[ ] a few caps at him," meaning defendant shot at the victim a few times. According to defendant, he was drunk and did not know what he was doing, and the shots did not hit the victim. Regarding his second conviction, defendant testified that he did not shoot the victim (other members of Young Crowd did), but he had been identified as the shooter, and he agreed to plead guilty in exchange for a sentence that

12

was significantly less than the possible sentence he could have received. Defendant also testified on cross-examination that he confessed to a third shooting when he was 13 years old so he could "take the rap" for an older gang member who had actually committed the assault.

Avila and defendant also testified concerning the ongoing problems between members of Young Crowd and the sheriff's department. Avila remembered there being tension between Young Crowd and the sheriff's department since 1984 or 1985. He testified there was a group of deputies called the "Vikings" who patrolled the Lynwood area which Avila considered to be a rival gang of Young Crowd. Avila knew the Vikings to "Shoot at people," "Beat up people," and "Throw gang signs" like any other rival gang. According to Avila, he personally had received "flashlight therapy" from deputies who were members of the Vikings on three or four occasions (including more than once from Deputy Blair), which entailed being hit with a flashlight for "disrespecting" the deputies. Avila knew Blair was part of the Vikings because on one occasion he had told Avila, "Fuck Young Crowd, this is the Vikings." Avila said the Vikings had a grudge against Young Crowd members, and "every time they get one of us, . . . they want to beat us up." According to Avila, five days before the Deputy Blair shooting, a deputy had shot a Young Crowd member in the back, which made some Young Crowd members angry at the deputies.

Defendant testified that around the time of the shooting, there was a "big problem going on" between Young Crowd and the sheriff's deputies, because weeks before, the deputies were threatening, beating up and harassing members of the gang. In defendant's view, the Vikings were "[j]ust a bunch of white cops that . . . mess around with the homeys all the time." Defendant testified that on the day of the shooting, he and other Young Crowd members were speaking of the recent shooting of Jose Nieves by sheriff's deputies, as well as another Young Crowd member who had been shot and killed by deputies in December of 1990. One of the group said they should "just blast on them

13

fools from now on," but somebody told that person to "shut up," and defendant did not pay attention to the comment.

Jose Nieves testified that he was also a member of the Young Crowd gang; he was the person who was shot by sheriff's deputies on May 7, 1995. The truck that had been painted to resemble a patrol car was parked in front of Nieves's home. He testified that other Young Crowd members painted the truck and made the holes in the truck using a pick ax, not by shooting it. According to Nieves, the search of his home (which had been discussed at the gang detail briefing on May 12, 1995), did not result in the deputies finding an AK-47 or a shotgun because there were no such weapons in the house.

Defendant also called Deputy Blair's ex-wife, Rebecca Blair, as a witness. When asked whether Deputy Blair had a "very volatile temper," Ms. Blair stated, "Excluding a couple of incidents, no." She confirmed, however, that in a declaration filed in their divorce proceedings, she had stated that Deputy Blair had a very volatile temper, broke furniture when he was upset and had physically attacked her. According to the declaration, the "last incident" resulted in the police being called to their house. Ms. Blair testified on cross-examination that the declaration had been prepared by her divorce attorney, and that the volatile temper, breaking of furniture and physical attack related to a violent argument they had when Ms. Blair confronted Deputy Blair regarding the extramarital affair he was having. Ms. Blair testified she was the one who started the argument and the physical contact during the argument because she was angry about the affair and "was out of control." Deputy Blair was trying to calm her down, and only pushed her away in order to stop her from hitting and kicking him. She thought a coffee table was broken when they both fell down during the mutual pushing. According to Ms. Blair, he was the one who called the police, and neither of them was arrested. On redirect examination, Ms. Blair testified that her statements in the declaration were misleading, because Deputy Blair exhibited a volatile temper, broke furniture and physically attacked her only during the argument regarding the affair and one previous

14

time. She acknowledged, however, that the statements in the declaration seemed not to be so limited.

The parties stipulated that Deputy Blair had a tattoo on his leg consisting of a picture of a Viking and the letters "LXXI" above it.

### 3. Prosecution Rebuttal Evidence

The parole agent who supervised Ernesto Avila testified that Avila initially told her he knew nothing regarding the shooting of Deputy Blair and had been taking a shower in his house when the incident happened. Later, after Avila had been arrested under suspicion of being involved in the shooting, the agent talked to him again, and he told her he and several other Young Crowd members, including defendant, had spent the afternoon of the day of the shooting together at a gang member's house. According to the agent, Avila told her they were "talking about how the Sheriff had been harassing them and that [there was] a lawsuit against [the department] because of the Viking gang," and someone said that the next time the deputies harassed the gang they were going to "blast one of [the deputies]." Avila also told the parole agent, contrary to his initial statement to her, that he was outside his house right before the shooting, but went into his house when he first saw the police car approaching because he did not want any trouble, and he was inside his house when the shots were fired.

## B. Penalty Phase

### 1. Prosecution Evidence

The prosecution presented testimony concerning four shooting incidents involving defendant. Manuel Ramirez testified that on the night of September 9, 1984, he was driving in Lynwood with several family members and a woman named Christina in his car. As they were passing a dark field, Ramirez heard what he thought were firecrackers, but someone else in the car said it was gunshots, and then Christina said she had been hit. Ramirez pulled over and saw she was bleeding from the area of her right jaw. Ramirez

15

drove her to the hospital. Deputy Kele Kaulana Kaono testified that he interviewed defendant concerning this incident, and defendant admitted he was the one who shot at Ramirez's car. According to Kaono, defendant said he shot at the car because he thought rival gang members were inside it.

Defendant also told Deputy Kaono he had shot at two other cars he thought contained rival gang members — one just minutes before he shot at Ramirez's car, and another a few weeks earlier. Defendant said, essentially, that "if he believed someone was a gang member or a rival to his gang, then he shot at them."

Deputy Matt Brady testified that in March 1992, he responded to a report of a shooting in Lynwood. The victim told Deputy Brady that a bullet had passed through the hair on her head, slightly grazing her scalp. It appeared to Deputy Brady that some of her hair had been removed and there was a mark on her skin. According to Deputy Brady, the victim's companion at the time of the shooting subsequently identified defendant as the shooter during a lineup conducted on the street.

The prosecution also presented a number of witnesses concerning Deputy Blair's character and the effect his death had on the witnesses, both personally and professionally. Blair's parents, his wife and ex-wife, and his three young sons testified concerning the impact of the killing upon them, Blair's strong devotion to his career, and how much his family missed him. Sheriff's Deputies Lyons, Tarasiuk, and Westin testified concerning how Deputy Blair helped to make them better deputies, and helped them on a personal level as a friend. Deputy Westin testified that the Vikings were merely a group of tightly knit deputies from the Century Station, and that groups of deputies stationed at other stations similarly had chosen mascots and some had received

16

tattoos of that symbol.[5]  Westin also testified that Deputy Blair had received a number of commendations from the sheriff's department, including one for accomplishing the arrest of a murder suspect without using deadly force, although the use of such force would have been justified.

### 2. *Defense Evidence*

Defendant's mother, one of his brothers, three of his sisters, a sister-in-law, and three of his friends testified that defendant was loving, caring, helpful and protective toward his family and friends.  Defendant had a special connection with children; he was known as "Uncle Freddie" to the children in the neighborhood.  The witnesses testified it would be very hurtful to them if defendant were to be executed.

Defendant testified that he believed the jury should spare his life for his family and loved ones, those who "know me better than this jury does and better than anybody who came up here and tried to make me out to be the monster that they tried to make me out to be."  He added, "Those who love me and care about me know the real me, the person that ain't no way in hell could have killed Deputy Blair that night in cold blood like they portrayed in this courtroom."

## II. DISCUSSION

### A. Denial of Motion for Discovery of Law Enforcement Officers' Personnel Files

Defendant filed a pretrial motion for disclosure of information contained in the personnel files of Deputy Blair and the arresting officers — Deputies James Corrigan and Jeff Riggin — concerning any accusations that these deputies previously had committed "unnecessary acts of aggressive behavior, acts of violence and/or attempted violence, [or]

---

[5]     For example, according to Deputy Westin the mascots of the Lakewood, Temple, and East Los Angeles Stations were, respectively, an eagle, the cartoon character the "Tasmanian Devil," and a caveman.

acts of excessive force and/or attempted excessive force." (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531; Evid. Code, §§ 1043, 1045; see also Pen. Code, §§ 832.5, 832.7, subd. (a).) The trial court conducted an in camera hearing outside the presence of the parties, at which the custodian of records for the sheriff's department, Deputy Gary Robertson of the Los Angeles County Sheriff's Office Internal Affairs Bureau, testified under oath and produced one potentially responsive document. The trial court found no information should be disclosed to defendant, and ordered sealed the transcript of the hearing and the document the custodian submitted to the court. On appeal, defendant raises two challenges to the denial of his motion: first, that the trial court failed to make an adequate record before ruling on the motion because it neglected to require that the custodian specify what, if any, other documents in the personnel files were deemed to be nonresponsive to the motion and therefore were not submitted to the court, and second, that the trial court erred by not disclosing to defendant the information contained in the document submitted by the custodian. We are not persuaded.

Although the trial court did not ask the custodian whether there were other materials in the deputies' personnel files deemed nonresponsive to defendant's motion, and, if so, what those materials were, we conclude that in these circumstances the trial court did not err. In arguing to the contrary, defendant relies upon our statement in *People v. Mooc* (2001) 26 Cal.4th 1216, 1229 (*Mooc*), that in the course of a hearing on a *Pitchess* motion, "[t]he custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." The guidance we offered in *Mooc* does not establish that in this case the trial court committed reversible error by failing to have Deputy Robertson do so.

In *Mooc*, we did not hold that a failure to specify what documents in a file were not brought to court would, by itself, result in an inadequate record. The problem we

18

addressed at length in *Mooc* was the trial court's failure to make any record of what materials the custodian of records *did* bring to court, none of which the trial court ordered disclosed to the defendant. In other words, in *Mooc* the custodian had deemed some documents potentially responsive to the *Pitchess* motion, but the trial court found they were not, and appellate review of that decision was compromised because there was no record of the documents at issue. (*Mooc*, *supra*, 26 Cal.4th at p. 1230.)

The circumstances of *Mooc* are markedly different from those in the present case, in which there is solely an absence of a statement from the custodian addressing what other documents might have been in the deputies' files that the sheriff's department deemed nonresponsive. As we acknowledged in *Mooc*, even if custodians of records were always ordered to bring complete personnel files for the court's review — a requirement we explicitly rejected (*Mooc*, *supra*, 26 Cal.4th at p. 1230) — there would still be the opportunity for an unscrupulous custodian improperly to withhold responsive documents from the court's review. (*Id.* at pp. 1229-1230, fn. 4.) In every case, accepting the custodian's representations concerning what is in a personnel file will be, at bottom, a credibility determination for the trial court, regardless of whether the custodian produces what purports to be the entire file in court, produces only what purport to be the potentially responsive documents, or produces what purport to be the potentially responsive documents and specifies on the record what nonresponsive documents were omitted.

Moreover, in the present case, the hearing on defendant's *Pitchess* motion predated our guidance in *Mooc* concerning what steps ought to be taken to ensure an ideal record, and as to the one document produced in this case, the trial court properly summarized it at the hearing and included a sealed copy in the record on appeal. Accordingly, we cannot conclude the trial court's acceptance of Deputy Robertson's sworn representation that there was only one potentially responsive document in the deputies' files, without requiring him to identify on the record any documents that he

deemed nonresponsive, made the record in the present case so inadequate that reversible statutory or constitutional error occurred. (Cf. *People v. Jackson* (1996) 13 Cal.4th 1164, 1221, fn. 10 [reviewing a *Pitchess* claim based upon the record of the in camera proceeding although the personnel documents at issue had been destroyed].)[6] And, as we acknowledged in *Mooc*, relief by way of a petition for a writ of habeas corpus would be available if defendant were to determine that documents improperly were withheld from the trial court, and defendant was prejudiced by the omission. (*Mooc*, *supra*, 26 Cal.4th at pp. 1229-1230, fn. 4.)

As to defendant's second claim — that the trial court erred by not disclosing information contained in the one potentially responsive document — we have reviewed the document and the trial court's grounds for its decision, and conclude that no reversible error occurred.

## B. Denial of Motion to Continue the Trial

On the day of trial, defense counsel filed a motion for a continuance of three days. The trial court denied the motion. On appeal, defendant contends the denial of the motion was an abuse of discretion that violated defendant's constitutional right to due process of law, effective assistance of counsel, and a reliable verdict under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. This contention is without merit.[7]

---

[6]    We need not, and do not, address whether a failure to require that a custodian of records state for the record what documents were deemed nonresponsive, occurring *after* our decision in *Mooc*, would constitute reversible error. (Cf. *People v. Guevara* (2007) 148 Cal.App.4th 62, 69 [reversing the judgment and remanding for a new *Pitchess* hearing due to the absence of information in the record concerning any documents in the officers' personnel files that the custodian had deemed nonresponsive to the motion].)

[7]    Initially, the Attorney General argues the trial court properly denied the motion because it was filed less than two court days before trial was set to commence, without good cause for doing so. (§ 1050, subds. (b), (c) & (d).) However, the prosecutor did not

*(footnote continued on next page)*

In the motion, counsel requested the continuance because "additional preparation [was] necessary." Counsel represented that over the weekend he had had a painful tooth infection that "prevented [him] from working on [his] final trial preparation." In addition, the defense investigator had been attending court in another case, and this had "prevented him from doing some final investigation for [counsel] that is necessary for trial." Other than being aware of tenderness in the tooth, counsel felt he could conduct the trial, but he was planning, if possible, to have a root canal performed within the next three days to prevent a recurrence of the debilitating toothache. Counsel stated he planned "to review the evidence, to go through all the documents and everything to sort of fine tune myself to be adequately prepared," and, more importantly, there also were "some last things for [the] investigator to do."

The trial court noted that "this promises to be a rather short trial," and that the court had had to make special arrangements involving "some considerable effort" in order to have a jury called in on the Monday following the Independence Day holiday. The court also observed it was unlikely that more than jury selection would be completed the first day, there would be "periods of dead time probably between now and certainly the defense case," and defense counsel was an experienced attorney. In addition, the court stated its view that counsel's medical condition, although at that time under control, posed a "lurking problem," and it would be "best to get the trial over and [then counsel could] seek whatever treatment" he needed.

---

*(footnote continued from previous page)*

object to the motion on this ground, and the trial court did not make or reject a good cause finding on the record, although the discussion at the hearing implies that the parties and the court were of the view there was good cause for the late filing. We need not decide whether defendant's appellate claim fails on this procedural ground, however, because the claim fails on its merits.

21

After the trial court stated it was denying the motion for a continuance, defense counsel requested and was granted an ex parte sidebar conference with the court so that counsel could explain what investigation still needed to be completed. Counsel stated he intended to call Deputy Blair's ex-wife to testify concerning her declaration from their marriage dissolution proceedings in which she described his violent temper, but the investigator had not yet located her.[8] The trial court explained that in the court's view, counsel likely would "have the time during trial to have your investigator looking for her," noting that "we're not going to get to the defense case until next week." After the sidebar conference, the court reiterated that it was denying the motion for a continuance.

"[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.] [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. [Citations.] Moreover, the denial of a continuance may be so arbitrary as to deny due process. [Citation.] However, not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence. [Citation.]" (*People v. Beames* (2007) 40

---

[8]     Defense counsel prefaced his discussion concerning the efforts to find Blair's ex-wife with a summary of the planned defense, that is, that Blair was a member of the Vikings, was a defendant in a civil rights lawsuit against the sheriff's department (see *post*, pt. II.D.1.a.), and initiated the gunfight with Avila and defendant. In response to the trial court's question regarding what witnesses would support "the Viking allegation," counsel stated he intended to call as a witness an attorney who had deposed Deputy Blair in the lawsuit, but counsel had not yet confirmed this attorney would be available to testify. Contrary to defendant's apparent assertion on appeal, trial counsel did not include the need to confirm the attorney witness's availability as a reason for continuing the trial.

22

Cal.4th 907, 920-921 (*Beames*).) "[T]he trial court may not exercise its discretion 'so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 450.) From the record in the present case, we conclude defendant has failed to establish that the trial court abused its discretion or violated his constitutional rights by denying the motion for a continuance.

Here, the expressed general need for counsel to go over the evidence and to "fine tune" himself before beginning the trial was not particularly compelling. Indeed, counsel himself characterized it as less important than the need to locate Deputy Blair's ex-wife, and stated he would make his last preparations in the evenings if the court denied the continuance. Even assuming counsel was required to complete his fine tuning in the evenings during the trial, this would not have been so unusual or burdensome that we would conclude the trial court's decision was outside the bounds of reason. In addition, although the need to locate Blair's ex-wife was significant for the defense, as the trial court stated, the need to do so *before the trial could begin* was slight; indeed, the defense did ultimately call her as a witness despite the denial of the continuance. (See *People v. Frye* (1998) 18 Cal.4th 894, 1013 ["[o]ne factor to consider is whether a continuance would be useful"].)

Although defendant cites on appeal examples of counsel's asserted unpreparedness during the trial, defendant fails to relate them to the denial of the motion for a continuance. Moreover, defense counsel did not base his request for a continuance on grounds that he was unprepared in specific areas. Therefore the trial court cannot be faulted for failing to grant a continuance on those grounds. (*Beames*, *supra*, 40 Cal.4th at p. 921; see also *People v. Rundle* (2008) 43 Cal.4th 76, 132 (*Rundle*) [review of the trial court's ruling on a motion is "based upon the evidence before the court when it made its decision"].)

It was not beyond the bounds of reason for the trial court to deny a three-day continuance because counsel's expressed needs could be reasonably met without delaying

23

the trial. Further, the court appropriately considered the inconvenience to prospective jurors that would result from postponing the trial, as well as the potential complications that might result if defense counsel had a root canal and needed additional time to recover before the trial could commence. The court reasonably found that starting the trial as scheduled would minimize the inconvenience and risks, while not impinging to any significant degree on defense counsel's ability to complete his final preparations. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [in ruling on a continuance motion, "[t]he court considers ' "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion" ' "].) The denial of a continuance was not an arbitrary insistence on expeditiousness, but rather a reasoned assessment of the need for delaying the trial in light of the potential problems such delay might cause.

Nor was defendant denied a reasonable opportunity to prepare; as respondent points out, trial counsel had been defendant's attorney of record for approximately eight months, and counsel's own statements established that the remaining preparations were counsel's final polishing of the defense and the locating of a witness that could be (and, apparently, was) accomplished in the time before the defense portion of the trial began. For these reasons, the denial of the request for a continuance was not an abuse of discretion or a violation of defendant's constitutional rights.

### C. Asserted Errors During Voir Dire

#### 1. *Voir Dire Concerning Circumstances of the Crime*

Defendant contends the trial court conducted constitutionally inadequate questioning of the prospective jurors concerning possible biases arising from the circumstances of the shooting of Deputy Blair. Specifically, he claims the trial court should have asked questions regarding (1) any racial prejudices the prospective jurors

may have held, and (2) the legal concepts of self-defense and defense of another, particularly in the context of a gang member shooting a police officer.

Defendant did not ask the trial court to pose any question regarding racial biases, and therefore that portion of his appellate claim is forfeited. (*People v. Bolden* (2002) 29 Cal.4th 515, 539 [the defendant must ask for questioning concerning racial bias; "the trial court need not make the inquiry on its own initiative"]; *Turner v. Murray* (1986) 476 U.S. 28, 37 ["a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry"].) We have recognized no exception to this requirement in cases in which the potential for racial bias assertedly was "obvious," and we decline defendant's invitation to do so now.

Defendant's remaining claim similarly is unavailing. Prior to commencing voir dire of the venire panel, the trial court advised the parties that it intended to question the prospective jurors itself, without the participation of counsel, and also without having the panel answer written juror questionnaires. Although the prosecutor objected, defense counsel expressly agreed to the court's plan to conduct voir dire. The court invited the parties to submit suggested questions the court should pose, and defendant submitted three questions concerning self-defense and defense of others: (1) "Can you accept the concept in the law that if one's life is illegally placed in peril by another, one may kill in self-defense[?]"; (2) "Could you accept this legal premise if the evidence shows that a uniformed police officer illegally placed the life of a street gang member in peril, and that officer is then killed in self-defense?"; and (3) "Can you accept the concept in the law that if the life of one's friend is illegally placed in peril by another, deadly force may be legally used in response?" In response to defendant's suggestions, the trial court stated, "Most jurors believe there is such a thing as self-defense. The concern is that jurors understand that if there is a self-defense issue, that they have to follow the court's instruction on the law regarding what constitutes self-defense. And will they do that and put aside their own ideas of what constitutes self-defense." Accordingly, the court agreed

25

"to give some brief comment to that effect [—] that they should not necessarily adhere to their own feelings of what constitutes self-defense, that they must follow the court's instruction." Defense counsel did not object to the court's plans.

Later, near the conclusion of voir dire, defense counsel asked the trial court at a sidebar conference whether it planned to ask any more followup questions of the prospective jurors. When the court stated it did not, counsel stated, "Okay, I would ask that you at least touch on self-defense." The court subsequently did so, telling the jurors, "[I]t is very important — I think we all have ideas of when the idea of self-defense is appropriate and when it isn't. I want to make sure that the jurors understand that if you are instructed on what the law says is appropriate for self-defense, that you follow my instructions on the law. [¶] Anybody have any question about that? . . . [¶] Let me make sure of this." The court then asked a prospective juror, "do you understand what I just said? . . . [¶] You may have in your own mind when you came in here an idea of when self-defense is appropriate. [¶] But you understand that if I instruct you — I am not saying I will — but if I instruct you on the law of self-defense, you must follow my instructions?" The prospective juror agreed he would follow the court's instructions. The court then asked if "everybody else" understood, and confirmed this with two other prospective jurors. Defense counsel did not object to the trial court's questions, nor did he request that the court pose any other question concerning the subject.

On appeal, however, defendant contends the trial court's questioning was insufficient "to ascertain whether the jurors harbored any biases that might prevent them from impartially entertaining a claim that a gang member's killing of a peace officer was justified by the need to defend one's self or a fellow gang member and from evaluating the evidence of such a defense." Defendant forfeited this claim by failing to raise this issue below, when the trial court could have remedied the alleged shortcoming. It is true defendant did initially submit proposed questions concerning the specific context of a claim of self-defense or defense of others in this case (highlighting that a gang member

26

had killed a police officer), and the trial court did not pose those questions during voir dire. Defense counsel, however, did not object that general questioning concerning the prospective jurors' ability to follow the court's instructions on self-defense would be — or subsequently was — insufficient to uncover any biases the prospective jurors might have held. Accordingly, this claim is not preserved for appeal. (*People v. Sanchez* (1995) 12 Cal.4th 1, 61-62.) Defendant's attempt to distinguish *Sanchez* on its facts is misplaced. The controlling principle is that a defendant may not challenge on appeal alleged shortcomings in the trial court's voir dire of the prospective jurors when the defendant, having had the opportunity to alert the trial court to the supposed problem, failed to do so. It is not sufficient, as in the present case, for a defendant merely to suggest that particular questions be asked, and then silently stand by when the trial court suggests and subsequently takes a different course — a trial court reasonably could view such silence as constituting assent to the court's approach.

In any event, even if defendant had not forfeited his claim, we would conclude it lacks merit. "We have observed that the adequacy of voir dire is a matter ' " 'not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and responses to questions.' " ' [Citations.] The applicable standard is a demanding one: 'Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. [Citation.]' . . . [¶] . . . 'The right to voir dire, like the right to peremptorily challenge [citation], is not a constitutional right but a means to achieve the end of an impartial jury. [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1215, 1250-1251.)

Defendant fails to establish any possibility that his trial was fundamentally unfair due to inadequate voir dire of the prospective jurors. To the extent our decision in *People*

27

*v. Williams* (1981) 29 Cal.3d 392 (*Williams*), upon which defendant relies, remains persuasive although one of its central holdings was abrogated by the passage of Proposition 115 (see *People v. Mendoza* (2000) 24 Cal.4th 130, 168, fn. 5 [that proposition "changed the scope of legitimate inquiry on voir dire by requiring that the examination of prospective jurors be conducted only in aid of the exercise of challenges for cause," not in aid of the parties' making peremptory challenges]), *Williams* is distinguishable.  The erroneous limitation of voir dire that led to our reversal of the judgment in *Williams* concerned the prospective jurors' thoughts regarding the legal concept that a person has no duty to retreat before he or she may use reasonable force to resist an attacker.  As we noted, that rule was controversial, and there was "a real possibility the average juror might disagree" with the rule.  (*Williams*, *supra*, at p. 411.)  Also implicit in *Williams* is an acknowledgement that the rule likely would be unknown to an average juror were it not addressed in voir dire.  Moreover, there was no suggestion the prospective jurors in *Williams* were made aware of any facts of the case that would have indicated that the question of a duty to retreat would be at issue, and therefore that their ability to follow the law as the court would instruct might have been inhibited in that regard.  We also pointed out in *Williams* that two of the prospective jurors *had* expressed doubts, even in the abstract, concerning their ability to follow self-defense principles with which they might disagree, and the trial court had foreclosed any further exploration of those responses.  (*Ibid.*)

The oral voir dire in the present case met constitutional standards.  The trial court questioned the prospective jurors concerning their ability to follow the law of self-defense as the court ultimately would instruct them, and none expressed any doubt regarding an ability to do so.  The prospective jurors were aware of the basic facts of the case, that is, that defendant was accused of shooting and killing a police officer engaged in his official duties.  Questions concerning the prospective jurors' knowledge of and biases against gangs and gang members also had been posed, and the jurors were told

they were required not to prejudge the case based upon any evidence of defendant's having associated with a gang. Because the prospective jurors were aware of the basic facts of the case, it was reasonable to assume they had these particulars in mind when the trial court admonished them concerning their duty and questioned them concerning their ability to follow any self-defense instructions the court might give them. Accordingly, defendant's proposed questions, although more focused than the trial court's queries, were not so significantly more likely "to expose strong attitudes antithetical to defendant's cause" (*Williams*, *supra*, 29 Cal.3d at p. 410) that we could conclude the court's voir dire failed to aid in the exercise of challenges for cause or otherwise resulted in a fundamentally unfair trial. We also observe that defendant has not pointed to any evidence in the record suggesting that any sitting juror actually was prejudiced against his claims of self-defense and defense of another.

### 2. *Voir Dire Concerning Penalty Decision*

Defendant contends the trial court's voir dire concerning the issue of the jury's role in the penalty phase of the trial, and the court's excusing for cause two prospective jurors who expressed reluctance regarding imposing the death penalty, denied him his state and federal constitutional rights to an unbiased jury and a reliable penalty decision. We are not persuaded.

To the extent defendant contends the manner in which the trial court questioned the prospective jurors erroneously resulted in "a jury that was prone to impose the death penalty," he forfeited any such challenge by not objecting below. A defendant ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed him or herself of the opportunity to bring them to that court's attention. (*People v. Seaton* (2001) 26 Cal.4th 598, 635.) Defendant maintains we nonetheless should reach the merits of his contention because the right to a fair and unbiased jury, and the trial court's general duty to ensure a fair proceeding, are

29

fundamental. There is, however, no evidence in the record suggesting the jury in this case actually was unfair or biased; that is, that these fundamental rights were compromised. Even if, as defendant urges, the manner in which the trial court conducted voir dire improperly tended to remove prospective jurors supposedly more favorable to the defense, this does not mean the remaining prospective jurors could not be fair and unbiased. We also observe that defendant does not allege that the trial court erroneously denied any challenge for cause he made against a prospective juror.

Defendant further contends the trial court violated his constitutional right to an impartial jury by excusing for cause two prospective jurors, Prospective Juror C. and Prospective Juror L., based on their answers expressing reservations concerning their ability to impose the death penalty.[9] The law regarding such appellate challenges is well established. In this context, the right to an impartial jury afforded by the state and federal Constitutions mandates that persons who oppose the death penalty are not disqualified from serving as a juror in a capital case simply by virtue of their personal views on that punishment. (See *Uttecht v. Brown* (2007) 551 U.S. 1, 6; *People v. Martinez* (2009) 47 Cal.4th 399, 425 (*Martinez*).) "Qualification to serve on a capital jury is not limited to determining whether the person zealously opposes or supports the death penalty in every case. Under federal and state law, a prospective juror may be excluded for cause where his views on capital punishment would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' ([*Wainwright v. Witt* (1985)] 469 U.S. 412, 424, clarifying *Witherspoon v. Illinois* (1968) 391 U.S. 510,

---

**9** Although defense counsel may not have explicitly objected to the trial court's decisions to excuse these prospective jurors, as we recently discussed in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643, at the time of defendant's trial, he was not required to make timely and explicit objections in order to preserve appellate claims that his constitutional rights were violated. In *McKinnon*, however, we overruled the no-forfeiture rule as to future trials. (*Ibid.*)

522, fn. 21 [framing issue as whether it is 'unmistakably clear' the prospective juror would 'automatically' (italics omitted) vote for life or death].) . . . At bottom, capital jurors must be willing and able to follow the law, weigh the sentencing factors, and choose the appropriate penalty in the particular case. [Citations.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 20 (*DePriest*).)

" ' "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]" ' [Citations.]" (*People v. Lancaster* (2007) 41 Cal.4th 50, 78-79 (*Lancaster*).) "Indeed, where answers given on voir dire are equivocal or conflicting, the trial court's assessment of the person's state of mind is generally binding on appeal. [Citation.] The trial court is in the unique position of assessing demeanor, tone, and credibility firsthand — factors of 'critical importance in assessing the attitude and qualifications of potential jurors.' [Citation.] Hence, the trial judge may be left with the 'definite impression' that the person cannot impartially apply the law even though, as is often true, he has not expressed his views with absolute clarity. [Citation.]" (*DePriest*, *supra*, 42 Cal.4th at p. 21; see also *Uttecht v. Brown*, *supra*, 551 U.S. at p. 20.)

Affording the appropriate substantial deference to the trial court's assessment of each prospective juror's state of mind, we conclude the decision to excuse them did not violate defendant's constitutional rights.

Before the court examined any individual prospective juror concerning the death penalty, it made extensive introductory remarks, advising that "there are a lot of things I want to say about this." The court proceeded to inform the panel that discussing the

31

death penalty was not meant to imply any outcome for the trial, but was intended to enable the court and the parties to explore the prospective jurors' "feelings about the death penalty." The court explained the mechanics of the two phases of a capital trial, including the issues and types of evidence presented in the penalty phase (if there were to be one), and contrasted the jury's role in a capital case with that of a jury in a noncapital case, in which the jury does not consider the issue of the defendant's punishment if he or she is found guilty. The court also noted, however, that a juror in a capital case is not permitted to consider the possible punishment when considering the issue of guilt, but must decide whether the defendant is guilty or not based upon only the evidence presented at that phase of the trial. In describing the process of determining the penalty, the court explained the required weighing of mitigating and aggravating evidence, and the circumstances in which a sentence of life without the possibility of parole or death would be permissible under the law.

The court then explained that it had been "going into all of this" because "the law promises each side, the defense and the prosecution, jurors who can make a decision between life without parole and death based upon the evidence. [¶] Jurors who would automatically vote for death cannot sit. Jurors who would automatically vote for life cannot sit. [¶] We need people who can consider all the evidence and make a decision between these two very serious consequences." The court stressed that it was "not talking about some hypothetical situation. We're not going to be asking you, gee, could you vote to put Adolph Hitler to death. That is not the question here. [¶] The question is, can you look in your heart and tell us that you can consider the evidence in a case like this and make a decision." The court emphasized that it would not be "prejudging anybody" and was "not trying to convince any one of you to take a position one way or the other," stating, "I want to know what is in your heart and what is in your mind, okay. Please, please, be straight with us. It is very important."

32

The trial court then discussed its view that prospective jurors generally would fall into four types. First, "people that would always vote for death regardless of what the evidence was. They believe in the death penalty. Eye for an eye. That's it. An officer was killed, [the] man should always get the death penalty." Second, "[t]here are going to be people that would never ever under any circumstance vote for the death penalty. They don't believe in it. They think it is wrong morally. They think it is wrong for religious reasons or for some other reason they could never ever impose the death penalty." In the court's view the third type of prospective jurors "are people that say they believe in the death penalty but when they really get down to it, even if they believe that the evidence that is aggravating outweighs substantially the mitigating evidence, they themselves can't impose the death penalty. They just can't do it." The trial court then told the panel of a case the court had presided over in which a jury had been sworn, but before any evidence had been presented, one of the jurors began crying after realizing that the case would be "too much for her." The court cautioned the jurors, "Ladies and gentlemen, if you feel that way — you are sitting in judgment on a fellow human being — tell us now, please. [¶] Don't get into something that is going to be over your head. You know yourselves better than we do. And I just implore you to not bite off more than you think you can chew, so to speak." Finally, the court explained that "the fourth kind of person, the [kind of] person that we're looking for to serve on this jury, is the kind of person that can keep an open mind, not prejudge this case, wait to hear all the evidence, look at the totality of all the aggravating and all the mitigating evidence and then make a decision. And the decision would be one of two choices, life without parole or death. And you must presume that the jury's decision will be carried out. [¶] Now, again, I am not telling you how you should decide this case. My only goal is to find jurors that can make a decision based upon the evidence."

Finally, the trial court told the panel that it would be asking each prospective juror to discuss his or her views concerning the penalty decision, and it reminded them to

33

answer "from your heart. [¶] We had some jurors this morning that were crying at the prospect of even being close to a case like this. Well, that is fine. I don't prejudge that. That is their business. If they are opposed to the death penalty, that is fine. I told them so. I admire the fact that they told us what their feelings were. That is all what we want you to do, is tell us straight from the heart how you feel." The court then proceeded to question each prospective juror.

Regarding Prospective Juror C., when the trial court asked her what she thought of the court's discussion of the death penalty, she answered, "I am really nervous." In response to the trial court's question whether that meant she should not serve on the jury, she answered, "I would like to be on the panel but probably not on a murder case." Prospective Juror C. agreed that this case was "probably" too much for her because she was "very sensitive." She continued, "I cry over [*sic*] when I see things in the street . . . . [¶] . . . [¶] People that are homeless on the street. So I could imagine what I would be hearing in this case." The trial court confirmed that she disliked violence, including the depiction of it in movies. The court then turned specifically to whether she would be able to vote in favor of the death penalty, asking her whether "it would be very difficult for you to vote for death." She replied that she initially "was thinking maybe I haven't heard the evidence so that is why I didn't raise my hand when you asked that question [whether anyone was automatically opposed to the death penalty]," but having had a chance to consider the subject further, she agreed that "it is going to be very difficult." The trial court asked whether it would be impossible, and she responded, somewhat cryptically, "Considering it is about [a] police officer, I have very high regard for police officers." Seeking to clarify her answer, the trial court asked her whether "you have very high regard for police officers, but are [a] very sympathetic person," and are "very emotional and it is going to be difficult for you to make a decision in this case?" Prospective Juror C. agreed. The court then asked her whether "really deep down you think it is highly unlikely that you would ever vote for death regardless of the evidence." She

34

answered yes. After the sidebar conference in which defense counsel expressed his view that there was not "enough information" concerning her ability to serve as a juror, the trial court questioned her again, first confirming that it would be highly unlikely she would ever vote for the death penalty. The court then asked her whether it was correct that she saw herself as falling "in that third category of people, the people that say, you know, I believe that the death penalty is okay, but I really couldn't do it." Prospective Juror C. again answered yes.

Although on appeal defendant characterizes Prospective Juror C. as "a thoughtful juror poised to determine penalty by balancing the evidence in aggravation against that in mitigation," the trial court reasonably could have been left with the definite impression that she would be too emotional to serve as a juror in this capital case. She consistently expressed concern that her sensitive nature would make it too difficult for her to sit on the jury. As her answer to the court's final question made clear, it was "highly unlikely" she would be able to vote in favor of a death sentence, not because she was opposed to the death penalty, but because she doubted she possessed the emotional fortitude to sit in judgment of defendant. As we recently stated in similar circumstances: Although there might have been some indication that she could, in the abstract, vote in favor of a death sentence, "her subsequent responses reflected significant hesitation regarding her emotional ability to impose the death penalty. The trial court was in a position, which we are not, to view her demeanor as she responded, and its determination of her state of mind is binding. Substantial evidence supports its ruling that [Prospective Juror C.'s] views concerning the death penalty would prevent or substantially impair her performance as a juror." (*People v. Farley* (2009) 46 Cal.4th 1053, 1089.)

Regarding Prospective Juror L., when the trial court asked for her views on the death penalty, she stated, "I don't have a problem weighing the evidence to determine innocence or guilt but I do have a problem voting for the death penalty." She denied that she "would never ever vote for death," but maintained that she would have "a real

35

problem" doing so. The trial court then asked her whether she was "saying that it is very unlikely that you would ever vote for death?" She answered yes. During the sidebar conference, defense counsel expressed his view that they did not "have enough information" regarding Prospective Juror L.'s ability to serve on the jury. The trial court, however, stated, "Oh, I felt she was real strong." The court subsequently excused her without posing any more questions to her.

On appeal, defendant contends the trial court erred by excusing Prospective Juror L. for cause because her statements that she would have a problem voting for death and that it was very unlikely she would ever do so did not establish substantial impairment of her ability fairly and conscientiously to follow the law in choosing the appropriate penalty in this case. Although the trial court certainly might have asked more probing questions concerning her ability to fairly weigh the aggravating and mitigating evidence, there nonetheless is substantial evidence in the record supporting the trial court's decision to excuse her.

First, we observe that it appears the trial court's decision relied to some degree upon Prospective Juror L.'s demeanor, because the court expressed its view that her feelings on the subject were "real strong." Second, she herself contrasted her ability fairly to weigh the evidence in reaching a determination of the issue of defendant's guilt with her ability to consider a verdict of death at the penalty phase. Her statements also must be viewed in light of the trial court's extensive preliminary remarks, in which it focused the area of inquiry on the prospective jurors' ability to "keep an open mind, not prejudge this case, wait to hear all the evidence, look at the totality of all the aggravating and all the mitigating evidence and then make a decision." We also note that Prospective Juror L. was the last prospective juror questioned on this subject, and she therefore had heard the trial court explore this issue many times with the other prospective jurors. In keeping with the trial court's focus, her comments addressed her ability to vote in favor of a death sentence within the context of the case and all the court's instructions, not her

36

personal views regarding the death penalty as a general matter. Accordingly, the trial court could reasonably view Prospective Juror L.'s own statements that she could be fair in assessing guilt but not penalty, that she would have a "real problem" voting for death, and her agreement that, although perhaps not impossible, it would be "very unlikely" she ever would vote for death, as establishing that her ability to follow the law would be substantially impaired. As with the prospective jurors at issue in *Lancaster*, substantial evidence supports the trial court's decision to excuse Prospective Juror L. even though she may have acknowledged a slight possibility she could vote to impose a sentence of death. (See *Lancaster*, *supra*, 41 Cal.4th at p. 80 [distinguishing *People v. Stewart* (2004) 33 Cal.4th 425, 446-447, and *People v. Heard* (2003) 31 Cal.4th 946, 964-966, in which the record did not support the trial court's decision to excuse the prospective jurors for cause]; see also *Martinez*, *supra*, 47 Cal.4th at p. 430 [the trial court's decision to excuse a prospective juror for cause is entitled to deference despite the juror's declaration of a "theoretical possibility that she could vote for the penalty of death"].)

## D. Guilt Phase Challenges

### 1. Assertedly Erroneous Evidentiary Rulings

#### a. Exclusion of Evidence Concerning Civil Lawsuit and Activities of the Vikings

As mentioned above, defendant presented testimony regarding the ongoing hostility between defendant's gang, the Young Crowd, and the group of deputies from the Lynwood area known as the Vikings. Defendant, Ernesto Avila, and Jose Nieves each testified to some degree on the subject. Before the trial began, defendant had notified the trial court he intended to introduce more extensive evidence related to alleged misconduct by sheriff's deputies, including testimony concerning a civil lawsuit filed in federal court that alleged widespread civil rights violations by sheriff's deputies in the Lynwood area

37

during 1990 and 1991,[10] as well as evidence of the shooting of two Young Crowd members (Nieves and Lloyd Polk) by sheriff's deputies. After several discussions concerning what evidence, if any, would be admitted, and a formal hearing on the subject that included live witness testimony, the trial court allowed defendant to present evidence of (1) specific acts of alleged misconduct by Deputy Blair (see Evid. Code, § 1103, subd. (a)(1)), (2) specific acts of alleged misconduct that other deputies inflicted upon defendant and Avila, (3) the circumstance that Nieves was shot by deputies several days before Deputy Blair was killed, and (4) Blair's membership in the Vikings. The court did not permit defendant to present evidence regarding the lawsuit, the specific circumstances of the shooting of Nieves, or alleged misconduct by other members of the Vikings or other unaffiliated deputies against other citizens. The court also ordered redacted a portion of the transcript of the jailhouse conversation between defendant and his mother and sister in which defendant discussed the lawsuit. In the trial court's view, presenting evidence of the lawsuit and other misconduct by other deputies would be going "too far afield," would "sidetrack" and "unduly prolong" the trial, and would "invite[] the jury to

---

[10] In keeping with defendant's description of this evidence, we will refer to this as "the lawsuit," although it actually was a number of separate lawsuits that had been consolidated for trial proceedings. The lawsuit was the subject of an appeal of the district court's preliminary injunction order, which resulted in a published opinion reversing the preliminary injunction. (*Thomas v. County of Los Angeles* (9th Cir. 1992) 978 F.2d 504.) It appears Deputy Blair was a named defendant in two actions within the lawsuit, neither of which involved Young Crowd members. It was, however, unclear to what extent it was alleged that Blair actively participated in the violation of any plaintiff's civil rights. Ernesto Avila was a plaintiff in an action within the lawsuit, but Deputy Blair was not a defendant in that particular incident. It appears the shooting death of Lloyd Polk, a Young Crowd gang member, also was at issue in the lawsuit. Only some of the alleged civil rights violations involved asserted members of the Vikings. It appears that after the first trial of a plaintiff's claims resulted in a verdict for the plaintiff, the parties reached a settlement of the remaining cases, which included the payment to the plaintiffs of a total of several million dollars.

speculate as to what the lawsuit was about." The court also noted the incidents in the lawsuit were remote in time, having occurred five years or more before Deputy Blair was shot, and concluded the lawsuit "doesn't really provide in the court's view any legitimate basis for Blair to have shot at [defendant], which is the defense allegation." The court therefore exercised its discretion under section 352 of the Evidence Code to exclude the lawsuit and other evidence of alleged deputy misconduct. (See Evid. Code, § 352 [providing that a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time].) During the trial, the court similarly excluded as "too remote" evidence concerning the shooting of Lloyd Polk after Avila testified that the shooting occurred in 1989 or 1990. Defendant, however, was permitted to testify that he had "heard about" the fatal shooting of Polk. The trial court later denied defendant's new trial motion contesting the exclusion of the proffered evidence. On appeal, defendant challenges the trial court's decisions.[11]

---

[11]    In this claim and most others raised in this appeal, defendant contends the asserted error or misconduct denied him various state and federal constitutional rights. As we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17, and subsequent cases: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

Stated succinctly, defendant's asserted basis for introducing this evidence is as follows: He proposed to introduce other persons' allegations that other deputies engaged in unlawful conduct in order to bolster his evidence that Deputy Blair unlawfully shot at him and Avila, and therefore defendant's shooting at Blair was justified. Pursuant to defendant's theory of admissibility, there were two primary grounds for admitting the evidence: to establish that (1) Blair was the aggressor, and (2) defendant reasonably believed the use of force against Blair was necessary in order to prevent unlawful harm to Avila or defendant. As to the former, evidence of past misconduct by other deputies, defendant urges, might have tended to establish both Blair's propensity to act in this manner and his motive for doing so — that is, to eliminate or intimidate a plaintiff in the lawsuit.

We will assume without deciding that these grounds met the relevance threshold of sections 351 and 210 of the Evidence Code. (See Evid. Code, §§ 351 ["Except as otherwise provided by statute, all relevant evidence is admissible."], 210 [" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."]; *People v. Scheid* (1997) 16 Cal.4th 1, 13-14 (*Scheid*) ["The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]"].)[12] We review for abuse of discretion a trial court's ruling to exclude proffered relevant evidence under Evidence Code section 352. (*People v. Hamilton* (2009) 45 Cal.4th 863, 929-930; *People v. Osband* (1996) 13 Cal.4th 622, 666 (*Osband*) ["A court abuses its discretion when its ruling 'falls outside the bounds of reason.' "]; *People v. Carrington* (2009) 47 Cal.4th

---

[12] As to defendant's theory that Blair was the aggressor, we assume the evidence was relevant because the trial court did not explicitly rule on the underlying question of whether the evidence would qualify as proper propensity or motive evidence.

40

145, 195 (*Carrington*) [an abuse of discretion is "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice' "].)

We agree with the trial court that the connection between the excluded evidence and the issues at this trial was unduly tenuous. Law enforcement officers, of course, lawfully may use force in order to perform their duties. The defense in the present case raised the question whether Deputy Blair *unlawfully* used deadly force against Avila and/or defendant, such that defendant was justified in using deadly force against Blair. The relevance (if any) of evidence regarding *other* deputies' past acts in establishing Blair's propensity or motive to engage in the supposed unlawful use of force on the night in question likewise was tied to establishing that these past acts by other deputies also were *unlawful*. Defendant implicitly acknowledges this in his briefs, throughout which he describes the other deputies' actions as "wrongful" and "lawless." If, however, the past uses of force and other actions by these other deputies were *lawful*, any relevance in proving Deputy Blair's propensity to use unlawful force is greatly diminished, if not eliminated. Similarly, if the past acts by other deputies were *lawful*, there would be little likelihood that, as defendant asserts, Blair was motivated to initiate a gun battle in plain view of numerous bystanders in order to eliminate or intimidate a plaintiff in what would have been an unmeritorious lawsuit against the sheriff's department. The trial court reasonably found that providing the jury with a full picture of the significance of the lawsuit, the shootings of Polk and Nieves, and any other alleged misconduct by other deputies would seriously "sidetrack" the trial, consuming undue time with a series of trials within this trial concerning whether the deputies' actions in those past incidents legally were justified.

In asserting that the lawsuit evidence "could have been presented in relatively abbreviated testimony," defendant fails to acknowledge that the allegations of misconduct in the lawsuit could not be offered for the truth of the matters asserted; such

41

use would violate the hearsay rule, section 1200 of the Evidence Code. (Evid. Code, § 1200 [evidence of an out-of-court statement is inadmissible when offered to prove the truth of the matter stated].) The trial court would have acted within its discretion in finding that evidence of the mere existence of the lawsuit, divorced from any proof of the truth of the allegations raised in it, would not have been relevant to prove Deputy Blair's propensity or motive to engage in the unlawful use of force. (See *Rundle*, *supra*, 43 Cal.4th at pp. 132-133 [the trial court did not abuse its discretion by excluding evidence as irrelevant when the defendant had failed to establish the necessary preliminary fact of a correlation between the proffered evidence and the inference to be drawn from it].)

In sum, the trial court's ruling was not beyond the bounds of reason. It was reasonable for the trial court to find that any probative value in admitting the lawsuit evidence (proffered with the hope of supporting an inference that because other deputies had engaged in unlawful activities unrelated to defendant — or the lawsuit so alleged — it was more likely Blair acted unlawfully in the shooting incident) was minimal and would have been substantially outweighed by the risk of jury confusion and undue consumption of time.

To the extent defendant also contends the trial court should have admitted evidence of other persons' allegations of misconduct by other deputies as establishing defendant's state of mind at the time of the shooting, we again conclude the trial court did not abuse its discretion by excluding the evidence. The reasonableness of defendant's asserted belief that he was justified in shooting at Deputy Blair was not tied to anything defendant claimed to know regarding the past actions of Deputy Blair, the Vikings, or other deputies. Defendant did not testify that he preemptively shot at Deputy Blair first because, based upon defendant's knowledge of past misconduct by the deputies, defendant feared that Blair was about to shoot him or Avila. He testified, rather, that Deputy Blair unjustifiably started the gunfight. The jury's decision, therefore, turned on its assessment of the credibility of defendant's and his other witnesses' testimony

42

regarding the issue of who shot first, not the issue of defendant's fear of the deputies. (See also *People v. Minifie* (1996) 13 Cal.4th 1055, 1070 [although evidence of threats by third parties can be relevant to defendant's state of mind, such threats "inherently carry less weight than threats from the victim" and "evidence of a third party's reputation for violence may be particularly susceptible to exclusion"].)

Defendant contends the federal and state Constitutions do not permit a trial court to exclude defense evidence that "goes to the heart of the case" based solely on the court's concerns regarding the consumption of time. We need not decide whether this assertion is correct because here the trial court's decision was not grounded solely on the consumption of time that would have been required had defendant's proffered evidence been admitted. Rather, the court also reasonably was concerned that essentially undertaking a series of trials concerning the numerous allegations of misconduct by other deputies ran the risk of distracting the jury from its task of deciding defendant's guilt. (See *People v. Hart* (1999) 20 Cal.4th 546, 607.) In addition, the trial court found at least some of the evidence was "too remote" — that is, of at most minimal relevance — another valid ground for declining to admit it. (*People v. Hall* (1986) 41 Cal.3d 826, 833 [stating, in addressing a challenge to the exclusion of evidence of third party culpability, that "we do not require that any evidence, however remote, must be admitted . . ."].)

Although defendant correctly points out that his defense made the issues of who shot first — and why Deputy Blair might have done so — central to the resolution of the charges, this does not mean the trial court constitutionally was compelled to permit defendant to introduce all possibly relevant evidence on these subjects despite its marginal relevance, the possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions), and the potentially significant amount of time entailed in admitting the evidence in a manner fair to both sides. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 82 ["a state court's application of ordinary rules of evidence — including the rule stated in Evidence Code

43

section 352 — generally does not infringe upon" the constitutional right to offer a defense]; accord, *People v. Brown* (2003) 31 Cal.4th 518, 545; *People v. Snow* (2003) 30 Cal.4th 43, 90.) Moreover, contrary to defendant's contention, the trial court's assessment of the possible probative value of defendant's proffered evidence in its weighing of the risk of confusion and undue consumption of time did not impermissibly invade the province of the jury. (*People v. Lewis* (2001) 26 Cal.4th 334, 373.) We also observe that the trial court permitted defendant to present evidence concerning alleged misconduct that Deputy Blair himself committed and of Blair's membership in the Vikings, and that defendant, Avila, and Nieves also testified regarding their own negative experiences with the Vikings. For these reasons, the trial court's decision to exclude the evidence regarding alleged misconduct by other deputies did not violate defendant's constitutional rights.

### b. Admission of Defendant's Criminal History

The trial court, over defendant's objections, permitted the prosecution to present in its guilt phase case-in-chief evidence concerning defendant's two prior convictions for assault with a firearm, and his being on parole at the time of the shooting of Deputy Blair, including the conditions of defendant's parole prohibiting him from possessing firearms and associating with Young Crowd members. Because the court decided this evidence was to be admitted in the prosecution's case-in-chief, it also ruled there would not be a bifurcated trial regarding the prior-prison-sentence-enhancement allegations. The prosecution proffered the evidence of defendant's prior convictions and parole status to establish defendant's motive — that he shot at Deputies Blair and Lyons in order to avoid being apprehended for possessing two handguns in violation of the law[13] and his parole.

---

[13] Section 12021, subdivision (a)(1) makes it a felony for any person who has been convicted of a felony to possess a firearm.

44

Defendant raises five related claims challenging the admission of this evidence at the guilt phase:  The trial court erred by (1) admitting evidence of both of defendant's prior felony convictions, rather than, more generally, of his status as a convicted felon; (2) failing to "sanitize" the prior conviction evidence, and instead permitting the jury to learn that the convictions were for assaults with a firearm; (3) admitting evidence that defendant was on parole when he shot Deputy Blair; (4) admitting evidence regarding the terms of defendant's parole prohibiting him from possessing firearms and associating with Young Crowd members; and (5) admitting prison records concerning his convictions.  He contends the trial court's decision to admit the challenged evidence was an abuse of discretion and a violation of his constitutional right to a fair trial.  We are not persuaded.

Citing various decisions of this court and others, defendant asserts that because the prejudice arising from this challenged evidence "was devastating" and "overwhelmed" its probative value, the trial court was obliged to exclude it pursuant to section 352 of the Evidence Code.  Although defendant does not precisely identify the asserted prejudicial effect of the evidence, we may presume from the decisions upon which he relies that he believes the evidence was unduly prejudicial because, apart from tending to establish his motive for shooting Deputy Blair, the evidence would have tended to convince the jury that defendant was guilty solely because he had a criminal disposition.  (See *People v. Thompson* (1980) 27 Cal.3d 303, 317 ["As Wigmore notes, admission of [criminal history] evidence produces an 'over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts.' "].)  To the contrary, however, the challenged evidence was highly probative on the central issue in the case, and the trial court took appropriate measures to reduce the risk of undue prejudice.

"Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.

45

Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) "Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' [Citation.]" (*People v. Daniels* (1991) 52 Cal.3d 815, 856.) " 'We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352.' [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 602 (*Davis*).)[14]

---

[14] In describing the asserted prejudicial effect of the challenged evidence, defendant mentions several times the prosecutor's guilt phase closing arguments, which, defendant contends, discussed not only defendant's motives but also his propensities. We do not, however, consider those arguments in addressing the question whether the trial court abused its discretion by admitting the evidence for the limited purpose of establishing defendant's motive, because when the prosecutor made those arguments to the jury, the evidence at issue no longer was admissible solely to prove motive, but also could be considered by the jury as proof of defendant's violent disposition, pursuant to section 1103, subdivision (b) of the Evidence Code. We address defendant's challenge to that provision *post*, in part II.D.3.

46

Under the prosecution's theory of the case, the connection between the challenged evidence and the charges being tried was clear and central to establishing defendant's guilt. The prosecution's theory was that defendant knew, because of his prior convictions and parole status, that it was illegal and a violation of his parole for him to possess firearms (and a separate violation of his parole to associate with Young Crowd members), and he shot at Deputies Blair and Lyons in order to avoid being apprehended and returned to prison. (See *People v. Heishman* (1988) 45 Cal.3d 147, 168-169; *People v. Durham* (1969) 70 Cal.2d 171, 187-189.) The circumstance that defendant had suffered two prior felony convictions for assault with a firearm corroborated the prosecution witnesses who would testify that defendant believed not only that he would be returned to prison if he was caught with the handguns, but also that he would be subject to a more lengthy "third strike" sentence. This evidence also bolstered the prosecution's interpretation of defendant's jailhouse comment to his mother — that if the police had caught him with the guns, it would have been "all over" for him — as another reference to a third strike or a long prison sentence.

Contrary to defendant's contention on appeal, it was not an abuse of discretion for the trial court to decline to "sanitize" the evidence concerning the prior convictions. A reasonable juror could find the circumstance that both convictions were for the same serious offense of assault with a firearm supported the testimony that defendant feared a third strike if he was caught, even though, as defendant testified, he later learned that only one of his convictions constituted a strike under the law. We need not consider the validity of the trial court's particular reason for not sanitizing the prior convictions — that, in the court's view, it likely would have been even *more* prejudicial to defendant if the jurors were not informed of the nature of his prior offenses, and instead engaged in speculation on the subject. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [if the trial court's ruling is correct " ' "upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its

47

conclusion" ' "].)  There was no abuse of discretion in admitting the evidence because establishing defendant's strong motive to shoot first at the deputies was critical to the prosecutor's case, and, as discussed *post*, the trial court took steps to avoid any unduly prejudicial effect on the jury.  The prosecutor needed to convince the jury that defendant was the shooter — a fact the defense had not conceded when the disputed evidence was admitted — and also the aggressor to disprove any claims of self-defense.

Defendant next contends the evidence concerning his parole status and the conditions of his parole should have been excluded as "cumulative at best," because "any motive to avoid a third strike completely overshadowed any motive to avoid a parole sanction."  Even assuming that defendant is correct in his assessment of the relative weight of these possible motivating factors for his actions, this does not resolve the relevant question:  did the trial court act outside the bounds of reason in determining that the probative value of the evidence that defendant (1) was on parole, (2) had been expressly warned by his parole agent he could not possess firearms, and (3) if discovered, would probably be returned to prison, was not substantially outweighed by the risk of undue prejudice if it were admitted?  In the same manner that defendant claims his parole status was less compelling evidence of his motive to shoot at the officers, the jury's learning that defendant was on parole also was less likely to result in undue prejudice.  But in any event, this evidence nonetheless provided important insight regarding the central issue of the trial by establishing a related, but alternative, motive for defendant to shoot at the officers — to avoid being returned to prison for a parole violation.  (See *People v. Mendoza* (2011) 52 Cal.4th1056, 1070-1071.)  This is particularly so in light of the circumstance that only one of his prior convictions actually counted as a strike, and the possibility that defendant was not aware of or concerned with the three strikes law at the time of the shooting, as, in fact, he claimed in his subsequent trial testimony.

The trial court also took actions to limit the possible unduly prejudicial effect of the prior crimes and parole status evidence.  The court instructed the jury at the

48

commencement of the trial that, unless the court were to instruct the jury otherwise, evidence concerning defendant's prior convictions could be considered only for the limited purposes of establishing defendant's motive and the truth of the prior-prison-sentence-enhancement allegations — in other words, by negative implication, it would be improper for the jury to consider this evidence as establishing defendant's criminal propensity. The court reiterated its instruction on this subject when the parole agent testified concerning the terms of defendant's parole and his prior convictions. (See *People v. Cain* (1995) 10 Cal.4th 1, 34 (*Cain*) [the jury is presumed to follow the trial court's instructions].) In addition, defendant was permitted to testify that only one of his convictions actually was a strike. In light of the significant probative value of the challenged evidence and the trial court's efforts to limit the possible undue prejudice, we cannot say the trial court's rulings were an abuse of its discretion.

Because the trial court did not abuse its discretion under state law in admitting this evidence over defendant's objections, his claim that the admission of this evidence violated his constitutional right to a fair trial, to the extent it is preserved for appeal, also is without merit. (*People v. Riggs* (2008) 44 Cal.4th 248, 292 (*Riggs*) [a defendant's failure to raise a distinct constitutional claim at trial forfeits such a claim on appeal, and to the extent the appellate claim was "merely a gloss on the objection raised at trial, it is preserved but is without merit because the trial court did not abuse its discretion in admitting the evidence"].)

Defendant also challenges the admission of his prison records because the records included a chronology of his imprisonment and parole, along with notations that, he contends, might have led the jury to infer he had committed numerous violations of prison rules, and that he might have been continued on parole (i.e., released from

custody) after he was arrested on the charges in the present case.[15] Defendant contends the trial court should have "sanitized" the report to remove the notations. Defendant, however, did not object to the contents of the records, or ask the trial court to redact them, and he therefore has forfeited this claim. (*People v. Clark* (1992) 3 Cal.4th 41, 125-126 (*Clark*) ["In the absence of a timely and specific objection on the ground sought to be urged on appeal, the trial court's rulings on admissibility of evidence will not be reviewed."].) In any event, even if the prison records should have been redacted to remove the notations at issue, any error was harmless under any standard. Defendant merely speculates that the jury might have understood the cryptic notations at issue in the manner he asserts. Moreover, even if the jury had deciphered the meaning of the notations, there is no reasonable probability that the verdict could have been affected by such collateral issues.

### c. Admission of Deputy Lyons's Testimony Concerning Deputy Blair's Police Work

Defendant contends the trial court erred when it allowed Deputy Lyons to testify, in essence, that Deputy Blair was not the type of deputy who would harass people. This contention is without merit.

During direct examination, Deputy Lyons testified that earlier during their patrol on the night of the shooting, he and Deputy Blair had talked with a group of approximately 15 members of a gang in Compton, who were standing around their cars, drinking beer, and listening to loud music. Although Deputy Blair told them to discard their beer and to turn down the music, the encounter was not particularly adversarial.

---

[15] Defendant contends the jury would have understood the numerous notations of "WCL" as meaning that defendant had suffered "work credit losses" due to (unspecified) violations of prison rules, and a notation of "Arrested/Reinstated" as meaning that defendant had been reinstated on parole after being arrested in the present case.

The gang members soon thereafter entered their cars and drove away. The prosecutor later asked Deputy Lyons whether he and Deputy Blair "jack[ed] them around and [said] get in your car and then watch them drive away and then stop them for driving under the influence?" After Deputy Lyons answered no, the prosecutor continued, "You sort of laughed when I asked you that question. Why is that?" Deputy Lyons answered, "That's just not — we just didn't do that. We weren't — I'm not that type of deputy and Deputy Blair was not that type of deputy." Defense counsel then objected that Deputy Lyons's answer was "nonresponsive," and the trial court overruled the objection.

On appeal, defendant contends the trial court should have struck Deputy Lyons's answer that he and Deputy Blair were not the type of deputies who would "jack around" people in the manner the prosecution suggested, because the testimony was irrelevant, lacked a proper foundation, and was prejudicial. The only objection he raised at trial, however, was that the answer was nonresponsive. The trial court properly overruled that objection because the answer was, in fact, responsive to the question the prosecution had asked, which was why Deputy Lyons had laughed at the previous question that had been posed. Defendant forfeited the grounds he asserts on appeal by not raising them at trial. (*Clark*, *supra*, 3 Cal.4th at pp. 125-126.) Nonetheless, even if defendant had preserved his appellate challenges, and assuming for the sake of argument that the testimony should have been excluded as irrelevant or lacking a proper foundation, any error was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *Scheid*, *supra*, 16 Cal.4th at p. 21 [applying the *Watson* standard to claim of erroneous admission of evidence].) There is no reasonable probability the jury would have reached a more favorable verdict had the trial court struck Deputy Lyons's brief statement that he and Deputy Blair were not the type of deputies who would "jack around" people by ordering them to do something and then arresting them after complying.

*d. Admission of Testimony Concerning the Perception of the Direction of Gunfire*

Defendant next contends the trial court erred by admitting Sergeant Harris's testimony concerning his opinion, based upon his experience as a deputy and firearms examiner in the sheriff's department, that a person might mistakenly identify the location from which a firearm was fired based upon the sound of the gunshot. Defendant's contention lacks merit.

The prosecutor asked Sergeant Harris — in a hypothetical question paralleling Deputy Lyons's testimony — whether, in essence, a person who heard gunshots in such circumstances might mistake the direction from which the shots were fired. Defense counsel objected on the grounds that the question "call[ed] for speculation" and was "not his expertise." After a brief sidebar conference, the trial court overruled the objections and the prosecutor repeated the question. Sergeant Harris testified that, drawing from his "experience when [he] was working at the training academy investigating, from a tactical standpoint we investigated officer involved shootings and deputy involved shootings in the actual training of deputies under stress conditions, that once we put people under stress and shots are being fired, the determination of where a shot came from, even though we know the shot came from the right, the person might say it came from the left or vice versa. So under times of stress, determining where a shot came from often is not possible." Sergeant Harris agreed that although an individual might have said that he or she did not "know where the shot came from but [he or she] heard it from the left," "based upon that alone you can't necessarily say whether the shot was coming from the right or left."

On appeal, defendant urges that the foundation for Sergeant Harris's opinion "was too vague and skimpy." According to defendant, "because Harris had no training or credentials in the science of acoustics or auditory perceptions, which was the subject of his testimony, his opinion was no better than a guess." To the contrary, as we will

52

explain, Sergeant Harris's testimony was not based on the science of acoustics or auditory perceptions, but rather on his specialized expertise gained from his involvement in the training of deputies. The trial court did not abuse its discretion in admitting the testimony. (See *People v. Catlin* (2001) 26 Cal.4th 81, 131 (*Catlin*) [the trial court's admission of expert opinion testimony is reviewed for abuse of discretion].)

" 'A person is qualified to testify as an expert if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) An expert witness's testimony in the form of an opinion is limited to a subject 'that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' (Evid. Code, § 801, subd. (a).)" (*Catlin*, *supra*, 26 Cal.4th at p. 131.) The witness's qualifications may be established by his or her own testimony. (Evid. Code, § 720, subd. (b).) In the present case, Sergeant Harris's testimony stemmed from his "special knowledge [and] experience" in training deputies at the academy. His opinions (that people under stress often are unable accurately to determine from where a shot came, and that if a person were to say that he or she heard a shot from the left this would not necessarily mean the shot did, in fact, come from the left) were "sufficiently beyond common experience" so as to assist the jury in assessing the significance of Deputy Lyons's testimony that it sounded to him like the first shots were fired from behind him and to his left. Accordingly, admitting this testimony was not an abuse of the trial court's discretion.

### e. Admission of Photograph of the Mock Shotgun

In conjunction with Deputy Lyons's testimony concerning the information he and the other members of the gang unit received regarding the Young Crowd gang at the briefing prior to the killing of Deputy Blair, the prosecutor presented six pictures of the pickup truck that had been painted to resemble a sheriff's department patrol vehicle, and

on which various confrontational statements directed at the sheriff's department had been written. Defendant contends on appeal that a photograph of the interior of the truck, which includes what appears to be a handmade representation of a shotgun, and Deputy Lyons's testimony concerning that photograph, should not have been admitted because Deputy Lyons testified that he was not shown that photograph at the briefing. Defendant did not object to the admission of the photograph or the testimony. His assertion to the contrary on appeal mischaracterizes the record. Although the prosecutor at one point stated he was not offering the testimony "for the truth of the matter asserted at this point in time," the trial court twice suggested that *defense counsel* might have made a tactical decision to allow the testimony "to show state of mind as to Blair as he went out" (that is, that he might have been in a heightened emotional state) and therefore "the defense may want all of that." Defense counsel agreed, stating, "Pretty much." When Deputy Lyons's testimony continued the following day after the evening recess, there was no other discussion concerning the prosecution's grounds for proffering the photographs and Deputy Lyons's testimony, or any objections by defendant to the admission of this evidence. Indeed, another witness, Deputy Roberts, also testified — without defense objection — that he was shown the photographs, including the one with the mock shotgun, at a briefing approximately one week before Deputy Blair was shot. Accordingly, defendant has forfeited his appellate claim.

In any event, even if defendant had preserved the claim, any error was harmless. The photograph of the mock shotgun inside the truck did not, by itself, "facilitate[] the prosecutor's promotion of the truck as signifying a deadly threat to the deputies," as defendant urges. Rather, the photographs of the truck Deputy Lyons testified he *did* see at the briefing (which included various disparaging and profane statements regarding the sheriff's department and the statement that "the Crowd's gonna get you," as well as what appeared to be numerous bullet holes in the truck's body) effectively supported the prosecutor's argument that members of Young Crowd were angry with and hated the

54

sheriff's deputies.  Contrary to defendant's arguments, even if the photograph of the mock shotgun had not been admitted, there is neither a reasonable probability that the jury would have reached a different verdict at the guilt phase, nor a reasonable possibility that it would have reached a different penalty verdict (see *People v. Brown* (1988) 46 Cal.3d 432, 448).

### *f.  Admission of Photographs of Mannequin Dressed in Deputy Blair's Uniform*

Defendant contends on appeal that the trial court abused its discretion by admitting several photographs of a mannequin dressed in Deputy Blair's undershirt, bulletproof vest and uniform shirt illustrating the location of the bullet holes in these items and the possible trajectory of the bullets.  Defendant forfeited this challenge by failing to object at trial.  In any event, for decades we have concluded the use of similar evidence is " 'a perfectly proper method of introducing highly relevant evidence.' " (*People v. Brown*, *supra*, 46 Cal.3d at p. 443 [quoting *People v. Robillard* (1960) 55 Cal.2d 88, 99].)  Contrary to defendant's assertion, the circumstance that the prosecution's ballistics expert testified that the sheriff's detectives had set up and photographed the mannequin, but the expert "didn't necessarily require that we do that," did not render the evidence irrelevant.  The expert, in fact, referred to the photographs during his testimony, and even if he had not done so, the jury properly could have considered the photographs in determining the manner in which Deputy Blair had been killed.  Had defendant objected to the evidence as being irrelevant, the trial court properly would have overruled that objection.

### *g.  Admission of Martha Godinez's Preliminary Hearing Testimony*

Over defendant's objections, the trial court permitted the prosecution to introduce at trial the preliminary hearing testimony of Martha Godinez.  After a hearing outside the presence of the jury, the trial court ruled that Godinez was unavailable as a witness because she could not be found, and that the prosecution had exercised reasonable

diligence in attempting to locate her.  Defendant contends the trial court erred by finding the prosecution's efforts to find Godinez were adequate.  The trial court did not err.

" 'The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses.  (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.)  That right is not absolute, however.  An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination.  Under federal constitutional law, such testimony is admissible if the prosecution shows it made "a good-faith effort" to obtain the presence of the witness at trial.'  [Citations.]

" 'In California, the exception to the confrontation right for prior recorded testimony is codified in [Evidence Code] section 1291, subdivision (a), which provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:  [¶] . . . [¶]  (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  A witness is unavailable if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."  ([Evid. Code,] § 240, subd. (a)(5).)  Although section 240 refers to "reasonable diligence," this court has often described the evaluation as one involving "due diligence." ' [Citation.]"  (*People v. Bunyard* (2009) 45 Cal.4th 836, 848-849.)

"We have said that the term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'  [Citations.]  Relevant considerations include ' "whether the search was timely begun" ' [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]."  (*People v. Cromer* (2001) 24 Cal.4th 889, 904.)  "When, as here, the facts are undisputed, a

56

reviewing court decides the question of due diligence independently, not deferentially. [Citation.]" (*People v. Smith* (2003) 30 Cal.4th 581, 610 (*Smith*).)

Detective Verdugo, a sergeant in the homicide division of the sheriff's department who had served as a deputy sheriff for more than 31 years, testified that he was assigned the task of attempting to locate and serve a subpoena upon Godinez in order to obtain her testimony at trial. He began looking for Godinez approximately two weeks before the date set for the start of the trial, first checking her two last known addresses — the motel where she had been residing at the time of the preliminary hearing, and her brother's house. Detective Verdugo found that Godinez had checked out of the motel, and her brother's house was vacant. One neighbor at the brother's house believed that Godinez had gone to Mexico, and another neighbor had not seen her in "quite awhile." Detective Verdugo checked the records of the Department of Motor Vehicles, but found only an address that appeared to predate the last known addresses he had already checked. He nonetheless went to that address, but did not find Godinez there. Detective Verdugo had no knowledge of Godinez's ever having been employed. He checked the hospital and jail records in Los Angeles County on a "pretty regular basis" to determine whether Godinez or her brother had been admitted into either system. He also gave the patrol deputies in the Century Station a photograph and physical description of Godinez, and directed the deputies to contact him if she was spotted, and to take her into custody if that was necessary to ensure that she would appear in court.

Based on this testimony, we conclude the trial court properly ruled that the prosecution had exercised reasonable diligence in attempting to locate Godinez. First, the reasonableness of the activities is supported by the circumstance that her testimony was not of critical importance in the trial. She testified at the preliminary hearing that on the night of the shooting she was seated inside her car, which was in the parking lot near the park at the end of Walnut Avenue, when she heard gunshots. She then saw defendant and several other people run from Walnut Avenue into the park, thereby placing defendant

57

near the scene of the shooting. Other prosecution witnesses and evidence, including defendant's own jailhouse conversation with his family members, provided much stronger support for the jury finding that defendant was the person who shot Deputy Blair.[16]

Second, Detective Verdugo began the search a reasonable period of time before the trial was to commence. Defendant urges that the prosecution should have "kept tabs" on Godinez between the preliminary hearing and the trial because she testified that she had been fearful of testifying, and, therefore, the prosecution should have known she might choose to flee or hide rather than testify. We disagree. Although Godinez testified that she had been fearful, she did testify at the preliminary hearing, and, moreover, she testified that she had moved (with the assistance of the sheriff's department) since the shooting, which presumably was for her protection. Moreover, we rejected a claim similar to defendant's in *People v. Hovey* (1988) 44 Cal.3d 543, 564: "[W]e could not properly impose upon the People an obligation to keep 'periodic tabs' on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply 'disappear,' long before a trial date is set." (See also *People v. Herrera* (2010) 49 Cal.4th 613, 630 (*Herrera*).) In *Hovey* we also distinguished the decision upon which defendant relies, *People v. Louis* (1986) 42 Cal.3d 969, because the witness at issue in *Hovey*, like Godinez in the present case and unlike the witness in *Louis*, could not be deemed a " 'critical' or 'vital' " witness. (*Hovey*, at p. 564.)

---

[16]     Of course, because defendant subsequently testified that he shot Deputy Blair, the identity of the shooter ultimately was not contested.

Finally, Detective Verdugo competently pursued the leads he had concerning Godinez's whereabouts. He checked two possible addresses of which he initially was aware, and a third address he learned from Department of Motor Vehicle records. He periodically checked county hospital and jail records to determine whether she had been placed into either system. He attempted to locate her brother. He interviewed neighbors at the brother's house and learned that Godinez might have gone to Mexico, and there is nothing in the record to indicate that Detective Verdugo should have suspected she might have gone somewhere else. (See *Smith*, *supra*, 30 Cal.4th at p. 611 [the prosecution may reasonably rely upon hearsay in deciding what steps should be taken to locate a witness, and need not attempt a " 'futile act,' " such as trying to compel an unwilling witness outside the court's jurisdiction to return to testify].) Because Detective Verdugo had no information concerning Godinez's employment history, he had no lead to follow in that area.

In sum, the prosecution exercised reasonable diligence under the circumstances in attempting to locate Godinez. (See *Herrera*, *supra*, 49 Cal.4th at p. 623.) Even if, as defendant asserts, the prosecution could have contacted the law enforcement officers who assisted in moving Godinez before the preliminary hearing, attempted to find other people who knew her, or searched for her in Mexico, the circumstance that "additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298 (*Cummings*); *Hardy v. Cross* (2011) 565 U.S. ___, ___ [132 S.Ct. 490, 495] (per curiam) ["when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence [citation], but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no

59

matter how unpromising."].)**17**  Accordingly, the presentation at trial of Godinez's preliminary hearing testimony did not violate defendant's statutory and constitutional rights.

To the extent defendant separately contends the use of Godinez's preliminary hearing testimony was unduly prejudicial because the jury might have inferred that her absence at trial indicated that the fears of being harmed that she had expressed at the preliminary hearing had come to fruition, defendant forfeited this claim by failing to object or request an admonition that might have prevented such speculation by the jury. Moreover, there is nothing in the record demonstrating the jury drew such an inference from Godinez's absence, and we observe that the prosecutor in no way implied that Godinez had been harmed. In addition, we might surmise that because Renele Brooks and Sara Frausto, who also expressed fear of retaliation for testifying and yet provided much more damaging evidence, testified in person at the trial, it was even less likely the jury would have believed Godinez had been harmed to prevent her from testifying. Further, Godinez had testified at the preliminary hearing that the reason she feared she might be harmed was because she initially had lied to the police to provide an alibi for someone other than defendant, but she later told the police that that person was, in fact, not with her when the shooting started. She confirmed that her false statements to the police had nothing to do with defendant. Accordingly, we discern no reasonable probability that defendant could have been unduly prejudiced by the admission of Godinez's preliminary hearing testimony.

---

**17**     Similarly, even assuming, as defendant's trial counsel suggested during the hearing, that Detective Verdugo could have checked with the United States Postal Service to determine whether Godinez had provided a forwarding address when she left the motel, this would not affect our conclusion that Detective Verdugo's efforts were reasonable.

### h. Assertedly Unfair Imbalance in Rulings

Defendant claims the trial court's evidentiary rulings, especially those concerning each party's motive evidence (defendant's evidence concerning the Vikings and the lawsuit, and the prosecution's evidence concerning defendant's criminal history), demonstrate the court improperly applied a more burdensome standard of admissibility to defense evidence than the standard it applied to prosecution evidence. We are not persuaded. Defendant points to no instances in the record in which the trial court explicitly applied inconsistent standards. Moreover, as is often the case, the trial court at times excluded evidence proffered by the prosecution, and at other times admitted defense evidence over the prosecution's objections. We have concluded the trial court did not err with regard to the evidence that both sides proffered concerning the motives of defendant and Deputy Blair (see *ante*), but even if we were to conclude the trial court had abused its discretion in those (or other) rulings, any such errors would not without more establish that the trial court had improperly employed inconsistent standards. (See *People v. Jones* (2011) 51 Cal.4th 346, 376-377.) Defendant has not established that the trial court utilized different standards with regard to the admission of evidence at the trial, and, therefore, his claim that his constitutional rights to due process and a fair trial were violated in this manner is without merit. (Cf. *People v. Thornton* (2007) 41 Cal.4th 391, 420-425 [rejecting the claim that the trial court had imposed different standards in assessing the ability of prospective jurors to serve on a capital case when nothing in the record suggested the court applied different standards].)

### 2. Asserted Prosecutorial Misconduct

#### a. Introduction

Defendant claims the prosecutor engaged in numerous instances of misconduct during the guilt phase of the trial, thereby violating his rights under both the state and federal Constitutions. "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when

attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights — such as a comment upon the defendant's invocation of the right to remain silent — but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." '  [Citation.]"  (*Riggs*, *supra*, 44 Cal.4th at p. 298.)  We note that, as will be applicable to many of defendant's assertions of misconduct, "[a]lthough it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct."  (*People v. Scott* (1997) 15 Cal.4th 1188, 1218.)

Defendant's briefing on the prosecutorial misconduct issue is difficult to follow, making it somewhat challenging to identify his exact claims of misconduct.  Rather than identifying a specific instance of asserted misconduct and then discussing why the prosecutor's action was improper and how defendant was prejudiced, defendant seems to have taken a more "global" approach, often asserting an overarching theme of misconduct, and then mentioning a number of actions by the prosecutor from various points in the trial that assertedly fall within the theme of asserted misconduct at issue.

In addition, defendant at trial did not object to a large majority of the alleged instances of misconduct he now mentions on appeal, nor did he request that the trial court admonish the jury in each instance when an objection was sustained, or assert that the admonitions the trial court did give on various occasions were insufficient.  A defendant generally " ' "may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.  [Citation.]" ' [Citation.]"  (*Riggs*, *supra*, 44 Cal.4th at p. 298.)  A defendant's failure to object and to request an admonition is excused only when "an objection would have been futile or an

admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159.) Defendant therefore forfeited appellate claims of misconduct related to many of the prosecutor's actions listed in his briefs. (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)

Defendant asserts that we should excuse his failure to preserve misconduct claims as to all these actions by the prosecutor because objections would have been futile, no action by the trial court could have cured the prejudice, and the prosecutor's alleged misconduct throughout the trial was so "pervasive" that defense counsel cannot be faulted for failing to bring every instance of misconduct to the trial court's attention. (See *Hill*, *supra*, 17 Cal.4th at pp. 820-821.) This case, however, is not on par with the circumstances of *Hill*. As was the case in *People v. Foster* (2010) 50 Cal.4th 1301, defense counsel here was not faced with a " 'constant barrage of [the prosecutor's] unethical conduct' " and counsel's objections did not provoke " 'the trial court's wrath.' " Unlike in *Hill*, the trial court in this case did not suggest before the jury that counsel was " 'an obstructionist,' " and was merely " 'delaying the trial with "meritless" objections.' " (*Foster*, at p. 1352; see *People v. Friend* (2009) 47 Cal.4th 1, 29 (*Friend*) [defense counsel's failure to object to alleged misconduct is excused "when the 'misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile' "]; *People v. Dykes* (2009) 46 Cal.4th 731, 775 (*Dykes*) [exception to forfeiture rule does not apply when the case "did not involve counsel experiencing — as did counsel in *Hill* — a 'constant barrage' of misstatements, demeaning sarcasm, and falsehoods, or ongoing hostility on the part of the trial court, to appropriate, well-founded objections"].) Here, the record does not establish that properly framed objections would have been in vain or provoked any "wrath" on the part of the trial court; rather, all indications are that the court was reasonably responsive to defense objections throughout the trial; indeed, the trial court at times interposed its own objections to what it perceived as improprieties by the prosecutor. (See *Friend*, *supra*, at

p. 30 [in light of defense counsel's frequent objections and the trial court's having sustained several of them, exception to the forfeiture rule did not apply because the record established "the trial court kept a firm hand on the actions of the attorneys and maintained a fair proceeding"].) There is no reason to suspect the trial court was predisposed to overrule objections to the prosecutor's deeds (i.e., that an objection would have been futile), or that corrective actions, such as appropriately strong admonitions, would not have been able to cure any prejudicial effect on the jury had defendant requested them. (See *People v. Boyette* (2002) 29 Cal.4th 381, 432 (*Boyette*).)

Moreover, contrary to defendant's contention, the trial court did not have a general duty to intervene on his behalf to counteract the asserted misconduct such that, as defendant urges, his specific failures to object and request admonitions would be excused on appeal. (*Riggs*, *supra*, 44 Cal.4th at p. 298 [rejecting claim that a trial court has "an independent duty to remedy unobjected-to prosecutorial misconduct in order to control the proceedings"]; see also *People v. Ervine* (2009) 47 Cal.4th 745, 806-807.)

For the most part, we address the asserted instances of misconduct in the order in which they are presented in the opening brief, but at times reframe the claims so they can be addressed in a more coherent and logical manner. We do not separately analyze each and every one of the multitude of particular acts by the prosecutor that are mentioned in passing in the brief in the context of defendant's global assertions of misconduct.

We discuss the merits of those claims that were preserved for appeal through a proper objection and request for an admonishment, as well as claims of misconduct in which the issue of forfeiture is "close and difficult," and we therefore assume the claim was preserved and proceed to the merits. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6.) As for claims that plainly were not preserved, we simply identify the claims and conclude they are forfeited, without undertaking an analysis of the merits of the claims. As we shall discuss, however, within the category of forfeited claims there are

two instances of improper actions by the prosecutor that, although forfeited as a basis for reversal on appeal, give us grave concern and warrant special condemnation.

### b. Introduction of Defendant's Criminal History

Defendant contends that during trial the prosecutor at times improperly introduced evidence concerning defendant's criminal history and referred to such evidence in his statements to the jury. Although defendant acknowledges the evidence in general was properly admitted, he urges that "the prosecutor commented and embellished on the evidence in such an intentionally sarcastic, repetitive and prejudicial manner that it constituted misconduct and a denial of [defendant's] right to confrontation of the evidence against him." Even assuming defense counsel's various trial objections to aspects of this questioning preserved this claim, we discern no misconduct. As the trial court ruled, defendant's criminal history initially was relevant to establish his motive to shoot at the deputies and the truth of the prior prison term sentencing allegations. Ultimately, after defendant introduced evidence to establish Deputy Blair's character for violence, the prosecutor was permitted to establish and comment upon defendant's character for violence, demonstrated by his having committed violent acts, such as the prior assaults using a firearm. (See Evid. Code, § 1103, subd. (b).) Defendant has not convinced us that either the prosecutor's actions regarding the introduction of evidence of defendant's criminal history or the prosecutor's arguments on the subject were improper.

To the extent defendant claims the prosecutor's comments during his opening statement to the jury that the shooting of police officers was an "unintended but not unanticipated side effect result of the three strikes law," and that "[w]e knew that these three strikes candidates are going to kill police officers rather than go to jail" constituted misconduct separate from the assertedly improper reliance upon defendant's criminal history, we again are not persuaded. Assuming defense counsel's objection to the first statement as being improper "argument" was sufficient to preserve defendant's appellate

65

claim, and even assuming misconduct occurred because the statements constituted argument (see *People v. Farnam* (2002) 28 Cal.4th 107, 168 [" '[t]he purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present' "]), and referred to matters outside the evidence to be presented at trial, defendant could not have been prejudiced by these brief and not particularly inflammatory comments. (*People v. Harris* (1989) 47 Cal.3d 1047, 1080.) This is especially so in light of the trial court's having instructed the jury several times that the statements of the attorneys did not constitute evidence.

### c. Cross-examination of Ernesto Avila

Defendant contends the prosecutor committed misconduct by questioning Avila regarding the meaning of "Smokey," defendant's nickname. The prosecutor, after eliciting from Avila testimony that in street parlance, "to smoke" someone meant to kill him or her, asked whether defendant had earned his nickname by "smoking" people. Avila denied that this was the meaning of defendant's nickname. Even assuming that defense counsel's objection to the initial question concerning defendant's nickname (which was overruled) was sufficient to preserve defendant's appellate claim, it is without merit. Contrary to defendant's assertion, the shared root of the two words at issue provided a good faith basis for the prosecutor to ask whether defendant's nickname derived from his having "smoked" someone. The circumstance that Avila testified this was not the meaning of defendant's nickname did not make the prosecutor's questions improper.

Defendant contends the prosecutor improperly questioned Avila concerning certain subjects with the "intention to emphasize group violence to incite the jurors against [defendant] and the defense witnesses." Even to the extent defendant made adequate objections to the prosecutor's assertedly improper conduct, he failed to request that the trial court admonish the jury not to draw any such adverse inference from the

testimony. In light of the circumstance that the trial court sustained several of defendant's objections to the questions at issue, we cannot say that a request for such an admonition would have been futile, nor can we conclude that a properly framed admonition would have been ineffective in preventing the asserted prejudice defendant raises on appeal. Accordingly, even to the extent the claim was preserved, there was no prejudicial misconduct.

Defendant also urges that the prosecutor engaged in misconduct because he continued to ask questions regarding certain subjects after the trial court had sustained defendant's objections to earlier questions, thereby assertedly disregarding the court's rulings.[18] Even assuming defendant adequately raised objections to the prosecutor's questions, defendant at no time asked the trial court to admonish the jury regarding the prosecutor's having ignored the court's rulings, and we discern no reason to believe that such an admonition could not have corrected any impropriety that might have been occurring. These claims, too, are forfeited. Moreover, we observe that it is not necessarily improper for an attorney to attempt to overcome prior sustained objections by asking a witness similar questions that have been reframed in an effort to meet the trial court's ruling.

Defendant contends the prosecutor committed misconduct by questioning Avila concerning his knowledge of defendant's having been incarcerated, and Avila's own history of being in jail and prison. Defendant asserts that by eliciting this testimony, the prosecutor sought to impeach Avila in an impermissible manner, and improperly "painted

---

[18]     For example, defendant points to the prosecutor's questioning of Avila concerning his testimony that he threw away the gun he was carrying because he was afraid of the police. After the court sustained defendant's relevance objection to the prosecutor's question "How many gun fights have you been in," the prosecutor asked Avila, "Have you been in gun fights?" and the trial court again sustained defendant's objection.

67

Avila as a dangerous person whose testimony should be disbelieved for that reason, and further smeared [defendant ] by association." Defendant forfeited this contention by failing to object in the trial court to any of the assertedly improper questions on that basis.

Defendant contends the prosecutor engaged in misconduct by misleading the jury when questioning Avila concerning his testimony that Deputy Blair subjected him to so-called flashlight therapy, that is, that Deputy Blair hit Avila with a flashlight for being disrespectful. At an earlier hearing outside the presence of the jury at which the trial court considered whether to permit defendant to present evidence concerning the civil lawsuit against the sheriff's department and the Vikings, Avila testified that Deputy Blair inflicted flashlight therapy on him "a few times." When questioning Avila at the hearing, the prosecutor's questions concerning flashlight therapy and Avila's subsequent answers were framed as though there had been only one incident of flashlight therapy by Deputy Blair.[19] Defendant did not object, or attempt to clarify Avila's testimony on the issue in redirect examination.

During his trial testimony, Avila stated on direct examination that he had been subjected to flashlight therapy by members of the Vikings "three or four" times, and specifically by Deputy Blair on more than one occasion. On cross-examination, the prosecutor confronted Avila with what the prosecutor perceived as an inconsistency between Avila's cross-examination testimony at the hearing, which, in response to the prosecutor's questions, seemed to imply that there was only one incident involving

---

[19] Avila testified during cross-examination at the hearing that he had "three or four" contacts with Deputy Blair in "around '93, '94" and confirmed that Deputy Blair was one of the deputies who had inflicted flashlight therapy on him. The prosecutor then asked, "So is this the same incident where Blair flashed the gang sign . . . , or is this a different incident?" Avila responded, "No, a different incident," and the prosecutor asked, "So when did this incident where Blair gave you flashlight therapy take place? When?" Avila replied, "About '94," and when pressed on a more definite time in that year, Avila said, "About June or July."

Deputy Blair, and Avila's trial testimony that there had been more than one incident.[20] Defense counsel objected that the prosecutor was misstating the evidence, and that the prosecutor's question concerning why Avila might have changed his testimony was argumentative. The trial court overruled each objection. The prosecutor then elicited from Avila that although he had testified that Deputy Blair gave him flashlight therapy in June or July of 1994, Avila, in fact, had been in jail and prison at that time, and Deputy Blair had not assaulted him while he was incarcerated. Avila ultimately stated that he was not exactly sure when he had received flashlight therapy from Deputy Blair. Defendant did not revisit this subject during Avila's redirect examination.

Defendant contends the prosecutor "blatantly misstated the facts" and referred to "facts that were beyond the trial evidence" in challenging Avila's credibility concerning the subject of flashlight therapy. Assuming defendant's objections at trial preserved this claim, we conclude it is without merit. Avila's testimony at the hearing outside the presence of the jury was ambiguous concerning how many incidents involved Deputy Blair — although he initially testified to "a few" incidents, he later appeared to adopt the prosecutor's characterization that there was only one incident. Thereafter, he testified before the jury that there was more than one incident. The prosecutor was permitted to explore the apparent inconsistency in this testimony. Indeed, defendant was free to

_____

**20** The prosecutor asked, "This morning you said it was one incident. This afternoon you said it was two. What changed." When Avila said that he did not understand the prosecutor's question, the prosecutor continued, "Well, this morning it was only one time. This afternoon in front of the jury it's more than once. What helped you remember the other times that Deputy Blair was supposed to have administered this flashlight therapy to you? . . . [¶] Why did it change [from] once to more than once? Do you think it sounded better?" Avila answered no, and said, "I would have swore I said . . . he gave me . . . flashlight therapy a few times earlier." The prosecutor responded, "We have a transcript and we'll look at it later."

attempt to clarify Avila's testimony in redirect examination, but he chose not to do so. (See *People v. Valencia* (2008) 43 Cal.4th 268, 283 (*Valencia*).)

Defendant next contends the prosecutor committed misconduct in his questioning of Avila regarding whether he told his parole agent that on the day Deputy Blair was shot some Young Crowd members had spoken of "killing the next deputy that came down the street." After Avila stated that he did not make such a statement, the prosecutor asked Avila whether his parole agent would be lying if she testified to the contrary. Defendant did not object to the prosecutor's "would she be lying" question, and therefore forfeited his appellate claim of misconduct.

Defendant contends the prosecutor's questions regarding whether Avila's father lied to the police concerning where Avila was during the shooting also constituted misconduct, because the prosecutor "smuggled in hearsay evidence about Avila's father covering for him" and denied defendant the opportunity to confront the evidence against him.[21] Defendant forfeited this claim by failing to object at trial.

Defendant next asserts that the prosecutor engaged in misconduct by asking Avila a series of questions essentially concerning whether, in his experience as a gang member, if the police were harassing one member of the gang, other gang members who were nearby and were armed would respond to help the person being harassed. Avila testified that some would do so and others, including Avila, would not. Defendant urges that Avila's answers introduced irrelevant evidence that was intended "to make [defendant] look that much worse, suggesting that [defendant] shot simply to kill a deputy." Defendant did not object on that basis at trial, and therefore forfeited this claim.

---

[21] The prosecutor asked Avila, "By the way, your dad lied about where you were that night, didn't he?" Avila answered that his father had been drunk that night. The prosecutor then asked, "Did he say you were in the shower?" Avila answered that he did not know what his father had said.

Defendant also contends the prosecutor committed misconduct by mischaracterizing Avila's testimony concerning where defendant was the last time Avila saw him before the shooting started.[22] As defendant observes, Avila did not agree with the characterization of the facts as stated in the prosecutor's questions, and the trial court, in response to defense counsel's objections, explicitly advised the prosecutor (and the jury) that the prosecutor had misstated the evidence. Accordingly, even to the extent we could be convinced the prosecutor was purposefully misstating the testimony and was not merely mistaken or properly attempting to clarify the witness's testimony, any such misconduct could not have been prejudicial.

Finally, defendant contends the prosecutor's cross-examination of Avila in general was inappropriately argumentative and inflammatory, noting that at certain points the trial court sustained objections to argumentative questions, or advised the prosecutor not to interrupt the testimony, and to "keep [his] voice down." It is clear from the record that the cross-examination of Avila was contentious. Even to the extent we might characterize the prosecutor as having overreacted to the difficulties he faced in effectively questioning Avila, however, it is clear that the trial court monitored the situation and intervened when it felt it necessary to do so. Defendant has not demonstrated that the trial court's actions were insufficient to ameliorate any possible prejudice arising from the prosecutor's behavior.

### d. Cross-examination of Defendant

Defendant contends the prosecutor committed misconduct during the cross-examination of defendant by questioning him regarding his prior criminal history in a "repetitive and derisive fashion" intended to prejudice the jury against him. Assuming

---

[22] The prosecutor asked several questions premised upon defendant's having been *at* a particular house on the street, although Avila had testified defendant was *on the way toward* that house.

71

defense counsel's objections were sufficient to preserve this claim, because defendant presented evidence in an attempt to establish Deputy Blair's violent character, the prosecutor was permitted to explore defendant's violent character, which included not only the nature of his past violence, but also its frequency, and its persistence even in light of the punishment he received. In the present case, evidence of defendant's violent character was intertwined with his criminal history, and evidence regarding his criminal history, including his parole status, was relevant insofar as it related to his motive to shoot at the deputies and to the truth of the prior-prison-term-sentence-enhancement allegations. Accordingly, the prosecutor's exploration of this subject was not misconduct.

Defendant also observes that at various points during the cross-examination the trial court sustained objections to some questions as being argumentative, or as having been asked and answered. As with the cross-examination of Avila, even from the cold record on appeal we can discern that defendant's cross-examination also was quite contentious. Again, however, defendant has not demonstrated that the trial court's actions to control the proceeding were inadequate to prevent any intemperate behavior by the prosecutor from prejudicing the jury against the defense case.

### e. Direct Examination of, and Argument to the Jury Concerning, Deputy Lyons

Defendant contends the prosecutor committed misconduct by eliciting from Deputy Lyons emotional testimony intended to inflame the jury's passions and its sympathy for the victims, and then highlighting that evidence in his arguments to the jury at the close of the guilt phase. Defendant urges that the prosecutor, in essence, improperly sought to introduce "victim impact" evidence and arguments into the jury's determination of defendant's guilt. Other than one instance in which defendant objected on relevance grounds to a question concerning whether Deputy Lyons thought the shooting affected his ability to be an effective deputy, defendant failed to object to any of

72

the asserted misconduct. He therefore has forfeited this claim except as to that particular question. The trial court sustained the objection to that question, and Deputy Lyons was not permitted to answer it. Even assuming the mere asking of the question could be characterized as misconduct, defendant could not have been prejudiced.

Defendant contends the prosecutor also engaged in misconduct by asking an argumentative question that improperly sought to mislead the jury concerning whether Deputy Blair shot first.[23] The trial court sustained defendant's objection to the question however, eliminating any possibility of prejudice. (*Dykes*, *supra*, 46 Cal.4th at p. 763.) Similarly, to the extent that any misconduct occurred when the prosecutor asked whether the person who shot at the deputies was taking cover behind a tree, the trial court's sustaining of defendant's objections precluded any prejudice to defendant.

Defendant also urges that the prosecutor's questions to Deputy Lyons regarding whether he had known where his "assailant" was located improperly assumed facts not in evidence (that Deputy Lyons had been assaulted). Defendant failed to object to the question, thereby forfeiting his appellate claim.

### f. Cross-examination of Jose Nieves

Defendant contends the prosecutor engaged in misconduct when he asked Nieves several times whether the deputies who searched his house recovered an AK-47 assault rifle. Defendant asserts the prosecutor's questions insinuated that, contrary to Nieves's testimony, the deputies did find such a weapon in the house, and that, because the prosecutor ultimately did not present any evidence confirming that such a rifle had been

---

[23] Based upon Deputy Lyons's testimony that, when he heard the first set of shots, he saw that Deputy Blair did not yet have his handgun out of his holster and he therefore knew that Deputy Blair did not shoot first, the prosecutor asked, "You don't need detectives or a degree in rocket science to show that[,] and you don't need a degree in rocket science to know that, do you?"

recovered during the search, the prosecutor knew his insinuation was false. Defendant did not object to the prosecutor's questions on these grounds, and therefore forfeited his appellate claim.

### g. *Examination of Renele Brooks and Sara Frausto*

Defendant contends the prosecutor engaged in improper "vouching" for the credibility of Renele Brooks's testimony when, during redirect examination, he asked her, "[On] June first when you finally talked to the deputies truthfully, you didn't call them, did you?" Defendant did not object to the prosecutor's question, and, therefore, his appellate claim is forfeited.

Defendant contends the prosecutor also improperly vouched for Brooks's testimony on another occasion during redirect examination when, in the course of questioning her concerning the circumstances of her later interview with the homicide detectives, the prosecutor asked whether Brooks had been accompanied by her lawyer "because you wanted to make sure that everything was legal that was going on?" After defendant objected, the trial court ruled that the question was beyond the scope of proper redirect examination, and ordered the jury to disregard Brooks's answer, which was yes. In light of the trial court's ruling, we conclude no prejudicial misconduct occurred.

Defendant next contends the prosecutor improperly dwelled upon an inflammatory term and "twisted" the meaning of Brooks's testimony concerning what defendant said concerning the reason he shot at the deputies. During her direct examination, Brooks testified defendant said that after Avila threw his gun, all defendant could think of was that because he had two strikes and was in possession of two handguns, he would go back to jail for the rest of his life — and so, instead, he shot at the deputies in order to escape. During *cross-examination*, defense counsel asked whether Brooks remembered telling the deputies that defendant had said "he wasn't going to jail for . . . no bullshit." Brooks stated she did tell the deputies that, and also testified that she did not ask defendant "what

74

the bullshit was," and that it was "never explained in the conversation." On redirect examination, the prosecutor sought to clarify Brooks's understanding of what defendant meant by saying he was not going to go to jail for "no bullshit." She testified that she understood defendant's statement to mean he viewed the possibility of his being convicted of a third strike for possession of the handguns and sent to prison for the rest of his life was the subject "bullshit." Defense counsel objected to the prosecutor's questions as leading and beyond the scope of redirect examination, but the trial court overruled the objections. Defendant asserts on appeal that the repeated use of the word "bullshit" during redirect examination was intended to inflame the jury, and that the prosecutor's questions "twisted" the assertedly "obvious" meaning of defendant's statement — namely, "that any criminal charge arising out of that shooting would be groundless." Because at trial defendant did not object on these specific grounds, his claims are forfeited.

Defendant contends that when the prosecutor asked Brooks questions regarding whether she had heard Young Crowd members speaking of the sheriff's deputies' having shot a member of the gang, these questions improperly emphasized gang membership in order to inflame the jury. The trial court sustained defense counsel's objection to the question, finding it argumentative, and the prosecutor rephrased the question. Defendant did not request an admonition. Even to the extent that a claim of misconduct regarding the question was preserved, defendant could not have been prejudiced in light of the trial court's action and the circumstance that the jury already was aware of defendant's membership in the gang.

Defendant contends the prosecutor committed misconduct when questioning Sara Frausto concerning what she heard Douglas Bristol say regarding the shooting. The substance of what she heard Bristol say was that defendant "did it." The trial court initially sustained defendant's hearsay objection to Frausto's testimony, but, contrary to defendant's characterization of the record, also recognized that the prosecutor might seek

75

to have the statement admitted not for the truth of the matter asserted, but to establish Frausto's state of mind when she later asked defendant about the shooting. Defendant urges that the prosecutor's subsequent questions regarding Bristol's statement constituted misconduct because the prosecutor "continue[d] to ask the same questions to which the trial court ha[d] just sustained an objection and [reminded] the jury of the stricken answer." Assuming defendant's claim is not forfeited, it lacks merit. The prosecutor asked questions regarding Bristol's statement for a nonhearsay purpose (to establish Frausto's state of mind), which the trial court acknowledged would be proper. When the trial court ultimately permitted the prosecutor to elicit what Frausto heard Bristol say, the court gave a proper and detailed instruction to the jury concerning the limited purpose for which the testimony was being admitted.[24] Accordingly, there was no misconduct.

### h. Cross-examination of Douglas Bristol

Defendant appears to contend that the prosecutor committed misconduct by questioning Douglas Bristol in a hostile manner and misstating his testimony in the questions posed. Even to the extent that we would conclude defendant's claim was preserved for appeal by defense counsel's objections to aspects of the questioning, and that any misconduct occurred, the record demonstrates that the trial court took appropriate action to prevent any prejudice to defendant. There is no reasonable probability that any misconduct could have affected the verdict.

---

[24] The trial court instructed as follows: "This answer is not being offered for the truth of the matter asserted; that is, you may not consider what Doug said to be truthful but it is being allowed as to this witness's state of mind to understand what she then said to the defendant. [¶] So under that instruction please keep that in mind because Doug is not here. Doug is not testifying. He is not subject to cross-examination. So you can't consider what Doug said to be true." The court later reminded the jury that the statement was "not being offered for the truth of the matter asserted," meaning the jury could not "presume that to be true. It only is admitted to explain what actions this witness took or what she thought at the time."

*i. Direct Examination of Claretha Jackson, Avila's Parole Agent*

Defendant contends the prosecutor improperly questioned Claretha Jackson, who was Ernesto Avila's parole agent, concerning Avila's having told her that Young Crowd members had spoken of shooting a deputy because the deputies had been harassing them. The claim is forfeited because defendant did not object at trial.

*j. Asserted Attempt to Dissuade Avila From Testifying*

At a hearing outside the presence of the jury, during which the trial court considered whether to permit the defense to present evidence regarding the Vikings and the civil lawsuit against the sheriff's department, defense counsel made an offer of proof asserting that Avila would testify to the circumstances of the shooting of Deputy Blair and his interactions with the Vikings, essentially consistent with Avila's ultimate testimony at the trial. Avila was not present at the hearing. After the offer of proof, the prosecutor advised the court that in testifying that he was the person who threw the gun, Avila would be "significantly incriminating himself," and as a possible third-strike candidate, might face a sentence of 25 years to life in prison if he were to be convicted of being a felon in possession of a firearm. The prosecutor questioned whether, if Avila had the advice of independent counsel, he would choose to testify. Defense counsel then advised the court that he had discussed the matter with Avila more than once, and had "explained what his constitutional rights are [and] his possible exposure to additional charges." According to defense counsel, Avila wished to have independent counsel appointed to advise him. The trial court then had Avila brought before the court and advised him that at his request the court would appoint counsel to discuss with him the "possibility that you may be implicating yourself in criminal activity that could have serious consequences to you." Avila ultimately chose to testify after consulting with the attorney who had been appointed to advise him.

Defendant contends on appeal that the prosecutor's actions constituted an improper attempt to interfere with defendant's ability to exercise his constitutional right

77

to "compulsory process." (See *In re Martin* (1987) 44 Cal.3d 1, 30 [a defendant's "constitutional right to compulsory process is violated when the government interferes with the exercise of his right to present witnesses on his own behalf," including "the intimidation of defense witnesses by the prosecution"].) This claim is forfeited because defendant did not raise a claim of a compulsory process violation in the trial court. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 991 (*Lewis and Oliver*).)

### k. Closing Arguments

Defendant raises a number of claims of asserted misconduct during the prosecutor's arguments to the jury at the close of the guilt phase of the trial. He failed to object to nearly all of these instances at trial. He urges, however, that his failure to object should be excused because repeated objections would have run the risk of alienating the jury. We are not persuaded. Defendant's proposed exception to the rule requiring contemporaneous objection would, in essence, swallow the rule that in order to preserve a claim of misconduct, the defendant must make an objection and request an admonition so that the trial court has an opportunity to attempt to alleviate the potential harm caused by the prosecutor's action. (See *Boyette*, *supra*, 29 Cal.4th at p. 432.)

In only three instances did defendant object at trial on the same ground he raises on appeal. The first was when the prosecutor, in discussing the defense's attempt to establish Deputy Blair's violent character, stated, "That was the only way that they could say what they're making up, this nonsense, about killing an unarmed gang member. They had to bring in his widow to talk about how they had a family dispute." Defense counsel objected that the defense had not called Deputy Blair's *widow* as a witness. The trial court agreed, advising the prosecutor that the witness had been Deputy Blair's *ex-wife*. The prosecutor then stated, "Ex-wife, to say that they had a family dispute." Even if the prosecutor's statement is characterized as misconduct and not merely an inadvertent misstatement, there clearly is no reasonable probability that the outcome could have been

affected in light of the trial court's prompt correction of the prosecutor's error on this insignificant point.

Defendant also objected at trial, and was overruled, when the prosecutor referred to defendant as a "punk."[25] The prosecutor's use of the epithet in this circumstance was not misconduct, but was "founded on the evidence in the record and fell within the permissible bounds of argument." (*Friend*, *supra*, 47 Cal.4th at p. 32; see also *People v. Young* (2005) 34 Cal.4th 1149, 1224 [" 'Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence.' "].) In any event, these brief comments "would not have had such an impact 'as to make it likely the jury's decision was rooted in passion rather than evidence.' [Citation.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 1003.)

Finally, defendant objected when the prosecutor stated, "If he had respect for the law, do you think that three times in prison might have told him that he shouldn't be hanging around there? [¶] Do you think three times in prison might have said, you probably shouldn't be carrying two guns?" Defense counsel objected "to three times in prison," but the trial court overruled the objection. As defendant observes on appeal, he had not served three prior prison terms — he was twice imprisoned, and once had been placed in a California Youth Authority facility. To the extent the prosecutor's comments overstated the nature of one of defendant's prior commitments, and constituted misconduct, any such misconduct could not have been prejudicial. There is no reasonable probability that, when compared to what would have been a correct statement

---

[25] Defense counsel made an objection while the prosecutor was in the middle of telling the jury, "When we allow punks like this . . . to roam the street, terrible things happen." Defense counsel did not state a specific ground for the objection. The trial court overruled the objection, stating, "It's argument." The prosecutor soon thereafter rhetorically asked, "Do you think this punk had any respect for the law?"

79

of defendant's commitment history, the prosecutor's inaccurate statement was so prejudicial that it could have affected the jury's verdict.

### l. Cumulative Prejudice

Defendant contends the cumulative prejudicial effect of the asserted prosecutorial misconduct warrants the reversal of the judgment because, he urges, the evidence supporting a finding of guilt was "less than compelling." To the extent we have concluded (or have assumed for the sake of argument) that defendant has preserved some of his claims of misconduct, and have concluded (or assumed) that, with regard to the preserved claims, misconduct occurred, we also have concluded that the misconduct could not have been prejudicial. Defendant's arguments concerning the relative strengths and weaknesses of the prosecution and defense cases do not convince us that the preserved instances of misconduct or assumed misconduct, when considered individually or cumulatively, deprived defendant of a fair trial.

### m. Improper Actions by the Prosecutor

We are quite troubled by two instances of improper actions by the prosecutor that, we conclude, were not preserved for appeal. We briefly discuss here these instances of misconduct to express our disapproval of such behavior.

First, the prosecutor elicited from Deputy Lyons that he was testifying in the uniform he wore on the night of the shooting, which, in fact, still had Deputy Blair's blood on it, and that Lyons wore the uniform "because [Deputy Blair] meant a lot to me"; it "was the last time that I saw him," after which Deputy Lyons apparently briefly wept. During closing argument, the prosecutor reminded the jury of Deputy Lyons's emotional moment on the stand by stating that Deputy Lyons "stood up here and bared his soul to you. There was no holding back. [¶] Do you think he wanted to cry up here? Do you think it made him feel good in front of his fellow co-workers? [¶] These guys don't wear their emotions on their sleeve. They are very deep inside. They can't let their emotions

80

come out." By presenting this witness to the jury in his bloodstained uniform and eliciting the deputy's emotional testimony, the prosecutor improperly engaged in inflammatory conduct that appealed to the passions of the jury. Further, in reminding the jury of this aspect of Deputy Lyons's testimony during argument, the prosecutor exceeded the permissible bounds of commenting on Lyons's demeanor while testifying as an indication of his sincerity (see CALJIC No. 2.20; CALCRIM No. 226) by improperly referring to facts not in evidence concerning what Deputy Lyons felt about his emotional breakdown, and how law enforcement officers in general deal with their emotions. (See *Osband*, *supra*, 13 Cal.4th at p. 698 [a "prosecutor should not, of course, argue facts not in evidence"]; *People v. Redd* (2010) 48 Cal.4th 691, 742 (*Redd*) [it is misconduct " 'to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response" ' "].)

Second, during his closing arguments, after discussing the basic dispute in the case — whether "Deputy Blair fired on an unarmed gang member because he [Blair] is a Viking or it didn't happen" — the prosecutor continued, "Now it doesn't mean the men and women that are in court today and out there on the street protecting the lives of the people in Lynwood; if I am worthy enough — I actually asked permission before doing this — I am going to become a Viking. [¶] You see what this is? It's just a pin. [¶] . . . [¶] A triangle and a Viking." The prosecutor then affixed the pin to the lapel of his suit coat. The prosecutor's act of — in his own words — literally "becom[ing] a Viking" in front of the jury constituted improper "vouching" in several ways. (See *People v. Huggins* (2006) 38 Cal.4th 175, 206-207 ["it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of

experience, or the prestige or reputation of their office, in support of it"].)[26]  The prosecutor essentially gave unsworn testimony that the Vikings were not a group of rogue deputies as the defense suggested, but were, instead, simply anyone who (with the deputies' permission) wore a Viking pin in solidarity with the deputies.  Further, the prosecutor placed his own prestige and the prestige of his office behind the Vikings, and in so doing, improperly interjected into the trial his personal view of the credibility of the heart of the defense case.  Indeed, the prosecutor's comments that he had "asked permission" to become a Viking, and, nonetheless, wondered if he was "worthy" of doing so, implied to the jury that the status of the prosecutor and his office actually was *less* than that of the Vikings.  In addition, the prosecutor's act implicitly contradicted his successful arguments regarding the exclusion of defendant's proffered evidence concerning the civil lawsuits against the sheriff's department by suggesting that because the other members of the Vikings (including, now, the prosecutor himself) would act only honorably, Deputy Blair also would have acted honorably.  Having successfully opposed the admission of defense evidence regarding the Vikings' and other deputies' bad reputations, the prosecutor should not have sought to interject what amounted to equally immaterial evidence of the Vikings' good reputation.

### 3. *Assertedly Improper Jury Instruction Concerning Propensity Evidence*

Defendant presented evidence attempting to establish that Deputy Blair had a reputation and character for engaging in violence, thereby seeking to bolster the credibility of his contention that it was Deputy Blair who unjustifiably shot first.  The

---

[26]  Contrary to defendant's assertions on appeal, defense counsel did not object to the prosecutor's donning the Viking pin as constituting improper vouching.  Defense counsel objected to the prosecutor's argument solely on the ground that there had been no testimony regarding the significance of the pin, and did not object to the prosecutor's continuing to wear the pin in keeping with the trial court's direction not to discuss its significance.

trial court ruled that by doing so, pursuant to section 1103, subdivision (b) of the Evidence Code,[27] defendant opened the door for the prosecution to present evidence of defendant's violent character. The trial court ultimately instructed the jury concerning its consideration of the violent character evidence as follows: "A person's character for violence may be shown by evidence of reputation, opinion, or specific acts of violence. Evidence of a person's character for violence may tend to show the person acted in conformity with such character. [¶] Whether a person had a character for violence and whether he acted in conformity with such character are matters for the jury to decide." Defendant contends on appeal that the admission of his violent character as propensity evidence and the instruction permitting the jury to consider it in determining his guilt "was fundamentally unfair in violation of his rights to a fair jury trial, due process and to be protected from cruel and unusual punishment, as protected by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution."[28]

Although defendant did not object to the instruction in the trial court, we nonetheless address the merits of his claim. It appears that because defendant, in essence, raises a legal challenge to section 1103(b), at the time of trial an objection may have been futile in light of *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1173-1176 (*Blanco*), which had upheld the statute. (See *People v. Welch* (1993) 5 Cal.4th 228, 237.) In any event, we may address defendant's claim under section 1259 in light of his assertion that the challenged instruction affected his substantial rights. We conclude defendant's claim fails on the merits.

---

[27]    Hereinafter in this part of the opinion we refer to this provision as section 1103(b).

[28]    Although defendant cites the Eighth Amendment in the introduction of his claim, he does not articulate a claim under that provision separate from his claim of a violation of due process. We therefore address only whether the statute violates due process.

83

"As a general rule, evidence that is otherwise admissible may be introduced to prove a person's character or character trait. ([Evid. Code,] § 1100.) But, except for purposes of impeachment (see [Evid. Code,] § 1101, subd. (c)), such evidence is inadmissible when offered by the opposing party to prove the defendant's conduct on a specified occasion ([Evid. Code,] § 1101, subd. (a)), unless it involves commission of a crime, civil wrong or other act and is relevant to prove some fact (e.g., motive, intent, plan, identity) *other than a disposition to commit such an act* ([Evid. Code,] § 1101, subd. (b))." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*) [addressing a constitutional challenge to section 1108 of the Evidence Code, which permits the admission in a sexual offense trial of evidence of the defendant's prior sexual offenses].) The Evidence Code, however, establishes several exceptions to this general rule. Three interrelated provisions relevant in the present case are set forth in section 1103, subdivisions (a) and (b). Pursuant to subdivision (a)(1), in a criminal action, the defendant is permitted to offer evidence of the victim's "character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)" in order "to prove conduct of the victim in conformity with the character or trait of character." (Evid. Code, § 1103, subd. (a)(1).) Once the defendant has offered such evidence, the prosecution is permitted to offer its own character evidence of the victim to rebut the defendant's evidence. (Evid. Code, § 1103, subd. (a)(2).) Further, if the defendant has offered "evidence that the victim had a character for violence or a trait of character tending to show violence," the prosecution is permitted to offer "evidence of the *defendant's* character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)" in order "to prove conduct of the defendant in conformity with the character or trait of character." (§ 1103(b), italics added.) In other words, if, as in the present case, a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is

84

permitted to introduce evidence demonstrating that (1) the victim was not a violent person, and (2) the defendant was a violent person, from which the jury might infer it was the defendant who acted violently.

Section 1103(b) was enacted in 1991 by unanimous vote of the Legislature as part of a measure that also restored the permissible use of specific instances of conduct to prove character. (Legis. Counsel's Dig., Assem. Bill No. 263, 1 Stats. 1991 (1991-1992 Reg. Sess.) Summary Dig., p. 14; 1 Assem. J. (1991-1992 Reg. Sess.) p. 301; 1 Sen. J. (1991-1992 Reg. Sess.) pp. 366-367.) According to the statement of the author of the bill, the amendments to the statute "create[] a level playing field between prosecutors and defense attorneys, and ensure[] that juries are given a complete picture of both the defendant's and victim's character." (Assemblyman Quackenbush, sponsor, letter to Governor re Assem. Bill No. 263 (1991-1992 Reg. Sess.), Mar. 1, 1991.)

A defendant challenging the constitutionality of a statute carries a heavy burden: "The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citations.] In the due process context, [the] defendant must show that [the statute] offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (*Falsetta*, *supra*, 21 Cal.4th at pp. 912-913.)

Defendant's argument rests on a claim that certain evidence is simply too prejudicial, and its admission at a criminal trial therefore violates due process. However, as the United States Supreme Court recently stated, "[o]nly when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' [citation], [has the court] imposed a constraint tied to the Due Process Clause." (*Perry v. New Hampshire* (Jan. 11, 2012, No. 10-8974) 565 U.S. ___, ___ [2012 U.S. LEXIS 579, p. *17] [citing, as an example, the constitutional prohibition against a prosecutor's " 'knowin[g] use [of] false evidence,' "]; see also *id.* at pp. ___-___ [pp. *17-*21] [discussing cases in which due process was violated by the admission of witness

85

identification evidence that was developed through improperly suggestive police procedures that created a " 'substantial likelihood of misidentification' "]; *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920 ["Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' "].) The high court has repeatedly stressed that, as a general matter, the federal Constitution does not mandate particular rules concerning the admission of evidence. As the court stated in *Perry*, at pp. \_\_\_-\_\_\_, [2012 U.S. LEXIS 579, pp. *16-*17] "[c]onstitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel [citation]; compulsory process [citation]; and confrontation plus cross-examination of witnesses [citation]. Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial." (See also *Marshall v. Lonberger* (1983) 459 U.S. 422, 438, fn. 6 ["the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"]; *Spencer v. Texas* (1967) 385 U.S. 554, 568-569 [concluding that mandating as a constitutional matter that a recidivist allegation must be tried separately from the issue of the defendant's guilt would be a "wholly unjustifiable encroachment by this Court upon the constitutional power of States to promulgate their own rules of evidence to try their own state-created crimes in their own state courts"].) Indeed, as pertinent to defendant's claim in the present case, the high court, in *Estelle v. McGuire* (1991) 502 U.S. 62, explicitly reserved the question whether a state law would violate due process if it permitted the admission of evidence of the defendant's criminal propensity to establish that the defendant committed the charged offense. (*Id.* at p. 75, fn. 5; see also *Alberni v. McDaniel* (9th Cir. 2006) 458 F.3d 860, 863-867 [concluding there is no clearly established federal law for purposes of federal habeas corpus review of a state court's decision to admit propensity evidence, and noting that the high court had

denied certiorari in at least four cases presenting the issue reserved in *Estelle*]; *Bugh v. Mitchell* (6th Cir. 2003) 329 F.3d 496, 512 ["There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."].)

Defendant's reliance on various judicial statements regarding the long-standing common law tradition of disallowing the use of propensity evidence to prove the defendant's conduct on a particular occasion is misguided for two primary reasons. First, as we stated in *Falsetta*, the existence of a general historical bar of the use of propensity evidence to prove the defendant's conduct does not mean that the Legislature's enactment of a contrary rule necessarily is at odds with affording defendants fundamentally fair trials. (*Falsetta*, *supra*, 21 Cal.4th at p. 914 ["a long-standing practice does not necessarily reflect a *fundamental*, unalterable principle embodied in the Constitution"].) Second, none of the cases defendant cites addressed the use of propensity evidence in the particular context at issue in the present case — the admission of evidence establishing defendant's propensity for violence to prove violent conduct on defendant's part (not merely criminal propensity to prove criminal conduct), which was presented to the jury only after defendant elicited evidence of the victim's violent propensity.

We cannot say that, in providing for the jury to obtain a balanced view of the possible violent tendencies of both the victim and the defendant, the Legislature ran afoul of any fundamental conception of justice embodied in the federal Constitution.

As the Court of Appeal observed in *Blanco*, the operation of section 1103(b) is dependent upon a choice made by the defendant, in much the same way that other strategic choices made by the defense during a trial will make admissible evidence that otherwise would have been excluded. (*Blanco*, *supra*, 10 Cal.App.4th at p. 1176.) It is not fundamentally unfair to require the defendant to make that choice: "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. [Citation.] Although a defendant

87

may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (*McGautha v. California* (1971) 402 U.S. 183, 213.)[29]

Moreover, in the time since *Blanco* was decided, the Federal Rules of Evidence have been amended to include a provision similar to section 1103(b). (See Fed. Rules Evid., rule 404(a)(1), 28 U.S.C., as amended Apr. 17, 2000 [providing in relevant part that "if evidence of a trait of character of the alleged victim of the crime is offered by an accused and admitted under Rule 404(a)(2), evidence of the same trait of character of the accused offered by the prosecution" is admissible].) Thirteen other jurisdictions, whose evidentiary rules generally parallel the federal rules, have since adopted the same or a similar rule.[30] The federal rule (and those of 12 other jurisdictions) actually would

_____

[29] Although, as defendant observes, the approach taken by section 1103(b) reflected a distinct minority view in the United States when it was enacted, defendant has not pointed to any instance in which that approach, despite having been criticized by some, has been ruled unconstitutional. Indeed, it appears the State of Missouri has followed a similar rule for more than 70 years. (*Blanco*, *supra*, 10 Cal.App.4th at p. 1174 citing *State v. Robinson* (Mo. 1939) 130 S.W.2d 530, 531-532; see also *State v. Oates* (Mo. 2000) 12 S.W.3d 307, 313 [applying the rule established in *Robinson*].) As the Court of Appeal observed in *Blanco*, the criticism of the minority rule, which was noted by the reviser of Wigmore's treatise on Evidence (see IA Wigmore, Evidence (Tillers ed. 1983) § 63, pp. 1378-1379), apparently has taken the form of "scholarly and judicial debate which has not heretofore been viewed as implicating issues of constitutional significance." (*Blanco*, *supra*, at p. 1174.)

[30] The other jurisdictions that (thus far) have followed the amended federal rule are Delaware, Colorado, Kentucky, Michigan, North Dakota, Pennsylvania, Tennessee, Utah, Vermont, the Commonwealth of the Northern Mariana Islands, and the territories of Guam and the United States Virgin Islands. These jurisdictions use a numbering system parallel to the Federal Rules of Evidence; that is, the comparable Delaware provision, for example, is found at rule 404(a)(1) of the Delaware Uniform Rules of Evidence. In addition, the State of Georgia recently amended its statute to follow the federal rule. (See 2011 Ga. Laws 52, enacting H.B. 24 (2011-2012 Reg. Sess.) amending Ga. Code Ann., § 24-4-404(a)(1), signed by Gov. May 3, 2011 and eff. Jan. 1, 2013.) The State of Alaska also enacted a similar provision prior to the amendment of the federal rule. (See Alaska

*(footnote continued on next page)*

appear to be broader than section 1103(b), in the sense that its scope is not limited to evidence of violence.[31] The rationale for the amendment to the federal rule is essentially the same as that articulated for section 1103(b). According to the federal Advisory Committee Notes for rule 404 (2000 amend.): "The amendment makes clear that the accused cannot attack the alleged victim's character and yet remain shielded from the disclosure of equally relevant evidence concerning the same character trait of the accused. For example, in a murder case with a claim of self-defense, the accused, to bolster this defense, might offer evidence of the alleged victim's violent disposition. If the government has evidence that the accused has a violent character, but is not allowed to offer this evidence as part of its rebuttal, the jury has only part of the information it needs for an informed assessment of the probabilities as to who was the initial aggressor. This may be the case even if evidence of the accused's prior violent acts is admitted under Rule 404(b), because such evidence can be admitted only for limited purposes and not to show action in conformity with the accused's character on a specific occasion. Thus, the amendment is designed to permit a more balanced presentation of character evidence when an accused chooses to attack the character of the alleged victim." Although defendant acknowledges the federal rule, he points to no decision (and we are aware of none) concluding that the amended federal rule — or the parallel provisions of the other jurisdictions — is unconstitutional.

_____

*(footnote continued from previous page)*

Rules of Evid., rule 404(a)(2), as amended eff. July 15, 1995 [providing for the admissibility of "evidence of a relevant character trait of an accused . . . offered by the prosecution in a case to rebut evidence that the victim was the first aggressor"].)

[31] The scope of the rule in Michigan, in a manner similar to section 1103(b), is limited to "evidence of a trait of character for aggression of the accused." (Mich. Rules of Evid., rule 404(a)(1).) Similarly, the Alaska rule is limited to evidence rebutting evidence that the victim was "the first aggressor." (Alaska Rules of Evid., rule 404(a)(2).)

Because defendant has failed to demonstrate that section 1103(b) violates any fundamental constitutional principle of fairness and justice, we conclude he has not carried his heavy burden of establishing that the statute is unconstitutional.

Moreover, as in *Falsetta*, even were we to conclude that the general rule against the use of propensity evidence against a defendant is of a "fundamental" nature, and that the general rule would be applicable in the particular context of the operation of section 1103(b), we would nonetheless uphold the statute. Section 1103(b) is "reasonably compatible" with the "three separate reasons supporting the general rule against admission of propensity evidence" and therefore does not violate due process. (*Falsetta*, *supra*, 21 Cal.4th at pp. 915-916.) As explained *ante*, the statute places no unfair burden upon the defendant because it leaves to the defendant the choice whether evidence of his or her violent propensity will be admissible. The statute also limits the admissible evidence to that establishing the defendant's character for violence, which, pursuant to sections 210 and 350 of the Evidence Code, must be relevant to a material issue in the trial. Although the statute does not contain an explicit statement of the applicability of Evidence Code 352 (unlike the statute at issue in *Falsetta*), we discern nothing in section 1103(b) prohibiting a trial court from exercising its discretion to limit the admission of violent propensity evidence in the interest of fostering judicial efficiency, or preventing "undue prejudice" to the defendant. In sum, the statute remains constitutional because it does not "unduly 'offend' " any fundamental principles advanced by the general practice of barring the use of propensity evidence to prove a defendant's conduct. (See *Falsetta*, *supra*, at p. 915.)

For these reasons, defendant's challenge to the trial court's instruction regarding the consideration of evidence concerning his violent propensity fails.

### 4. Assertedly Improper Trial Court Actions Concerning Jurors

#### a. Lack of Investigation Concerning Possible Effect of Spectator Behavior Upon Jurors

Defendant contends the trial court abused its discretion by failing to conduct an adequate investigation concerning the possibility that members of the jury had been improperly influenced by the conduct of two spectators in the courtroom audience. We are not persuaded.

On the morning defense counsel was to resume giving his guilt phase closing argument to the jury, the trial court first conducted an in-chambers meeting with the parties to discuss a telephone call the court had received that morning from one of the jurors, Juror J. The court reported that Juror J., who was crying, told the court she had been awake all the previous night, had a migraine headache and felt nauseated, and was "basically incapacitated and unable to come to court today." Juror J. had said she commonly gets such headaches when she was under stress, and that the case had caused her a "great deal of stress." One particular source of stress was that she had observed two female spectators in the courtroom, who she believed were "aligned" with the defense, apparently speaking of the jurors and pointing at several of them. Although Juror J. did not perceive the pointing as intended to threaten the jurors, the incident concerned her. The trial court confirmed with Juror J. that no one had approached her or said anything to her. Juror J. stated, however, that as the jurors were walking through the parking lot on their way home the previous evening, "some of the jurors talked about this," and one juror, Juror A., suggested that "perhaps a note should be sent to the court."

The trial court advised the parties that it had not observed any improper conduct by courtroom spectators, but the court was of the view that, "[a]t a minimum," Juror J. should be excused and replaced with an alternate juror. The court then continued, "Beyond that I am seeking counsel's input, to what, if anything, we should do to assuage any possible concerns that any of the jurors have. [¶] My own feeling would be that

until the other jurors tell us something, it's not necessary to take any action. [¶] If [Juror A.] writes us a note, then we will read what the note is and we'll go from there." The court observed that there was no indication that anyone had said something directly to the jurors, and that Juror J. might have been "just an overly sensitive person."

In response to the trial court's suggestion that Juror J. could be called to state on the record what the trial court had recounted, defense counsel stated, "No, I don't need to do that." Defense counsel also observed that it was not necessarily improper for courtroom spectators to discuss the jurors, and the trial court reiterated that Juror J. "did not say that the gestures were threatening." The prosecutor agreed with the trial court's plan of dismissing Juror J., and not questioning the remaining jurors, but suggested that the court, outside the presence of the jury, admonish the spectators not to engage in any behavior directed at the jury. Defense counsel added that the court should remind the spectators that their gestures could be misinterpreted. After the trial court admonished the courtroom spectators as suggested, the jury was called into the courtroom, the court advised the jury that Juror J. was unable to continue because she had a migraine headache, which she "says she gets . . . occasionally," and was feeling nauseated. An alternate juror was seated in her place, and defense counsel then continued with his closing arguments.

On appeal, defendant contends that, even in the absence of a request by the parties, the trial court breached its duty to investigate the possibility that other members of the jury might have been prejudiced by the spectators' alleged conduct. "We have held that when a court is put 'on notice that improper or external influences were being brought to bear on a juror . . . "it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of the other jurors has been affected." ' [Citation.] Such an inquiry is central to maintaining the integrity of the jury system, and therefore is central to the criminal defendant's right to a fair trial. [Citation.]" (*People v. Kaurish* (1990) 52 Cal.3d 648, 694.) On the other

92

hand, "not every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct — like the ultimate decision to retain or discharge a juror — rests within the sound discretion of the trial court. [Citation.] . . . [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citation.]' [Citation.]" (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 (*Cleveland*); see also *Martinez*, *supra*, 47 Cal.4th at pp. 942-943; § 1089 [providing that the trial court may discharge a seated juror and replace him or her with an alternate if "a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty"].) " ' "The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." ' [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348 (*Bradford*).)

The trial court did not abuse its discretion in the present case by taking a "wait and see" approach concerning whether any juror other than Juror J. might have been affected by any actions of the courtroom spectators. First, the court itself had not observed any possibly inappropriate behavior by any spectators at the trial. Second, even assuming the truth of what Juror J. had reported to the court — that two people associated with defendant had been talking and pointing at various jurors in a nonthreatening manner, and this had upset Juror J. — these circumstances did not suggest that other jurors were similarly upset to the extent that they, too, might not have been able fairly to perform their duties as jurors. As the trial court observed, it may have been the case that Juror J. was an overly sensitive person. Assuming further that, as Juror J. reported, the subject was mentioned as the jurors were leaving the courthouse on the previous day, and that Juror A. had suggested that perhaps a note should be sent to the court, this similarly did not suggest that anyone other than Juror J. had been upset — the exchange could have

93

simply been Juror A. and the other jurors advising Juror J. that if she was disturbed by something that had happened during the trial, she should advise the court. There is no support for defendant's speculation that the other jurors were "unsettled" by the gestures of the spectators, or, for that matter, that anyone other than Juror J. even saw the alleged gestures at issue. Third, defense counsel's acquiescence in the trial court's decision regarding how to handle the situation, without an assertion of possible misconduct or a request for a hearing regarding the other jurors' ability to continue on the case, further supports our conclusion that a hearing was not warranted. (See *Bradford*, *supra*, 15 Cal.4th at p. 1349.) Indeed, it was defense counsel who pointed out that there was "certainly nothing improper" if courtroom spectators simply had discussed the jurors. In sum, it was reasonable for the trial court to proceed on the belief that any other juror who might have been affected by asserted spectator conduct would call that circumstance to the court's attention, rather than the court suspending the trial in the midst of closing arguments to undertake an inquiry on the subject. (See *ibid*.)

Defendant's argument that there is uncertainty in the record concerning what occurred because the trial court did not conduct an inquiry, and, therefore, we must conclude the trial court erred, overlooks the starting point of the analysis — whether the information the trial court was aware of when it made its decision warranted further inquiry. Adopting defendant's position would, in essence, mandate that the trial court conduct an inquiry whenever it becomes aware of any indication of a possibility that there might be good cause to remove a juror. That is not the law. (*Martinez*, *supra*, 47 Cal.4th at p. 942; *Bradford*, *supra*, 15 Cal.4th at p. 1348.)

Accordingly, we conclude there was no abuse of discretion in the trial court's decision not to conduct an inquiry of the remaining jurors. We also observe that defendant has pointed to nothing in the record that would indicate any remaining juror actually was biased against defendant as a result of the juror's having seen spectators talking and pointing at the jurors, such that we could conclude that there actually was

94

good cause to remove a juror on that ground, or that any failure to excuse such a juror violated defendant's constitutional right to an impartial jury. (See *Martinez*, *supra*, 47 Cal.4th at p. 943 [" ' "juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality' [and a reviewing court] will not presume bias" ' "].)

### b. Discharge of Juror T.

Defendant contends the trial court abused its discretion by dismissing Juror T. during the guilt phase deliberations because the record does not establish to a demonstrable reality that Juror T. was unable to perform his duties as a juror. He asserts this error violated his state and federal constitutional right to trial by jury, warranting the reversal of the judgment. We conclude the trial court did not abuse its discretion.

### i. Background

On the third day of the jury's guilt phase deliberations, the trial court received a note from the jury foreperson, informing the court that Juror T. wished to speak with the court regarding a "personal matter concerning this case." Accompanying the foreperson's note were two other notes addressed to the court: a typewritten note from Juror T., and a handwritten note from another juror, Juror P. We reproduce Juror T.'s note below as the original appeared:

> Dear Your Honor,
>
> As a juror of People v. Fuiava, I have encountered potentially significant and disturbing legal issue during the course of deliberation, which I believe can be addressed by the court and thus clarified to our fellow jurors. Juror [P.], on behalf of several jurors, has expressed and brought to my attention in explicit, no less certain terms, of their belief of reprehensible infraction for a juror to accentuate a testimony, while discrediting another statement by the very same witness, based on the juror's personal bias.
>
> Meanwhile, more than one fellow juror have taken adamant stance to outright reject entire testimonies of some key witnesses, valid or not, based solely on the witness' age, alleged association with the defendant, or affiliation with the gang,

95

The Young Crowd. Again, I must confess to my disagreement with the treatment of witness credibility.

I have rarely been accused of wrongdoing in my adult life, and never involving a matter with such momentous implication as in this case of determining the future of another individual's life. However, if the court's interpretation is fully consistent and concurs with [Juror P.]'s "admonition," I will ask for permission for dismissal from the case at once as an unfit juror, based on failure to comply with the court's instruction as stated.

Juror P.'s handwritten note read as follows:

Your Honor,

I read [Juror T.'s] letter to you and strongly feel that he has misinterpreted what I and others have said. I would like to speak to you in regards to the letter. Please know that the letter does not accurately reflect what I have said.

Furthermore, I question [Juror T.]'s ability to follow the instructions of the law as you have instructed us to do. He is letting the "death penalty" and his emotions cloud the case. In addition, I question [Juror T.]'s understanding of English. If he feels he should be dismissed, I would support that request.

Thank you.

[Juror P.]

(Pgs to refer to: pgs 11, 15, 16, 17, 19, 21)

In closing, your Honor, I am disturbed that [Juror T.] thinks that I would discount a witness just because he/she is in Young Crowd or affiliated with YC.

The trial court discussed the two notes with the parties. The court mentioned that it appeared Juror T.'s note had been prepared the night before, and that the pages referred to in Juror P.'s note appeared to be certain jury instructions, specifically, CALJIC Nos. 2.06 (Efforts to Suppress Evidence), 2.13 (Prior Consistent or Inconsistent Statements as Evidence), 2.20 (Believability of Witness), 2.20.1 (Evaluation of Testimony of Child Ten Years of Age or Younger), 2.21.2 (Witness Willfully False) and 2.23 (Believability of Witness — Conviction of a Felony). The court then stated it was

96

"very troubled" by Juror T.'s note, although it was "not all that sure what it is he's saying." The court acknowledged that "apparently some of the jurors are taking the position of outright rejection of entire testimony of some key witnesses and that he disagrees with that." The court also observed that Juror T.'s statement regarding the seriousness of the case was of concern because "we want him to judge the case on the evidence without concern for the consequences of the assessment of the evidence, . . . and that ties into a point that [Juror P.] raises in her note to us." The court then explained its inclinations concerning how to proceed: "Since [Juror T.] asked to speak to me, I thought we should probably have him come out and tell us what is on his mind. [¶] He indicates that he is thinking about asking to be dismissed from the case as an unfit juror if he's misunderstanding the instructions on the law. [¶] This is what I read in this note. [¶] I don't want to misread what he is saying. [¶] My thought is another way to proceed would be to start with [Juror P.] and see what she says. [¶] The third option, of course, would be to take no action. But I think under these circumstances, that would be unwise. [¶] I think that we should try to assist the jury and these jurors in their understanding of the law." The court stated that it did not view questioning the jurors as "an impermissible inquiry into how deliberations are proceeding" but rather "as a concern over what the law says and how the law should be understood," which the court viewed as a proper matter to address with the jurors. The court then invited counsel to comment.

The prosecutor expressed his view that the notes brought out the "potential that a juror or jurors are unwilling to follow the instructions as they were provided by the court," and therefore called for an inquiry. The prosecutor agreed with the suggestion to question Juror T. first, but noted that "depending upon what he says obviously, I think that we may necessarily have to expand the inquiry to include [Juror P.] and potentially other members of the jury . . . ."

Defense counsel stated a different view of the notes: "It sounds to me like there is some disagreement in there and that jurors have accused each other of not following the

97

law.  [¶]  It's apparently a matter of interpretation, and I think that if [Juror T.] apparently is sensitive in, and has been accused I guess by other jurors of not following the law, but he apparently — the gist that I get is he is following the law as he understands it.  [¶] And I guess — I think what he is asking for is a little help from the court to reassure him that he is entitled to interpret the evidence as he sees it or whatever."

The prosecutor then pointed out that Juror T.'s note could suggest that he was inappropriately considering the issue of punishment in the guilt phase deliberations.  The trial court agreed that was a concern, adding, "Another concern I have is this idea of — the sentence where a juror accentuating the testimony while discrediting another statement by the very same witness based on the juror's personal bias.  [¶]  Well, I don't think personal bias is appropriate when a juror weighs and considers evidence."  The court concluded, stating, "So I think we have got a lot of questions to ask."  Thereafter, the readback of testimony that was occurring was interrupted, and Juror T. was brought into the courtroom.  We reproduce the entirety of the court's colloquy with him:

"The Court:  Hi, [Juror T.].

"[Juror T.]:  I'm sorry to trouble you.

"The Court:  How are you doing today.

"[Juror T.]:  Oh, I'm little bit tired because of not too much sleep, but I'm okay. Thank you.

"The Court:  Are you?

"[Juror T.]:  Yeah.

"The Court:  I'm not sure I fully understand your letter.  And I think we ought to start with that.

"[Juror T.]:  Excuse me?  Yeah.

"The Court:  And are you — is it okay with you to talk in this setting?  [¶]  First of all, did you just want to see me by myself in chambers, or is this okay?

"[Juror T]:  Oh, no.  This will do just fine.

98

"The Court: Because I think it is important for the attorneys and the defendant to hear what you have to say.

"[Juror T.]: Absolutely.

"The Court: All right. What — is there a disagreement that you have with some of the other jurors as to what the law is?

"[Juror T.]: Well, actually we had a discussion in the jury room this morning. I wrote that actually last night following our deliberation. [¶] I mean it came to my attention — I was not fully aware of your instructions at the time. But some of the jurors made it clear that — well, she used the term 'legal' [32] to take account of some part of a witness testimony while disregarding another by the witness. [¶] And, also, that — yeah, it was made clear to me today, but I was not comfortable with the instruction that — to completely reject certain testimony from what I believe are key witnesses based on their age or some background. [¶] I would have liked to look at both, but I cannot — I have problem with rejecting all the witness — all the testimony because of certain inconsistencies.

"The Court: Well, I don't want you to tell me about the deliberations or who is arguing what.

"[Juror T.]: Okay.

"The Court: I want to know though if there is a need to have a better clarification on what the law says?

"[Juror T.]: No, I think that part — well, this morning we examined the instruction book, and I had a chance to glance over it.

---

**32**    Defendant questions whether this was an accurate transcription of Juror T.'s statement, or whether he might have said "illegal." Our conclusion regarding the propriety of the trial court's dismissing Juror T. would not change based upon a possibility that Juror T. might have used the word "illegal."

"The Court: All right. [¶] So in your own mind, do you have any question as to what the law says at this time?

"[Juror T.]: At this point, no, I am much more clear about that, yes.

"The Court: All right.

"[Juror T.]: Yes.

"The Court: Now, are you able to follow the instruction and the law?

"[Juror T.]: I thought over this last night, and today, but I might not be fair to the prosecutors or the defense if my bias plays a role in which testimonies I will reject entirely while relying on other evidence or witness which to me was little bit less — well, more inconsequential. [¶] So to reject these testimonies based on certain background, it may not be — I might not be fair to the system as intended.

"The Court: So are you telling me that as you sit here now and you have had a chance to think about the law and you have had a chance —

"[Juror T.]: Yes.

"The Court: — to think about these things overnight — and you obviously wrote this letter, what, last night?

"[Juror T.]: Yes.

"The Court: Okay. But having had a chance to think about everything, are you telling me that you believe that it is likely that you will not be able to follow the law in this case?

"[Juror T.]: As, yes, stated in the instruction book. Of course, not all, but perhaps certain — the details. I may fail to meet the standards that you come to expect from the jurors.

"The Court: Well, what I expect from the jurors is for them to understand the law.

"[Juror T.]: Yeah.

"The Court: And for them to apply the law. [¶] Now, are you saying that you think that you are not going to be able to apply the law? [¶] Is that what you are saying?

100

"[Juror T.]:  Yes, yes.

"The Court:  Well, having said that, do you think that you should be excused from the case?

"[Juror T.]:  I —

"The Court:  You know why I ask —

"[Juror T.]:  I think I should — I think I should be — I think I should be —

"The Court:  Excused?

"[Juror T.]:  — Excused.

"The Court:  And, you know, this is not a personal thing.  [¶]  You understand that?

"[Juror T.]:  Of course.

"The Court:  It is just that you are saying if I understand you — and I want to make it clear that you believe having thought about the law that you cannot follow the — all the law's instructions; is that correct?

"[Juror T.]:  Yes, Yes.

"The Court:  Okay."

The trial court then had Juror T. return to the jury room, and discussed the matter with counsel.  The court stated it was "satisfied that the juror has indicated an unwillingness to follow the law," and had "stated it very clearly."  Defense counsel, however, told the court he "would like to know what bias he is talking about."  The prosecutor stated his view that such an inquiry would be "inappropriate under the circumstances," and the court told counsel it did not "think it's necessary to explore it further."  The court then stated, "I am satisfied that he has said he will not follow the law.  And that's all that I need I think to excuse him, and I think he should be excused."  Defense counsel continued to request further questioning:  "Your honor, my impression is that his interpretation in following the law is what the other jurors have told him.  [¶] And he hesitated, and he didn't specifically say that he couldn't follow the law.  He just

101

felt that his own biases somehow prevented him from following the law. [¶] But my interpretation of what he was saying is that that's according to what the other jurors think. And I'd like to at least ask him that." The trial court disagreed, stating, "I think that it was very clear that he felt that he — after talking to the jurors, after reading the instruction that he had personal biases that would prevent him from following the law. [¶] And I am satisfied. I am going to go ahead and excuse him." The trial court then called the jury into the courtroom, excused Juror T., replaced him with an alternate, and directed the jury to begin its deliberations anew. The first alternate juror who replaced Juror T. participated in deliberations for the remainder of the day, but then, because she was too emotionally distraught to continue, was removed from the jury without objection the next morning. The next alternate juror then joined the jury, and it deliberated for approximately three hours before reaching its verdict.

### ii. Discussion

A trial court made aware of the possibility of a juror's misconduct, and particularly possible misconduct occurring during the jury's deliberations, is placed on a course that is fraught with the risk of reversible error at each fork in the road. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*) ["Removing a juror is, of course, a serious matter . . . . While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care. [Fn. omitted.]"].) The court must first decide whether the information before the court warrants any investigation into the matter. (See *People v. Compton* (1971) 6 Cal.3d 55, 60 (*Compton*) [trial court abused its discretion by failing to investigate possible misconduct and simply discharging the juror " 'out of an abundance of caution' "].) If some inquiry is called for, the trial court must take care not to conduct an investigation that is too cursory (see *People v. Burgener* (1986) 41 Cal.3d 505, 520-521 [trial court abused its discretion by questioning only the jury foreman regarding the possible misconduct of another juror, and by not questioning

102

the juror at issue]), but the court also must not intrude too deeply into the jury's deliberative process in order to avoid invading the sanctity of the deliberations or creating a coercive effect on those deliberations (see *Cleveland*, *supra*, 25 Cal.4th at pp. 475-476). After having completed an adequate (but not overly invasive) inquiry into the misconduct issue, the trial court must then decide whether, under section 1089, there is "good cause" to excuse the juror at issue.[33] The court at this final fork might err in declining to dismiss a juror who should have been excused (see, e.g., *People v. Holloway* (1990) 50 Cal.3d 1098, 1108 [trial court abused its discretion in failing to declare a mistrial based on guilt phase juror misconduct]) or excusing a juror who should have been retained (see, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 814 [trial court abused its discretion by discharging a juror based on inadequate reasons].) In making these decisions, a trial court might at times be placed between a rock and a hard place; indeed, in this case defendant contends that the trial court's investigation was both too intrusive and not probing enough.

Although we have long held that the decision to discharge a juror under section 1089 is committed to the trial court's discretion (*People v. Abbott* (1956) 47 Cal.2d 362, 371), assessing the breadth of that discretion, at least with regard to the decision to discharge a seated juror, is more complex than it otherwise might appear. Early on, we held that "the trial court has at most a *limited discretion* to determine that the facts show an inability to perform the functions of a juror . . . ." (*Compton, supra,* 6 Cal.3d at p. 60,

---

[33] "Penal Code section 1089 provides, in pertinent part: 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors.' " (*Cleveland*, *supra*, 25 Cal.4th at p. 474.)

italics added [citing *People v. Hamilton* (1963) 60 Cal.2d 105, 124-127].) Subsequently, however, we revised that holding: "The more modern rule provides that, under section 1089, a trial court 'has *broad discretion* to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve.' " (*Boyette, supra,* 29 Cal.4th at p. 462, fn. 19 [quoting *People v. Millwee* (1998) 18 Cal.4th 96, 142, fn. 19].) Nonetheless, as we made clear in *Barnwell*, *supra*, 41 Cal.4th 1038, regardless of how the scope of the trial court's discretion is described, an appellate court's review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the "demonstrable reality" test. In *Barnwell* we explained the difference as follows.

The typical abuse of discretion standard involves an analysis of whether the trial court's decision is supported by " 'substantial evidence,' " and "has been characterized as a 'deferential' standard." (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.) "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. [Citation.] Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*Ibid.*; see also *Osband*, *supra*, 13 Cal.4th at p. 666 [typically, "[a] court abuses its discretion when its ruling 'falls outside the bounds of reason' "].)

In contrast, "[t]he demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported

by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides." (*Barnwell*, *supra*, 41 Cal.4th at pp. 1052-1053.) "That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Id.* at p. 1052; see also *People v. Lomax* (2010) 49 Cal.4th 530, 589 (*Lomax*) [on appeal, " 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support" the decision to discharge a juror during deliberations].)

Defendant initially challenges the trial court's inquiry into Juror T.'s ability to serve on the jury as being improperly coercive, and too intrusive. The *manner* in which the trial court conducted its inquiry is subject to review for abuse of discretion under the typical standard. (*People v. Alexander* (2010) 49 Cal.4th 846, 927 (*Alexander*).) Even if we assume this claim is not forfeited by defendant's failure to raise it below, we conclude the trial court did not abuse its discretion in the manner in which it conducted its inquiry. Defendant first contends the court improperly questioned Juror T. outside the presence of the rest of the jurors, which, he asserts, risked (1) tainting the rest of the jury "by encouraging speculation about that isolated inquiry and suggesting that the court found [Juror T.'s] behavior problematic," and (2) intimidating Juror T. such that the development of a true understanding of his ability to serve as a juror would be impaired. It was, however, Juror T. who (as stated in the jury foreperson's note) initially requested to speak with the court. Moreover — and especially in light of our past admonitions that courts must take care not to intrude needlessly into the sanctity of a jury's deliberations — the trial court reasonably focused its inquiry on the juror whose ability to serve was in doubt. The notion that other jurors took some larger meaning from the court's questioning of Juror T. by himself that affected their deliberations is pure speculation on defendant's part. Furthermore, there is no indication that Juror T. was intimidated by the

court's inquiry; indeed, the court asked whether he was agreeable to being questioned in open court, and the record discloses no hesitation in his assenting to that suggestion.

Defendant also contends that once the trial court learned the jurors had discussed the jury instructions that morning and Juror T. reportedly had arrived at a better understanding of the law, the court should have ceased its inquiry. Defendant is incorrect, because although one inference from the information before the court was that Juror T. might not have understood the applicable law, another inference that reasonably could be drawn was that he was unable to follow the law. Juror T.'s own note brought out that possibility in stating that the other jurors believed he could not follow the law because of a personal bias, and Juror P.'s note echoed those concerns. The trial court did not abuse its discretion in asking Juror T. whether, in light of his newly enhanced understanding of the court's instructions, he could follow them. (See *Alexander*, *supra*, 49 Cal.4th at p. 927 [scope of trial court's inquiry of jury foreman properly extended beyond whether a problem juror was refusing to deliberate when indications were that the juror also might have been failing to follow the court's instructions].)

Defendant next contends the trial court improperly ended its inquiry when Juror T. professed his inability to follow the law due to a personal bias, and that the court, pursuant to the defense counsel's requests, instead should have further probed the reasons why Juror T. believed he should be excused. According to defendant, the asserted inadequacy of the trial court's inquiry means that the court's decision to discharge Juror T. is not supported to a demonstrable reality. Defendant, however, misperceives the nature of our review of the trial court's decision. We conclude the manner in which the court conducted the hearing was within the court's reasonable discretion. The court's decision that bias was established is subject to somewhat more searching review, but, as we made clear in *Barnwell*, *supra*, 41 Cal.4th at page 1053, we do not reweigh the evidence that was before the trial court, which is, in essence, what defendant asks us to do.

106

The heart of what Juror T. told the trial court is that he understood the court's instructions on the law but he could not follow them because of a personal bias, and he therefore agreed he should be excused from the jury. It is beyond dispute that a juror who cannot follow the court's instructions because of a personal bias should be discharged under section 1089. (*People v. Engelman* (2002) 28 Cal.4th 436, 442.) There also is no question that the trial court relied on Juror T.'s statement of his inability to follow the court's instructions due to his bias as the reason for discharging him. Accordingly, the court relied " 'on evidence that, in light of the entire record, supports its conclusion that bias was established.' " (*Lomax*, *supra*, 49 Cal.4th at p. 589.)

Defendant asserts, however, that Juror T.'s other statements during the colloquy with the trial court as well as in his note rendered ambiguous his confession of disabling bias, and therefore the court was obligated to ask clarifying questions. In essence, defendant claims the trial court should not have believed Juror T. when he said he understood the law and could not follow it, because, in defendant's view, Juror T. (and perhaps the remainder of the jurors) actually may have misunderstood the court's instructions. This argument, in effect, is a challenge to the weight of the evidence — that the trial court gave Juror T.'s admission of disabling personal bias undue weight in light of other information before the court. As we have consistently cautioned, however, even under the demonstrable reality standard the reviewing court does not reweigh the persuasive value of the evidence. (See *Lomax*, *supra*, 49 Cal.4th at p. 590 [even when there is conflicting evidence of juror bias, an appellate court must recognize that it is for the trial court to "weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings," and the reviewing court must "defer to factual determinations based on these assessments"].) The trial court credited Juror T.'s confessions that he could not follow the court's instructions because of a personal bias, and we will not, as defendant wishes, revisit that assessment of the weight

107

of the evidence before the trial court in our evaluation of whether the record supports to a demonstrable reality its decision to discharge the juror.

We reject the notion that a trial court, having received an admission of disabling bias from a juror, is always required to attempt, in essence, to rehabilitate that juror by further exploring what the juror really meant. We have recognized — in the context of the evaluation of prospective jurors during voir dire — that a trial court has the "discretion to decide that a juror's disqualification is so clear that further voir dire is pointless . . . ." (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1085; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 823; *People v. Mattson* (1990) 50 Cal.3d 826, 846.) In this case, even to the extent Juror T.'s statements *surrounding* his admission of disabling bias were not the model of clarity, the trial court did not abuse its discretion in concluding there was no need to question him further because his disqualification was clear, based on his having told the court he understood the law but could not follow it because of a personal bias.

Defendant's reliance on our decision in *Cleveland*, *supra*, 25 Cal.4th at pages 480-484, in asserting that the trial court was required to inquire further, is misplaced. Contrary to defendant's argument, that decision does not mandate that a trial court *must* conduct further inquiry if there is some ambiguity surrounding the issue of whether a juror should be discharged. Rather, in rejecting the position taken in several decisions of the federal courts of appeals, we concluded a trial court is *permitted* to conduct further inquiry regarding a juror's fitness to serve, despite the possibility that such questioning might touch on the jury's deliberations. (*Id.* at p. 484.) Again, we discern no abuse of discretion here in the trial court's decisions to take at face value Juror T.'s statements that he understood the court's instructions and could not follow them because of a personal bias, and therefore not to attempt any additional clarification of the juror's state of mind — or that of the rest of the jury.

The circumstances of this case are similar to those we recently addressed in *People v. Thompson* (2010) 49 Cal.4th 79 (*Thompson*), in which we also concluded the trial court did not abuse its discretion in discharging a juror during deliberations. In that case, the juror at issue told the trial court she was not emotionally capable of continuing to deliberate, and the court denied defense counsel's request to question the juror in order to determine "whether the reason [she] felt [she] could not continue to deliberate was because the other jurors were telling [her] [she] should vote for the death penalty even though [she] had a lingering doubt about defendant's guilt." (*Id.* at p. 136.) On appeal, we rejected the defendant's contentions that the trial court had abused its discretion in refusing to conduct further inquiry to determine if the other jurors had committed misconduct in pressuring the discharged juror, and in ultimately discharging the juror. We concluded the trial court had properly declined to inquire further "because to do so would have threatened to intrude on the deliberation process," and in light of that conclusion and the existing record, the trial court had good cause to dismiss the juror. (*Id.* at p. 137.)

In the present case, defendant asserts the other jurors might have misunderstood the court's instructions, and subsequently may have convinced Juror T. of their own erroneous view of the law, meaning that his professed inability to follow the court's instructions would have been based on an invalid premise.[34] Juror T.'s comments,

---

[34] Defendant posits that Juror T.'s comments hint that the jurors may have interpreted the trial court's instructions as providing that assessing the credibility of the witnesses was an all-or-nothing proposition, in which the jurors were required to accept or reject all of a witness's testimony, rather than, if they deemed appropriate, to accept some and reject other parts of the testimony. (Cf. *People v. Robinson* (1964) 61 Cal.2d 373, 389; *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68 [" 'the jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material' "].) One might, however, reasonably interpret those parts of Juror T.'s remarks as indicating that

*(footnote continued on next page)*

109

however, provide no indication that the rest of the jurors misunderstood the court's instructions. Indeed, Juror P.'s note indicated that, in her view, Juror T. had misinterpreted what she had said. What is clear from the juror notes and Juror T.'s statements in court was that the jurors had *some* disagreement concerning the assessment of the credibility of the various witnesses, which was the central issue of the trial. As was the case in *Thompson*, we cannot conclude either that the trial court abused its discretion in determining it had heard sufficient disqualifying information from Juror T., or that the court's refusal to delve further into the matter rendered the record inadequate to support to a demonstrable reality the decision to discharge him.

To the extent defendant claims the trial court erred in discharging Juror T. simply because there was a "reasonable possibility" that Juror T.'s difficulties were related to his view of the merits of the case, we repeatedly have rejected that standard. (*Thompson*, *supra*, 49 Cal.4th at pp. 137-138.) Defendant's reliance on recent decisions, such as *Williams v. Cavazos* (9th Cir. 2011) 646 F.3d 626, certiorari granted *sub nomine Cavazos v. Williams* (Jan. 13, 2012, No. 11-465) ___ U.S. ___ [2012 U.S. LEXIS 582], does not convince us to revisit that conclusion.

Because the trial court's finding of good cause to dismiss Juror T. is supported to a demonstrable reality, there was no violation of defendant's statutory or constitutional rights. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410.) Moreover, there is no merit to defendant's claim that the court's entirely proper discharging of Juror T., as well as the first alternate juror who replaced him, coerced the jury's verdict. We presume the reconstituted juries followed the trial court's instructions to begin the deliberations anew

---

*(footnote continued from previous page)*

he simply disagreed with other jurors' decisions to reject all of certain witnesses' testimony, which clearly was their prerogative.

(*Cain*, *supra*, 10 Cal.4th at p. 34)*,* and defendant's speculation to the contrary does not persuade us to conclude otherwise. Finally, it also follows that the trial court properly denied defendant's postverdict motion for a new trial premised on this issue. The trial court's decision to discharge Juror T. was proper when made; therefore, even if later presented evidence might have contradicted to some degree the evidence the court had before it when it ruled, this would not establish grounds for concluding defendant had been denied his rights or a fair trial by that ruling. (See *Rundle*, *supra*, 43 Cal.4th at p. 132 [reviewing court evaluates a trial court's decision based on the evidence before the trial court when it ruled].)

### 5. *Cumulative Prejudice of Asserted Guilt Phase Errors*

Defendant contends the cumulative prejudicial effect of the guilt phase errors he has raised on appeal deprived him of a fair trial, even if the errors were harmless when considered separately. To the extent we have concluded or assumed for the sake of argument that errors occurred during the guilt phase of the trial, those errors, even when considered cumulatively, did not deprive defendant of a fundamentally fair trial.

### E. Penalty Phase Challenges

#### 1. *Assertedly Erroneous Evidentiary Rulings*

##### a. *Admission of Victim Impact Evidence*

Defendant contends "the extensive presentation of victim impact evidence violated [his] constitutional rights to due process, a fair trial, and a reliable verdict as protected by the Eighth and Fourteenth Amendments to the United States Constitution, correlative rights of the state Constitution (Cal. Const., art. I, §§ 15 & 24), and Evidence Code section 352." Although the nature of defendant's claim is not entirely clear from his briefs, it appears he raises three challenges to the scope of victim impact evidence permissible under California law. Even assuming defendant may bring his claims on appeal despite his failure to raise them at trial, we conclude they are without merit.

Defendant contends victim impact evidence must be limited (1) to members of the victim's family who were present during the crime or who witnessed its immediate aftermath, (2) in the number of witnesses, their age (that is, minors should not testify except when there are no available adult witnesses), and the scope of the testimony (that is, it must be factual and not designed to evoke the emotions or sympathy of the jury), and (3) to evidence admitted at the guilt phase to prove guilt and other facts or circumstances of which defendant was aware when he committed the crime. We previously have rejected these and related contentions, and discern no reason to revisit those decisions. (*Carrington*, *supra*, 47 Cal.4th at pp. 196-197 [victim impact evidence need not be limited to a single witness, individuals who witnessed the crime, or matters within the defendant's knowledge when the crime was committed]; *Dykes*, *supra*, 46 Cal.4th at p. 787 ["emotion need not be eliminated from the penalty determination"]; *People v. Zamudio* (2008) 43 Cal.4th 327, 364 [emotional victim impact evidence is admissible unless " 'it invites a purely irrational response from the jury' "]; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1057 ["nothing precludes the children of murder victims . . . from describing their loss simply because they are not adults at the time of trial"]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195 [the jury may consider victim impact evidence in exercising sympathy for the victim and others affected by the crime].)

### b. *Admission of Defendant's Statements Regarding Two Shooting Incidents*

Defendant contends the admission into evidence, and the jury's consideration, of testimony of Deputy Kele Kaono concerning defendant's admissions to having committed two armed assaults on people he believed were members of rival gangs violated the corpus delicti rule. That rule " 'generally requires the prosecution to prove "the body of the crime itself" independent of a defendant's extrajudicial statements.' [Citation.]" (*Valencia*, *supra*, 43 Cal.4th at p. 296.) We agree that error occurred, but conclude the error was harmless.

112

Deputy Kaono testified in the penalty phase that he interviewed defendant concerning the incident in which someone shot at the car being driven by Manuel Ramirez (who had testified at the guilt phase regarding this incident), resulting in one of the passengers in the car being struck in the jaw by a bullet. Defendant told Deputy Kaono that he shot at the car because he thought it contained members of a rival gang.[35] Defendant also told Deputy Kaono that he had shot at two other cars that he thought contained rival gang members — one just minutes before he shot at Ramirez's car, and another a few weeks earlier. Defense counsel objected to the admission of the statements concerning the earlier two shootings on the ground that there was no "corpus to the other shootings." The trial court overruled the objection, stating its view that the absence of other independent evidence went to the weight of the deputy's testimony. The prosecution presented no other evidence concerning the earlier two incidents. During his penalty phase arguments to the jury, the prosecutor referred to defendant's having committed five shootings, which included the two shootings at issue. The trial court did not instruct the jury regarding the corpus delicti rule.

As defendant concedes, the *admission* of Deputy Kaono's testimony concerning defendant's confessions to the two earlier shootings was not error. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1179-1180 (*Alvarez*) [Cal. Cont., art. 1, § 28, former subd. (d) (now subd. (f)(2)), of the Cal. Const. (the "Right to Truth-in-Evidence" provision enacted by the voters in 1982 as Prop. 8), eliminated "a trial objection to the *admission in evidence* of the defendant's out-of-court statements on grounds that independent proof of

---

**35** Defendant was a minor at the time of this incident. According to defendant's testimony at the guilt phase, he was placed on probation after admitting to shooting the victim, but his probation was later revoked, and he was placed in a California Youth Authority facility. Defendant testified in the guilt phase that he did not shoot at Ramirez's car, but "took the rap" for an older member of his gang who actually was the shooter.

113

the corpus delicti is lacking"].) Nonetheless, although the corpus delicti rule no longer limits the admissibility of a defendant's extrajudicial confessions, Proposition 8 did not abrogate the requirements that the trial court instruct the jury on the rule, even on its own motion, and that the proof adduced at trial in support of a conviction must include sufficient independent corroboration of the defendant's confessions. (*Alvarez*, *supra*, 27 Cal.4th at p. 1180.) After briefing in the present case was completed, we concluded, contrary to the Attorney General's contention, that these surviving portions of the corpus delicti rule apply to unadjudicated offenses proffered as aggravating evidence at the penalty phase of a capital trial. (*Valencia*, *supra*, 43 Cal.4th at p. 296.)

Although the challenged evidence was admissible under *Alvarez*, *supra*, 27 Cal.4th 1161, it is undisputed that the trial court did not instruct the jury concerning the requirement that there be independent evidence corroborating defendant's admissions to Deputy Kaono concerning the earlier two shootings, and that the prosecution presented *no* independent evidence in support of those offenses. Accordingly, we conclude that there was error under state law.[36] This error, however, does not warrant reversal of the penalty verdict. Under the test applied to state law errors occurring at the penalty phase, "we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." (*Brown*, *supra*, 46 Cal.3d at p. 448.) In light of the circumstances of the shooting of Deputy Blair, defendant's guilt phase testimony placing the blame for what happened upon the victim, his penalty phase testimony expressing apparent unwillingness to accept responsibility for the crimes of which the jury had convicted him, and the other evidence of defendant's undeterred history of violence involving additional shootings,

---

[36] In *Alvarez*, we rejected the contention that the corpus delicti rule was based on federal constitutional principles. (*Alvarez*, *supra*, 27 Cal.4th at p. 1173.) Defendant presents no compelling reason to revisit that conclusion.

114

including his pleas to two, we cannot say there is a reasonable possibility the jury would have reached a different verdict if it had not considered Deputy Kaono's testimony regarding defendant's uncorroborated confessions to two other, ultimately nondescript, shootings.

### c. Admission of Testimony Concerning the 1992 Shooting

During its guilt phase case-in-chief, the prosecution presented conviction records and the testimony of defendant's parole agent to establish that defendant had been convicted of an assault with a firearm in 1992. In his testimony in the guilt phase, defendant stated he did not commit that shooting, but had pleaded guilty to the charge merely because he had been offered a significantly reduced sentence if he did so. Later, at the penalty phase, the prosecution presented the testimony of Deputy Matt Brady, who was one of the deputies who responded to the 1992 shooting incident. Deputy Brady testified, without defense objection on this point, that the female victim reported someone had shot at her, and the bullet had passed through the hair on her head, grazing her scalp. Deputy Brady saw expended shell casings at the scene, and observed that the victim's hair had a crease in it, which "looked like the bullet just passed right through her hair but touching her scalp." At a field showup, a person who had been with the victim at the time of the shooting identified defendant as the person who had shot at her. According to Deputy Brady, the female victim was too "traumatized and frightened" to participate in identifying the shooter.

On appeal, defendant contends the admission of Deputy Brady's testimony violated his federal constitutional right to confront the witnesses against him under the United States Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36. In *Crawford*, "the high court held that the confrontation clause of the Sixth Amendment to the federal Constitution prohibits 'admission of *testimonial* statements of . . . witness[es] who did not appear at trial unless [the witness] was unavailable to testify, and

115

the defendant had had a prior opportunity for cross-examination.' [Citation.]" (*People v. Romero* (2008) 44 Cal.4th 386, 421.)

Assuming without deciding that defendant did not forfeit or waive his confrontation claim, that the Sixth Amendment right to confrontation applies to evidence introduced at the penalty phase of a capital trial, and that the admission of some of Deputy Brady's testimony violated defendant's right to confrontation (but see *Michigan v. Bryant* (2011) 562 U.S. ___, ___ [131 S.Ct. 1143, 1155] [when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause"]), we nonetheless conclude that any violation was harmless beyond a reasonable doubt. Properly admitted evidence, including Deputy Brady's personal observations, was sufficient to establish that *someone* assaulted the victim by shooting at her, and there was no dispute that defendant pleaded guilty to having committed this assault and received a prison sentence as a result. Moreover, although defendant at trial denied having committed the assault, when the jury heard Deputy Brady's testimony, it already had determined that defendant had falsely testified concerning the shooting of Deputy Blair. Defendant also admitted to the jury that he lied in his testimony concerning where he went immediately after the shooting, and admitted that he previously had committed an assault with a firearm. In sum, in light of defendant's obvious lack of credibility and confirmed history of violence, the addition of improperly admitted testimonial evidence in Deputy Brady's testimony could not have affected the jury's determination of whether defendant, contrary to his trial testimony, did commit the 1992 assault. Accordingly, we conclude that, if there was error, the death sentence " 'actually rendered in *this* trial was surely unattributable to the error.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*) [quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279]; see also *Davis*, *supra*, 46 Cal.4th at p. 620 [any *Crawford* error in admission of police officers' hearsay

116

testimony concerning statements of the defendant's prior victims was harmless in light of defendant's confessions to those offenses].)

To the extent defendant adequately has raised a claim on appeal that the admission of Deputy Brady's hearsay testimony violated state law pursuant to section 1200 of the Evidence Code, he forfeited such a claim by not raising it during the trial.  (See *People v. Partida* (2005) 37 Cal.4th 428, 433-434 [" 'In accordance with [section 353 of the Evidence Code], we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' "].)  In any event, for the same reasons any federal constitutional error was harmless, so too was any possible state law error.  (See *People v. Wilson* (2008) 43 Cal.4th 1, 28 [the state standard for evaluating prejudicial effect of penalty phase error — whether " 'there is a reasonable *possibility* the error affected the verdict' " — is "effectively the same" as the federal "harmless beyond a reasonable doubt" standard].)

### d.  Exclusion of Evidence Concerning Civil Lawsuit

Defendant contends the trial court erred in preventing him from introducing at the penalty phase evidence concerning the federal civil rights lawsuits filed against the sheriff's department, which we discussed *ante*, in part II.D.1.a., and that this error denied defendant his right to a fair and reliable penalty determination.  We disagree.

During cross-examination of Deputy Westin, defense counsel asked several questions regarding whether he knew that allegations of the use of excessive force had been made against Deputy Blair.  In response to defense counsel's question whether he knew of a lawsuit raising such a claim, Deputy Westin answered that there had been a lawsuit that "sued the entire station of Lynwood, and if you worked there . . . you were named in the suit."  In response to the subsequent question whether Deputy Westin was aware of specific allegations raised in the lawsuit, he replied that he "never read it personally," but the lawsuit "seemed frivolous to me, and I never really followed it."

117

Deputy Westin also testified that he and Deputy Blair were members of a group of deputies known as the Vikings, and he (Deputy Westin) had a Viking tattoo on his leg. In response to the prosecutor's questions on redirect examination, Deputy Westin testified that the group was not "sinister or sadistic or evil," as had been alleged in the lawsuit, but was, instead, a multiracial group of deputies who merely adopted the Viking symbol as a mascot for their station.

On recross-examination, defense counsel asked Deputy Westin to "explain" his testimony concerning the civil rights lawsuit, but the trial court interposed its own objection to the question. The court stated that, pursuant to section 352 of the Evidence Code, it was excluding evidence concerning the lawsuit, and advised the jury that a lawsuit had been filed in 1990, but the court had ruled it was "too remote," and therefore, "We're not going to get into it." At a sidebar conference, defense counsel argued that the defense should be permitted to introduce evidence that the lawsuit apparently had settled for the sum of $7 million in order to rebut Deputy Westin's testimony that the lawsuit was frivolous. The trial court disagreed, observing that "lawsuits settle for different reasons and things that I don't want this jury to be focused on."

Later, defense witness Terri Clark testified she believed the jury should spare defendant's life because defendant "spoke the truth," and, like others in the neighborhood, he was afraid of the sheriff's deputies because they engaged in criminal activity. Clark then said, "If I am wrong then why did we win over . . . 7 million," at which point the trial court stopped her. The court stated her answer was "not appropriate in this proceeding," and the court was "very disappointed that you did not respond to the question." Following the prosecutor's request to strike the answer, the trial court advised the jury that Clark's answer was "not relevant here and it gets us off into areas that I have ruled are not appropriate for this jury to consider," and therefore the jury should disregard it. Defense counsel then asked Clark to answer the question "by just us[ing] your own personal experience."

118

On appeal, defendant asserts that the trial court erred by ruling he could not introduce evidence concerning the lawsuit and its alleged monetary settlement. He contends such evidence would have rebutted Deputy Westin's testimony that the lawsuit was frivolous, and that the Vikings were, essentially, an innocuous club merely reflecting the camaraderie of some of the deputies assigned to the Lynwood Station. Similarly, defendant also contends the trial court should not have instructed the jury to disregard Clark's testimony concerning the community's fear of the deputies.

As we stated in *People v. Fauber* (1992) 2 Cal.4th 792, 856: "While it is true, as defendant contends, a capital defendant must be allowed to present all relevant mitigating evidence to the jury [citations], the trial court determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." We conclude the trial court in the present case acted within its discretion in excluding the proffered evidence, and, accordingly, there was no violation of defendant's constitutional rights.

The resolution of this claim parallels the resolution of defendant's challenge to the exclusion of the lawsuit evidence from the guilt phase of the trial. Any relevance of the lawsuit or the community's fear of the deputies with regard to possible mitigation of the circumstances of Deputy Blair's murder (such as, for example, fostering some lingering doubt concerning defendant's guilt) depended on establishing the merits of the allegations raised by the plaintiffs in those cases and the reasonableness of the community's and defendant's supposed fear of the deputies. As the trial court observed, even the circumstance that the lawsuit — which, it must be remembered, was actually a collection of a number of lawsuits — apparently had been settled with a global monetary payment to the plaintiffs did not establish that the plaintiffs' allegations necessarily had merit and therefore would have supported defendant's defense. The trial court acted well within its discretion in ruling that, once again, the trials within a trial that would have

119

resulted from the introduction of evidence concerning the merits of the lawsuit or other supposed instances of misconduct by sheriff's deputies would have entailed an undue investment of time and might have unreasonably distracted the jury.

This is especially true concerning the assertion that the merits of the lawsuit or its settlement should have been admitted in order to impeach Deputy Westin's characterization of the lawsuit as frivolous. In the context of his testimony, Deputy Westin's own views of the lawsuit were relevant in assessing his opinion of Deputy Blair's character, regardless of whether the lawsuit actually was meritorious or frivolous. But even to the extent Deputy Westin's testimony could have been impeached to some degree by evidence that the lawsuit was not frivolous, the probative value of evidence of the *settlement* in impeaching Deputy Westin on this minor point would have been greatly outweighed by the risk of misleading the jury, given that, as the trial court observed, a lawsuit might settle for reasons not necessarily related to its merits. Moreover, the trial court properly could be concerned that exploring the reasons why the lawsuit settled risked undue consumption of time and the possibility of the jury being distracted from deciding the appropriate punishment for defendant's crime.

### e. Exclusion of Testimony Concerning the Impact of Execution on Defendant's Family Members

During the defense case in mitigation, defense counsel asked defendant's sister, "Now, if the jury comes back with a death verdict and Freddie is executed, how would that affect you?" The trial court sustained the prosecutor's objection to this question, stating that the question was not "appropriate[,] technically." The court went on to explain that it would permit testimony regarding "the love for her brother and good things in his life and why she would not want the death verdict in this case." After defense counsel subsequently asked her why she did not want a death verdict, defendant's sister explained that she did not believe defendant deserved the death penalty because

120

defendant acted to protect himself and his friend, and did not deserve to die for a crime he did not commit.

Defendant contends on appeal that the trial court erred by sustaining the objection to the question concerning how defendant's sister would be affected by defendant's execution. This contention is without merit. As we recently stated: "The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation. [Citations.] In [*People v. Ochoa* (1998) 19 Cal.4th 353, 454-456], we explained it is a defendant's background and character, and 'not the distress of his or her family,' that is relevant under section 190.3. [Citation.] We distinguished between 'evidence that [a defendant] is loved by family members or others, and that these individuals want him or her to live . . . [and evidence about] whether the defendant's family deserves to suffer the pain of having a family member executed.' [Citation.] The former constitutes permissible indirect evidence of a defendant's character while the latter improperly asks the jury to spare the defendant's life because it 'believes that the impact of the execution would be devastating to other members of the defendant's family.' " (*People v. Bennett* (2009) 45 Cal.4th 577, 601.) There was no error in the present case, because the trial court's ruling and clarification of the permissible scope of the testimony were proper.

### f. Restriction of Defendant's Testimony

Defendant contends the trial court improperly restricted his penalty phase testimony by preventing him from expressing remorse. (See *Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [the federal Constitution requires that " 'the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death' " (italics omitted)].) At the beginning of defendant's penalty phase testimony, defense counsel asked if defendant had "anything that you want

121

to say to Deputy Blair's family?" The prosecutor objected to the question as "inappropriate." The trial court sustained the objection, directing counsel to "confine yourself to the issue of . . . what the sentence [should] be." Defense counsel requested a sidebar conference, and subsequently explained that "if the prosecutor is going to be prevented from arguing remorse, then I will withdraw the question and have my client sit down." The prosecutor agreed that he was not planning to "argue remorse," presumably referring to an argument based on a lack of remorse on defendant's part. Defense counsel then stated that he needed to discuss with defendant whether he nonetheless wished to testify, and the trial court agreed, stating, "He has a right to testify. He has a right to plead for his life. At this point it would be inappropriate given the position that the [P]eople are taking that they are not going to argue the issue of remorse that he should make a public apology, for instance, to the Blair family. I don't think that that would be appropriate." Defense counsel stated, "That is fine," and proceeded to consult with defendant. After apparently confirming that defendant still wished to testify, defense counsel asked him "why should this jury spare your life." Defendant answered that the jury should do so for his family and friends, those who knew that he was not "the monster that they tried to make me out to be," and who knew that there "ain't no way in hell [he] could have killed Deputy Blair that night in cold blood like they portrayed in this courtroom."

Defendant's challenge to the trial court's ruling lacks merit. The trial court did not clearly state that it would not permit testimony on the subject of remorse in general. Rather, its comments show it believed that, in the context of the People's agreement not to argue absence of remorse, it would be particularly inappropriate "that he [defendant] should make a public apology, for instance, to the Blair family." In any event, defense counsel expressly agreed to the trial court's limitation on defendant's testimony, and we therefore conclude defendant's appellate claim of error was not preserved. (*People v. Hughes* (2002) 27 Cal.4th 287, 397 (*Hughes*) [claim of *Skipper* error was "waived"

122

because "defense counsel expressly acceded to the trial court's limitation on the evidence"].)

Even if defendant had preserved a challenge to the trial court's ruling, we would conclude any error in preventing him from making a public statement to the victim's family was not prejudicial. (See *People v. Brown*, *supra*, 31 Cal.4th at pp. 576-577, 578 [applying *Chapman v. California* (1967) 386 U.S. 18 harmless error standard to *Skipper* error]; *Hughes*, *supra*, 27 Cal.4th at pp. 397-398.) Lingering doubt was a cornerstone of the defense's penalty phase strategy, and counsel argued it at length during closing argument. In light of the inconsistency between the lingering doubt defense and a genuine expression of remorse for his crime, it is doubtful that a statement by defendant to Deputy Blair's family would have been viewed as an effective apology. That an apology or even some other expression of remorse by defendant was not critical to his penalty phase defense is further supported by the fact that defense counsel offered to withdraw the question and his client's testimony as soon as he learned that the prosecutor would not be arguing lack of remorse. Finally, the likelihood that a statement to the victim's family would have carried any mitigating value is severely undercut by the testimony defendant did give, in which he rejected the jury's verdict that he murdered Deputy Blair. Accordingly, any error was harmless beyond a reasonable doubt.

### 2. *Assertedly Improper Limitation on Defense Consultation Concerning Defendant's Testimony*

Defendant contends the trial court violated his rights under the state and federal Constitutions by imposing an overly restrictive time limit on defense counsel's opportunity to consult with defendant before he testified at the penalty phase. We are not persuaded.

Before defendant testified, defense counsel advised the trial court at a sidebar conference that counsel had not had "a chance to talk to [defendant] about testifying — I mean, I talked to him before but not today. And he is telling me now that he wanted to

123

testify so I need a chance to talk to him." The court responded that it would "give you five minutes," and stated that the court wanted to "try to finish . . . this case today." The court then recessed. After the recess, the court asked, "Are we ready for the jury?" Apparently receiving no response to the contrary, the court directed that the jury be brought out, and defense counsel began his examination of defendant.

On appeal, defendant contends that five minutes was an inadequate amount of time for discussing defendant's testimony, and that the trial court's haste to complete the trial denied him his right to counsel and to prepare a defense. Defendant forfeited such claims by failing to assert at trial that the period of time provided was inadequate. In any event, defendant has not established on this record that any inadequacy in the time provided actually affected the defense. Indeed, there is nothing in the record establishing that the recess provided by the trial court actually was limited to five minutes. Defendant asserts that his testimony was negatively affected by an inadequate opportunity to consult with counsel, but this unsupported allegation — especially viewed in light of the absence of any request for additional time — does not establish that his constitutional rights were violated.

### 3. Asserted Prosecutorial Misconduct

Defendant contends the prosecutor committed prejudicial misconduct during the penalty phase of the trial. Based upon our reading of defendant's appellate briefs, we conclude he forfeited the large majority his claims of misconduct by failing either to object or to request appropriate admonitions at trial (*People v. Price* (1991) 1 Cal.4th 324, 447 [in order to "preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition"]), and by failing to adequately raise them on appeal (*Catlin*, *supra*, 26 Cal.4th at p. 133 [declining to address an appellate claim when the defendant "fail[ed] to offer any authority or argument in support of this claim"]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182

[rejecting an appellate claim as not properly raised when the defendant "fail[ed] . . . to support that claim with adequate argument"]). To the extent defendant relies simply on the number of asserted instances of misconduct he has raised on appeal to demonstrate that any objections would have been futile and that therefore his failure to preserve his claims during the trial should be excused, such reliance is misplaced. The prevalence of asserted misconduct raised for the *first time on appeal* cannot establish that, had defense counsel made proper objections at trial, the trial court would have consistently overruled those objections, the prosecutor would have persisted in engaging in the asserted misconduct, or the jury would have been alienated by defendant's bringing the prosecutor's asserted improprieties to the court's attention. (Cf. *Friend*, *supra*, 47 Cal.4th at pp. 29-30 [concluding that exceptions to forfeiture rule were inapplicable when defense counsel frequently objected to asserted misconduct and the trial court sustained several objections]; *Hill*, *supra*, 17 Cal.4th at p. 821 [exception to forfeiture rule applied when the record established the "unusual circumstances" of "continual misconduct, coupled with the trial court's failure to rein in [the prosecutor's] excesses, [which] created a trial atmosphere so poisonous that [counsel] was thrust upon the horns of a dilemma" concerning whether to object, thereby "provoking the trial court's wrath," or declining to object, thereby forcing the defendant to suffer the prejudice of the prosecutor's "constant misconduct"].) Similarly unpersuasive is defendant's blanket assertion that admonitions would not have been effective in curing any possible prejudice. (*Gamache*, *supra*, 48 Cal.4th at p. 371 [an invocation of an exception to the requirements of an objection and request for an admonition must be based upon the record — " '[t]he ritual incantation that an exception applies is not enough.' "].) Defendant's suggestion that we are required to review his forfeited claims of prosecutorial misconduct for "plain error" also is without merit. (*Redd, supra,* 48 Cal.4th at p. 731, fn. 19.)

125

To the extent, however, defendant at least partially preserved two particular claims of misconduct regarding the prosecutor's closing argument to the jury, we conclude neither instance constituted prejudicial misconduct. First, defendant observes that, in arguing that the jurors should not let their "religious convictions save [defendant's] life," the prosecutor reminded the jury of the adage in the King James version of Genesis 9:6: "Whoso sheddeth man's blood by man shall his blood be shed for in the image of God made He man." We agree that the prosecutor's use of this adage, even taken in context, exceeded an acceptable comment that religious doctrine would not prohibit the jury from imposing the death penalty if that verdict was appropriate under the law, and instead encouraged it to rely on the Bible as justification for imposing that punishment. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1168-1170.) In addition, the prosecutor's comment was made in 1996, after *People v. Wrest* (1992) 3 Cal.4th 1088, 1105, and *People v. Wash* (1993) 6 Cal.4th 215, 261, in which we explicitly condemned biblical references that lessen the jury's sense of responsibility or imply that the jury should follow some law other than that set forth in the trial court's instructions. (See *People v. Vieira* (2005) 35 Cal.4th 264, 298, fn. 11 [reserving question whether a prosecutor's biblical reference that "postdates and deliberately contravenes the holdings in those decisions [might] constitute[] a more serious form of prosecutorial misconduct warranting reversal of the penalty phase judgment"].) Nonetheless, defendant objected to the prosecutor's comment and the trial court sustained the objection and advised the jury, "I'm going to strike that last argument, ladies and gentlemen. We are not going to be referring to the Bible." The misconduct therefore was not prejudicial. To the extent defendant contends on appeal that the trial court's admonition was insufficient, he forfeited such a claim by failing to request a different admonition.

Second, defendant asserts the prosecutor committed an improper act of "vouching" when he drew the jury's attention to the absence of testimony from defendant's wife, Tina Fuiava. Although the trial court overruled defendant's

126

nonspecific "improper argument" objection to the prosecutor's initial comments on the failure of the defense to call Tina as a witness, it sustained defendant's objection to the subsequent suggestion that the failure to call her might have been because "they are afraid that they couldn't argue lingering doubt when I asked her what he told her." (Cf. *People v. Cook* (2006) 39 Cal.4th 566, 593 [a prosecutor is not permitted to suggest that evidence of which he or she is aware but which has been not submitted to the jury corroborates the prosecution's case].) As with the prosecutor's biblical reference, we deem the trial court's action sufficient to have prevented prejudice, and to the extent defendant contends the court's admonition was insufficient, he forfeited that claim.

As with our discussion of defendant's claims of guilt phase prosecutorial misconduct (see *ante*, part II.D.2.m.), we take this opportunity to comment on an aspect of the prosecutor's penalty phase closing argument that, although forfeited as a basis for reversal on appeal, warrants condemnation. In two instances the prosecutor improperly suggested to the jury that it speculate regarding aspects of defendant's violent criminal history that were not presented at the trial — by describing defendant as a "killing machine" (although there was no evidence that defendant had killed anyone other than Deputy Blair), and then, with regard to defendant's victims, asking that the jury speculate "How many others are there?" (See *People v. Yeoman* (2003) 31 Cal.4th 93, 149 ["[c]ertainly a prosecutor should not invite the jury to speculate"]; *People v. Bolton* (1979) 23 Cal.3d 208, 212 [the prosecutor engaged in misconduct by "invit[ing] the jury to speculate about — and possibly base a verdict upon — 'evidence' never presented at trial"].)

### 4. *Denial of Request to Give the Jury a Lingering Doubt Instruction*

Defendant contends the trial court violated his statutory and state and federal constitutional rights by refusing to instruct the jury concerning its consideration in its

127

deliberations of any "lingering doubt" regarding his guilt.[37]  We previously have rejected

similar contentions, and discern no reason to reconsider those decisions.  (*People v. Page*

(2008) 44 Cal.4th 1, 55 [" 'there is no *requirement*, under either state or federal law, that

the court specifically instruct the jury to consider any residual doubt of defendant's

guilt' "].)

### F.  Assertedly Improper Denial of Motion for New Trial Based Upon Insufficiency of the Evidence

Defendant contends the trial court erred by denying his motion for a new trial

because, he asserts, the evidence demonstrates he is "innocent," in the sense that the

evidence did not (1) negate a reasonable doubt that he acted in self-defense, (2) prove he

acted with premeditation when he shot Deputy Blair, or (3) establish that he shot Deputy

Blair to prevent a lawful arrest, or (4) establish that Deputy Blair was engaged in the

lawful performance of his duties when defendant shot him.  The trial court denied the

motion, finding that the evidence of defendant's guilt was "overwhelming."  We

conclude defendant's claim of error is without merit.

"In reviewing a motion for a new trial, the trial court must weigh the evidence

independently.  [Citation.]  It is, however, guided by a presumption in favor of the

---

[37]    Defendant requested two special instructions on this subject.  The first stated:
"Each individual juror may consider as a mitigating factor residual or lingering doubt as
to whether the defendant had premeditation when he killed the victim.  Lingering or
residual doubt is defined as the state of mind between beyond a re[a]sonable doubt and
beyond all possible doubts.  [¶]  Thus if any individual juror has a lingering or residual
doubt about whether the defendant had premeditation when he killed the victim, he or she
must consider this as a mitigating factor and assign to it the weight you deem
appropriate."  The second stated:  "Although proof of guilt beyond a reasonable doubt
has been found, you may demand a greater degree of certainty for the imposition of the
death penalty.  The adjudication of guilt is not infallible and any lingering doubts you
entertain on the question of guilt may be considered by you in determining the
appropriate penalty, including the possibility that at some time in the future, facts may
come to light which have not yet been discovered."

128

correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.] [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)

The trial court clearly did not abuse its discretion in denying the motion in the present case. It was not beyond the bounds of reason for the trial court to find credible the testimony of Deputy Lyons, establishing that the shooting started before Deputy Blair was completely outside of the patrol car and before he had drawn his gun, and that of Renele Brooks and Sara Frausto, establishing that defendant opened fire upon the deputies because he feared being apprehended and returned to prison for illegally possessing two handguns. The trial court also reasonably could accept the prosecution's interpretation of defendant's jailhouse conversation with his mother and sister, in which he never mentioned that the deputy shot first and that he returned fire only to protect his friend and himself, and in which he stated that he knew that if the deputies caught him with the two handguns he was carrying it would be "all over" for him. The trial could reasonably find that the defense version of events was inherently unlikely, and the defense witnesses simply were not credible. The testimony of other witnesses to the shooting may have been contradictory, but this does not establish that the evidence pointing to defendant's guilt was insufficient. Accordingly, the trial court did not abuse its discretion by finding the evidence (1) negated defendant's claim of self-defense, and (2) established that he deliberated and premeditated the murder in the moments between

129

when he saw the police car stopping in front of Avila and when he opened fire on the deputies.

The trial court also did not abuse its discretion in finding the evidence was sufficient to establish that defendant committed the murder for the purpose of avoiding or preventing a lawful arrest. There is no requirement that defendant already must have been arrested, or even that the deputies actually had formed an intent to arrest defendant or Avila for this special circumstance to apply. (See *Cummings*, *supra*, 4 Cal.4th at p. 1299.) The evidence presented at trial was sufficient to establish that defendant feared that an arrest was "imminent" (see *People v. Bigelow* (1984) 37 Cal.3d 731, 752), and he opened fire on the deputies for the purpose of preventing them from arresting him. (See *Cummings*, *supra*, at p. 1299 [special circumstance finding that the murder was for the purpose of preventing lawful arrest was supported by sufficient evidence, including that the defendant "had stated more than once that he was not going back to jail and would shoot any police officer who stopped him"].) Moreover, the evidence established that an "imminent arrest was possible under the circumstances." (*People v. Coleman* (1989) 48 Cal.3d 112, 146; see also *Cummings*, *supra*, at p. 1300 [the circumstances of the case made an arrest "highly likely"]; *People v. Vorise* (1999) 72 Cal.App.4th 312, 322 [observing that in the circumstances of that case, "there was a direct connection between the perceived threat of imminent arrest and the murder"].)

The trial court also reasonably could have found that defendant shot at the deputies *as they were exiting* the patrol vehicle and therefore defendant killed Deputy Blair while he was engaged in his lawful duties. Whether the encounter actually would have progressed to a detention or arrest, and whether there would have been lawful grounds for the deputies to take such actions, is of no moment because the trial court reasonably could find that at the time defendant murdered Deputy Blair, the deputies were simply and properly beginning to investigate suspicious activity.

Finally, to the extent defendant contends the trial court was required to apply a "heightened" standard of review to the sufficiency of the evidence because of the death sentence in this case, that contention is without merit. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161 (*Letner*); *People v. Lewis* (2009) 46 Cal.4th 1255, 1290, fn. 23.)

### G. Assertedly Improper Role of Race in the Proceedings

Defendant contends "[t]he record supports the inference that race played an improper role in [his] case from the initial charging decision to the penalty sentencing," and therefore, he asserts, his federal constitutional rights to equal protection, due process, and a fair trial were violated. Defendant forfeited this claim by failing to raise it in the trial court.[38] In any event, there is no evidence in the record supporting a conclusion that any aspect of this case improperly was affected by racial factors. Defendant's unfocused speculation regarding possible inappropriate racial considerations in the manner in which the prosecution and trial were conducted does not establish a constitutional violation. (*People v. Lewis* (2001) 25 Cal.4th 610, 677; *People v. Box* (2000) 23 Ca1.4th 1153, 1218.)

### H. Asserted Denial of an Impartial Judge

Defendant contends he was denied a fair trial because the trial judge was biased against him, as demonstrated by various rulings during the trial proceedings, which, defendant asserts, improperly favored the prosecution and hindered the defense. This claim is forfeited because it was not raised below, and is without merit because "a trial court's numerous rulings against a party — even when erroneous — do not establish a

---

**38** As noted, *ante*, in part II.C.1., defendant also did not request that the trial court question the prospective jurors regarding possible racial bias.

charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112.)

## I. Challenges to the Constitutionality of California's Death Penalty Statutes

Defendant asserts that various aspects of California death penalty law violate his constitutional rights. We previously have rejected his contentions, and discern no persuasive reason to reconsider those decisions.

" '[W]e reiterate that the death penalty statutes adequately narrow the class of murderers eligible for the death penalty, are not impermissibly vague or overbroad, and do not result in an "arbitrary and capricious" or "wanton and freakish" penalty determination. [We] also have held that the statutes do not require that the prosecution carry the burden of proof or persuasion at the penalty phase, that the jury make written findings or reach unanimous decisions regarding aggravating factors, or that the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved, (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence. *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 do not render the statutes invalid; neither does *Cunningham v. California* (2007) 549 U.S. 270. [Citation.] There is no violation of the equal protection of the laws as a result of the statutes' asserted failure to provide for capital defendants some procedural guarantees afforded to noncapital defendants.'

"The statutes are not invalid because they permit the jury to consider in aggravation, under section 190.3, factor (b), evidence of a defendant's unadjudicated offenses. [Citation.]

" 'The use in the statutes, and in the standard jury instructions, of terms such as "extreme," "substantial," "reasonably believed," and "at the time of the offense" in setting forth the mitigating factors does not impermissibly limit the mitigation evidence or otherwise result in an arbitrary or capricious penalty determination. The statutes, as

translated into those standard jury instructions, adequately and properly describe the process by which the jury is to reach its penalty determination. There is no need to instruct the jury at the penalty phase (1) regarding a burden of proof, except as to section 190.3, factors (b) and (c), or the absence of a burden of proof, (2) regarding the meaning of the term "mitigation," (3) that mitigating factors can be considered only in mitigation, (4) that if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole, or (5) that the jury is not required to impose the death penalty even if it finds the aggravating evidence outweighs the mitigating evidence. The trial court need not omit from the instructions any mitigating factors that appear not to apply to the defendant's case.' [Citation.]" (*Letner*, *supra*, 50 Cal.4th at pp. 208-209.) The instructions also do not impermissibly permit the jury to consider nonstatutory aggravating factors. (*People v. Weaver* (2001) 26 Cal.4th 876, 993 (*Weaver*).)

In the absence of a request from the defendant, the trial court is not obliged to instruct the jury not to "double count" the same facts as circumstances of the crime and as special circumstances pursuant to section 190.3, factor (a). (*People v. Welch* (1999) 20 Cal.4th 701, 769.) Nor is the trial court required to instruct the jury concerning (1) which factors are aggravating and which are mitigating (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180), (2) the absence of a requirement that the jurors unanimously agree upon the existence of a particular mitigating factor (*Weaver*, *supra*, 26 Cal.4th at p. 988), (3) the meaning of a sentence of life imprisonment without the possibility of parole (*Rundle*, *supra*, 43 Cal.4th at p. 187), or (4) the existence of a presumption in favor of a sentence of life imprisonment without the possibility of parole (*id.* at p. 199).

"The existence of prosecutorial discretion in deciding in which cases the death penalty should be sought does not render that punishment unconstitutional." (*Rundle*, *supra*, 43 Cal.4th at p. 199.) " 'There is no requirement that the trial court or this court engage in intercase proportionality review when examining a death verdict. A sentence

of death that comports with state and federal statutory and constitutional law does not violate international law or norms, or the Eighth Amendment to the United States Constitution.' " (*Letner*, *supra*, 50 Cal.4th at p. 209.)  Also without merit is defendant's assertion that supposed inadequacies in the postconviction review of death judgments in the state and federal courts render his sentence unconstitutional.  (*Redd*, *supra*, 48 Cal.4th at p. 758.)

## J.  Cumulative Prejudicial Effect of Asserted Errors

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors requires reversal of his conviction and sentence, even if none of the errors is prejudicial individually.  Any errors we have found or assumed were harmless.  Any possible cumulative prejudicial effect of those errors does not establish that defendant was denied a fair trial.

## III.  DISPOSITION

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

134

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Fuiava

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____


**Opinion No.** S055652
**Date Filed:** February 6, 2012

_____


**Court:** Superior
**County:** Los Angeles
**Judge:** Robert J. Perry


_____


**Counsel:**

Michael Satris and Diana Samuelson, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Locker, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael Satris
Post Office Box 337
Bolinas, CA  94924
(415) 868-9209

Thomas C. Hsieh
Deputy Attorney General
300 South Spring Street
Los Angeles, CA  90013
(213) 576-1335